**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

ONYX WHITE v. COMMONWEALTH OF MASSACHUSETTS, et al.

Civil Action No. 1:26-cv-10046-DJC

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT CHRISTOPHER TOBIN'S MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. 62) AND MOTION TO DISMISS (DOC. 63)**

Plaintiffs Onyx White and Sincere Northcross, proceeding pro se, respectfully submit this opposition to Defendant Christopher Tobin's Motion for Judgment on the Pleadings (Doc. 62) and Motion to Dismiss (Doc. 63), and the Memorandum of Law filed in support of them (Doc. 64). For the reasons below, both motions should be denied. In the alternative, Plaintiffs request leave to amend the Complaint under Federal Rule of Civil Procedure 15(a)(2), and that any dismissal be without prejudice and without costs.

---

## PRELIMINARY STATEMENT — "I WAS ONLY BACKUP" IS NOT A DEFENSE TO PARTICIPATING IN AN UNLAWFUL ARREST

Defendant Tobin's memorandum asks the Court to believe that he was a mere passerby — a backup trooper who stopped by, placed a hand near Plaintiff White's shoulder for two or three seconds, and had nothing more to do with anything. That is not what the Verified Complaint alleges, and it is not what the record shows. The Complaint pleads that Trooper Tobin arrived gripping his firearm in a threatening posture; that he and Trooper Yasmin Sobrinho Silva forcibly opened Plaintiff White's door, removed him from the vehicle, handcuffed, and arrested

him without lawful justification; and that he questioned Plaintiff Northcross while holding him on scene, threatened him, and made him feel unsafe and not free to leave — leaving him stranded for hours and forced to remain in the state police barracks until bail arrangements could be made. Compl. § IV.C. That is participation in a seizure, not a cameo. And the Complaint pleads that the false criminal charges were "initiated by Ysmin Sobrinho and Christopher tobin on April 9 2025." Compl. § III. Trooper Tobin was every bit as much a part of this as Trooper Sobrinho Silva — not a bystander who happened to be there.

Five points decide these motions.

**First, the Complaint — not Trooper Sobrinho Silva's police report — supplies the facts.** Trooper Tobin's probable-cause argument credits Exhibit C, the police report, over the Complaint. Doc. 64, pp. 8–10 (citing Doc. No. 1-1, p. 19). But Exhibit C is the very document the Complaint alleges is false. Compl. §§ IV.F, IV.I. The Dudley District Court dismissed the criminal charges on October 22, 2025, finding materially false information submitted by Trooper Sobrinho Silva, and multiple judges found her testimony not credible after reviewing body-worn camera footage. *Id.* At this stage the Court takes Plaintiffs' well-pleaded facts as true and draws every reasonable inference in their favor. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). A defendant may not defeat a complaint by asking the Court to believe his co-defendant's account of the facts over the plaintiffs' pleaded allegations — and a two-to-three-second video excerpt cannot do that work for him. See Section XV, *infra*.

**Second, the fellow-officer rule transmits probable cause; it does not create it — and Trooper Tobin was told, before the arrest, that this was a man being an "asshole" whom Trooper Sobrinho Silva "kinda wanna" take on a reckless-operation charge.** When Trooper Tobin arrived on the scene, Trooper Sobrinho Silva told him: "I'm gonna get him out — he's

being an asshole — but I kinda wanna take him on a reckless op." (BWC, Doc. 61, Ex. 1 — Trooper Tobin's arrival on scene. The substance is confirmed under oath: she admitted she referred to Plaintiff White as "an asshole" to Trooper Tobin, Ex. N, Transcript Pg 34, ll. 3–4, and that she told Trooper Tobin she "wanted to get him out and charge him with reckless [operation]," Ex. N, Transcript Pg 34, ll. 17–19.) Being an asshole is not a crime. "Kinda wanna" take someone on a reckless-operation charge is not probable cause — either a crime was committed or it was not. Trooper Tobin heard those words. He had a duty to communicate with his partner — what was the actual crime? There was no live threat; they were pulled over on the side of the road. Instead he backed her up, gripped his gun, put his hands on Plaintiff White as part of the arrest, and helped take him into custody. Her own words should have raised grave concern with him about any crime. And the briefing he received was itself inflated: she told him Plaintiff White was going "like, 95 miles an hour, cutting people off, weaving in and out of traffic," Ex. N, Transcript Pg 34, ll. 5–8 — and then admitted under oath that "cutting people off" and "weaving" appear nowhere in her police report. Ex. N, Transcript Pg 35, ll. 18–21; Ex. N, Transcript Pg 36, ll. 1–4. Whether a backup officer's reliance on a fellow officer's account remained reasonable when the account he was given on the scene was itself a stated desire to charge a man for being an "asshole" is a question of fact. It is not decided on a motion to dismiss.

**Third, Trooper Tobin's name was on the reports used against Plaintiff White — and he has a duty to examine what his name is put on.** The Complaint pleads that the false criminal charges were initiated by Trooper Sobrinho Silva **and** Trooper Tobin. Compl. § III. A trooper whose name is put on a report as a witness and as a document has a duty to examine the evidence and what his name is put on. Trooper Tobin chose not to. He stayed quiet about the lies, and he

physically supported the arrest — knowing it was because Trooper Sobrinho Silva felt Plaintiff White was acting like an asshole and she kinda wanted to do it. The information he had before and after should have triggered him to know this was suspicious and a lie. That is not the conduct of a man who merely stopped by. It is the conduct of a participant who lent his name, his gun, and his hands to an arrest he had reason to doubt.

**Fourth, the memorandum's claim that there is "no evidence" Trooper Tobin was aware of Plaintiff White's social-media postings is contradicted by the record.** The memorandum states: "Plaintiff has failed to allege any connection with Tpr. Tobin on this point or that Tpr. Tobin was aware of any social media posting by the plaintiff." Doc. 64, p. 15. But Trooper Tobin viewed Plaintiff White's TikTok profile — the account where Plaintiff White posts about this incident. The screenshots attached as Exhibit Q show "Chris Tobin viewed your profile. 15h ago," and the profile clicked through from that entry is Christopher Tobin's TikTok account, @christobin10. The screenshots were taken in 2025, and the view occurred about 15 hours before they were taken; the exact date within 2025 is not known. Plaintiffs do not claim the view occurred on November 22, 2026, or on the day these motions were filed. A defendant who tells the Court he had no connection to the postings, while the record shows he viewed the very profile on which they appear, has not shown the absence of a connection — he has shown the opposite. The Complaint itself pleads "Online stalking by defendant(s) through these defendant(s) conduct." Compl. § IV.G (second). Plaintiffs ask the Court to note the pattern: the defendants keep watching Plaintiff White online while telling the judge that Trooper Tobin had no connection to the postings.

**Fifth, the threshold defects are curable, not fatal.** The Rule 11 ground — Plaintiff Northcross's signature — is answered by the cure filed with this opposition: his own signature

on this opposition, with his own Rule 11(a) contact block, and a signed First Amended Complaint under Rule 15(a)(1)(B). Rule 11(a) names striking the paper as the remedy, "unless the omission is promptly corrected after being called to the attorney's or party's attention" — and the Supreme Court and the First Circuit treat a missing signature as a curable, non-jurisdictional defect. *Becker v. Montgomery*, 532 U.S. 757, 763–64 (2001); *Casanova v. Dubois*, 289 F.3d 142, 145–46 (1st Cir. 2002). And Doc. 62, the judgment-on-the-pleadings motion, is premature: no defendant has answered, so the pleadings are not closed, and the motion must be treated as a Rule 12(b)(6) motion — which gets it no procedural advantage and changes nothing about the outcome. See Section III.A, *infra*.

Plaintiffs are pro se. Plaintiff White is a Department of Mental Health client with severe mental-health and cognitive disorders. Compl. § IV.D. Their Complaint is verified under 28 U.S.C. § 1746 and is to be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Complaint pleads specific facts, count by count, against Trooper Tobin by name — he is the officer who arrived gripping his firearm, who helped forcibly remove, handcuff, and arrest Plaintiff White, who questioned and detained Plaintiff Northcross, and whose name is on the false charges. Both motions should be denied.

---

## I. THE FACTS TAKEN AS TRUE, AND THE EXHIBITS THAT CARRY THEM

The facts below are the Complaint's allegations, taken as true for purposes of these motions. Section cites are to the Verified Complaint (Doc. 1). Where the memorandum disputes a pleaded fact, the dispute is noted — and the record that contradicts the memorandum is identified.

**The stop.** On April 9, 2025, at approximately 5:00 p.m., Plaintiff White was lawfully driving in Massachusetts with his brother, Plaintiff Northcross, a passenger. Plaintiff White, a Black

Islamic man, was wearing a traditional Islamic head wrap; Plaintiff Northcross, also Black, wore shoulder-length dreadlocks. Compl. § IV.B. Trooper Sobrinho Silva followed Plaintiff White's vehicle for several miles, tailgating closely before activating emergency lights. Fearing for his safety on a high-speed highway, Plaintiff White pulled into the breakdown lane. Trooper Sobrinho Silva later falsely claimed Plaintiff White stopped in a travel lane — "an assertion contradicted by body-worn camera footage." *Id.* Trooper Sobrinho Silva approached in a hostile and aggressive manner and questioned Plaintiffs about their destination and purpose of travel without any lawful basis. *Id.*

**The arrest — Trooper Tobin's role.** Trooper Sobrinho Silva appeared to review Plaintiff White's CORI record and called for a tow and backup without probable cause. Trooper Tobin arrived and stood gripping his firearm in a threatening posture. Trooper Sobrinho Silva and Trooper Tobin forcibly opened Plaintiff White's door, removed him from the vehicle, handcuffed, and arrested him without lawful justification. No weapons or contraband were found. Compl. § IV.C. Plaintiff Northcross was questioned while being held on scene, threatened, and made to feel unsafe and not free to leave. He was stranded in an unfamiliar location for hours, left without transportation or shelter, and forced to remain in the state police barracks until bail arrangements could be made for his brother. These actions caused Plaintiff Northcross severe emotional distress, fear, anxiety, physical symptoms of stress, and lasting trauma. *Id.*

**What Trooper Tobin was told before the arrest.** Before re-approaching Plaintiff White and placing him under arrest, Trooper Sobrinho Silva spoke with Trooper Tobin. Ex. N, Transcript Pg 33, ll. 21–24. She told him Plaintiff White was going "like, 95 miles an hour, cutting people off, weaving in and out of traffic," Ex. N, Transcript Pg 34, ll. 5–8; that he was driving a rental

car and going to New York to "'handle business,'" Ex. N, Transcript Pg 34, ll. 9–13; she called Plaintiff White "an asshole," Ex. N, Transcript Pg 34, ll. 3–4; and she told Trooper Tobin she "wanted to get him out and charge him with reckless [operation]." Ex. N, Transcript Pg 34, ll. 17–19. She admitted under oath that the "cutting people off" and "weaving" language appears nowhere in her police report. Ex. N, Transcript Pg 35, ll. 18–21; Ex. N, Transcript Pg 36, ll. 1–4. After Trooper Tobin arrived, she re-approached Plaintiff White and placed him under arrest. Ex. N, Transcript Pg 36, ll. 22–25; Ex. N, Transcript Pg 37, l. 1. Trooper Tobin did not testify in that proceeding; everything about what he was told comes from Trooper Sobrinho Silva's own sworn testimony.

**The search of the SUV.** Plaintiff White's account, supported by body-worn camera footage and to be pleaded expressly by amendment: Trooper Tobin searched the vehicle over and over again — not merely stopping by. He thoroughly searched the vehicle, way more than an inventory search — the SUV's insides and personal belongings inside it. He is seen on body camera — his own body camera — looking within the trunk, and he kept Plaintiff Northcross on the scene while questioning him. The Complaint as filed does not plead the search of the SUV in so many words; Plaintiffs offer it here as body-worn-camera-supported context for the pleaded seizure and as a Rule 15 amendment point, not as if it were already pleaded. See Sections IV and XVI, *infra*. Doc. 61, Exhibit 1, is Trooper Sobrinho Silva's body-worn camera video, already filed electronically and in the record. Plaintiffs rely on the body-worn camera footage already in the record.

**Disability.** Plaintiffs are individuals with mental health disabilities protected under the ADA, and Plaintiff White receives treatment through the Massachusetts Department of Mental Health. Defendants failed to accommodate these disabilities and escalated the encounter despite visible

distress, causing panic attacks and acute psychological harm. Compl. § IV.D. Mental-health documentation from a licensed social worker is Complaint Exhibit I.

**Religion and retaliation.** During transport, Trooper Sobrinho Silva interrogated Plaintiff White about his religion, including questions about whether he was Christian or Catholic and if he goes to church. These inquiries were unrelated to any alleged offense and demonstrate religious discrimination in violation of the First Amendment. Compl. § IV.E. After Plaintiff White spoke publicly about the incident, Trooper Sobrinho Silva retaliated by submitting false information to the RMV, resulting in an indefinite driver's license suspension. *Id.* The body-worn camera footage of the religion inquiry is Complaint Exhibit F. The Complaint further pleads "Online stalking by defendant(s) through these defendant(s) conduct." Compl. § IV.G (second).

**The judicial findings and the continuing harm.** On October 22, 2025, the Dudley District Court allowed Plaintiff White's motion to dismiss, finding materially false information submitted by Trooper Sobrinho Silva. Multiple judges found her testimony not credible after reviewing body-worn camera footage. Compl. §§ IV.F, IV.I. Despite possessing such exonerating evidence, the institutional defendants — including the Massachusetts State Police, Investigator John Banik, the probation departments, Massachusetts state parole, and the RMV — continued to rely on the false narrative. *Id.* The RMV suspended Plaintiff White's driver's license based on the false submissions, and required him to pay $500 to reinstate it. Compl. § III. Plaintiffs' license has since been reinstated, on January 12, 2026, upon payment of the $500 reinstatement fee. The live prospective relief is correction of the driving record. Probation and parole officials knowingly proceeded with violations. Plaintiff White was subjected to GPS monitoring, curfews, travel restrictions, and repeated court appearances. Compl. § IV.G. The parole hearing was held on Thursday, April 17, 2025, at 11:00 a.m., with a guilty finding, a GPS bracelet, and a 10:00 p.m.

curfew; the monitor was worn for months. The injuries pleaded include severe anxiety, panic attacks, PTSD symptoms, night terrors, asthma complications, hair loss, skin breakouts, physical pain, loss of professional and employment opportunities, and ongoing emotional, physical, and financial harm. Compl. §§ IV.G–IV.H.

**The exhibits.** The Complaint incorporates Exhibits A through M, each verified under 28 U.S.C. § 1746 as a true and correct copy. They include the body-worn camera footage (Ex. A), the Dudley dismissal order (Ex. B), the police report and statement of facts (Ex. C), the RMV Immediate Threat letter and suspension notice (Ex. D), Trooper Sobrinho Silva's request to the RMV (Ex. E), the body-camera footage of the religion inquiry (Ex. F), the parole and probation violation proceedings (Ex. G), the State Trooper Investigator's statement and emails (Ex. H), mental-health documentation (Ex. I), the vehicle registration cancellation (Ex. J), images of the Emmy Award and Edward R. Murrow Award (Ex. K), social-media posts (Ex. L), and the audio recording of the RMV hearing (Ex. M). This opposition also relies on the transcript of Trooper Sobrinho Silva's sworn testimony of January 8, 2026, cited by page and line and attached only as to the cited pages; on the declarations of Plaintiff Northcross filed herewith upon signature; and on the TikTok screenshots attached as Exhibit Q. See Exhibit List, *infra*.

**What the memorandum adds that the Complaint does not allege.** The memorandum's factual narrative (Doc. 64, pp. 4–5) is Trooper Sobrinho Silva's version, not the Complaint's. Where it departs from the Complaint, Plaintiffs identify the departure in the count-by-count argument below. By way of summary, the memorandum asserts: that Plaintiff White was "recorded by Sobrinho Silva's radar/lidar equipment as travelling at a speed of ninety-four (94) miles per hour" (Doc. 64, p. 5, citing Doc. No. 1-1, p. 19); that Plaintiff White "initially pulled over in the far left portion of the highway" and was directed to the far right breakdown lane; that Trooper

Tobin was "called in as back-up to assist with the arrest of White, and there is BWC footage available of this encounter"; that "the footage shows the entire extent of Tpr. Tobin's contact with the plaintiff, which amounted to a hand being placed near plaintiff White's shoulder to guide him out of the vehicle," lasting "roughly two or three seconds," with "no hostility or any reaction by the plaintiff to suggest resistance" (Doc. 64, p. 5, citing Sobrinho Motion to Dismiss, Exhibit 1, at 9:32 and 9:58–10:00); that "Tpr. Tobin had no further contact with the plaintiffs after his role as a back-up on the road"; and that Plaintiff Northcross "did not have a valid driver's license" and was "offered transportation to the barracks." None of those propositions, except the fact of the stop itself, is pleaded in the Complaint. Each is a factual dispute to be resolved on a full record — not a basis for dismissal.

---

## II. THE STANDARD THE COURT MUST APPLY — PRO SE, VERIFIED, AND READ IN PLAINTIFFS' FAVOR

**The sole inquiry** on a motion to dismiss is "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Hernández*, 640 F.3d at 7. The Court applies the two-step analysis of *Ashcroft v. Iqbal*, 556 U.S. 662, 678–679 (2009): first strip legal conclusions, then test the remaining facts for plausibility. The Complaint is read as a whole, for its cumulative effect, not parsed piece by piece. *Ocasio-Hernández*, 640 F.3d at 13–14. "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss." *Id.* at 14. Threadbare recitals and legal conclusions do not suffice — but the Complaint here does not rest on them. It pleads who did what, when, and with what consequences, section by section. The memorandum's invocation of *In re Citigroup, Inc.*, 535 F.3d 45, 52 (1st Cir. 2008), and *Glaros v. Perse*, 628 F.2d 679, 684

(1st Cir. 1980) (Doc. 64, p. 3), adds nothing to that standard: both state the same first step of *Iqbal*. Plaintiffs meet it by pointing to the Complaint's specific factual allegations, not labels.

**Pro se liberal construction.** "A document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94; *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). Judge Casper applies this in this District. *Daniels v. Varela*, No. 19-10623-DJC (D. Mass. Sept. 9, 2020). Plaintiffs do not ask the Court to excuse *Twombly/Iqbal* plausibility — pro se status does not excuse Rule 8 compliance. *Boivin v. Black*, 225 F.3d 36, 43 (1st Cir. 2000). They ask only for what the law already gives them: a Complaint read in their favor, with its specific facts credited. Plaintiff White is a Department of Mental Health client with severe mental-health and cognitive disorders, Compl. § IV.D, and Plaintiffs proceed without counsel after the Court denied Plaintiff White's renewed motion for appointed counsel (Doc. 51). The Court should weigh that in reading a Complaint that pleads its facts plainly and in order.

**Verification.** The Complaint is verified under 28 U.S.C. § 1746. Verification does not change the Rule 12(b)(6) test — the Court already takes the allegations as true. Its weight comes later: at summary judgment, a verified complaint is "the functional equivalent of an affidavit to the extent that it satisfies the standards explicated in Rule 56." *Sheinkopf v. Stone*, 927 F.2d 1259, 1262, 1271 (1st Cir. 1991); Fed. R. Civ. P. 56(c)(4). Plaintiffs note it here for one reason: the Complaint's verification means the factual allegations the memorandum disputes are sworn allegations, not lawyer's argument — and they are corroborated, count by count, by the exhibits the Complaint incorporates and by Trooper Sobrinho Silva's own sworn testimony, cited below.

**The same standard governs a Rule 12(c) motion.** A motion for judgment on the pleadings "is treated much like a Rule 12(b)(6) motion." *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29

(1st Cir. 2008); *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54–55 (1st Cir. 2006); *Kando v. R.I. State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018). The standard is identical, so the opposition need not fight a different test — the same plausibility arguments defeat both motions. The difference between Doc. 62 and Doc. 63 is timing, not substance, and it is addressed in Section III.A, *infra*.

**The body-worn camera and the transcript at this stage.** The memorandum asks the Court to consider Trooper Sobrinho Silva's body-worn camera video (Doc. 61, Exhibit 1) at the pleading stage, citing *Bowman v. Monteiro*, No. 24-CV-10850-AK, 2025 WL 2174871, at *2 (D. Mass. July 31, 2025), and related authority (Doc. 64, pp. 3–4).* Bowman* holds only that properly authenticated body-worn camera footage that is central to a plaintiff's claims "may be considered" on a motion to dismiss. It does not hold that a defendant's excerpt displaces the Complaint whenever the defendant says it does. The First Circuit's rule is that "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56," subject to narrow exceptions. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *Beddall v. State Street Bank*, 137 F.3d 12, 17 (1st Cir. 1998). The video here is Trooper Sobrinho Silva's exhibit, not an exhibit to the Complaint and not an exhibit filed by Trooper Tobin, and the Complaint's allegations are adverse to the memorandum's reading of it — the Complaint says the video contradicts her report. Compl. § IV.B. Authenticity is not the question: even an authentic video does not show what the defendant claims it shows. If the Court is inclined to watch the video and weigh it against the Complaint, it must either exclude it or convert the motion under Federal Rule of Civil Procedure 12(d), with notice and a reasonable opportunity for Plaintiffs to present all pertinent material — including the full video, Trooper Tobin's own

body-worn camera footage, the other officers' body-worn camera footage, and dispatch audio. It may not weigh the video against the Complaint while calling the motion a Rule 12(b)(6) — or Rule 12(c) — motion. The same applies to the transcript pages attached to this opposition: they are offered to show what Trooper Sobrinho Silva has said under oath, and Plaintiffs request Rule 12(d) treatment to the extent the Court considers them. See Section XV, *infra*. What the video cannot do — on any reading — is supply probable cause: speed is not visible on body-worn camera, and a two-to-three-second excerpt cannot "blatantly contradict" the Complaint's account of the stop, the arrest, and the months of proceedings that followed. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (summary judgment; "blatant" contradiction standard).

---

## III. THRESHOLD ISSUES — RULE 12(c), OFFICIAL CAPACITY, RULE 11, AND ORAL ARGUMENT

### A. Doc. 62 is premature: the pleadings are not closed, so it must be treated as a Rule 12(b)(6) motion — and it is duplicative of Doc. 63

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." **No defendant has answered in this case.** Trooper Tobin's answer was due November 23, 2026; he filed motions instead. The pleadings are therefore not closed, and Doc. 62 is premature. "If a party files a Rule 12(c) motion before its answer, the Court may treat it as a motion to dismiss under Rule 12(b)(6)." *Jung v. Ass'n of Am. Med. Colleges*, 339 F. Supp. 2d 26, 35 (D.D.C. 2004); *Seber v. Unger*, 881 F. Supp. 323, 325 n.2 (N.D. Ill. 1995) (the "common practice of treating the premature Rule 12(c) motion as a Rule 12(b)(6) motion"); *Andro v. Union Carbide Corp.*, 2014 WL 1371713, at *2 (D.N.J. Apr. 8, 2014) (same).

Plaintiffs ask the Court to treat Doc. 62 as a Rule 12(b)(6) motion, to deny it as duplicative and moot, and to consolidate briefing on Docs. 62 and 63. Doc. 62 is substantively duplicative of Doc. 63 — the same arguments, filed the same day, supported by the same memorandum. Dismissal of Doc. 62 would not change the outcome. Rule 12(h)(2)(B) expressly preserves the failure-to-state-a-claim defense in a Rule 12(c) motion, and the First Circuit holds a successive motion is usually harmless because the standard is identical. *Jones v. Mass. Reg'l Transit Auth.*, No. 22-1569, 2023 WL 9233970, at *2 (1st Cir. Nov. 30, 2023). No Rule 12(g)(2) bar applies cleanly because Doc. 62 is styled under Rule 12(c), not Rule 12(b). And unlike a Rule 12(b)(6) motion, a Rule 12(c) motion "implicates the pleadings as a whole" — the court considers the complaint **and** the answer.* Aponte-Torres*, 445 F.3d at 54–55. Here there is no answer to consider, so there is nothing for Doc. 62 to add. If Doc. 62 were granted, it would be judgment on the pleadings, not a Rule 12(b)(6) dismissal — the same practical effect at this stage. The point of this section is procedural, not outcome-determinative: the Court should decide the motions on the same plausibility standard, on the Complaint's facts, and not give Doc. 62 any procedural advantage from its label.

**There is no summary-judgment motion in this case.** Trooper Tobin's certificate of conference, Doc. 65, ¶ 1, twice describes his filing as a "Motion for Summary Judgment." No motion for summary judgment under Federal Rule of Civil Procedure 56 has been filed by any defendant in this case. Trooper Tobin's motions are Doc. 62 (judgment on the pleadings) and Doc. 63 (motion to dismiss) only. Plaintiffs note the misdescription as a footnote-level observation about the care with which the defense filings were prepared — a second misdescribed certificate in two motions filed the same day, alongside Doc. 58's certificate of service, which describes a motion to dismiss as a "NOTICE OF APPEARANCE" — not as a ground to strike or deny either motion.

The certificate still evidences conferral by email on November 19 and 20, 2026, and no prejudice is apparent. Plaintiffs do not build an argument on it, and they do not accuse counsel of falsity; the certificates are consistent with reused templates.

## B. Official-capacity claims: Plaintiffs do not concede damages; the individual-capacity claims survive (Doc. 64, § A)

Defendant Tobin is sued in his individual and official capacities. Compl. § III. His 12(b)(1) argument is that a state official sued in official capacity is the State, not a § 1983 "person" for damages. *Will v. Michigan*, 491 U.S. 58, 71 (1989); *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 105 (1st Cir. 2015); *Fantini v. Salem State College*, 557 F.3d 22, 33 (1st Cir. 2009). Plaintiffs do not concede the point. Whether *Will* bars retrospective damages against Trooper Tobin in his official capacity is for the Court to decide. If the Court holds it barred, that is the Court's ruling — not Plaintiffs' concession — and it decides nothing about the claims that follow:

**Individual-capacity claims are untouched by *Will*.** The Complaint sues Trooper Tobin in his individual capacity for damages, and qualified immunity — not sovereign immunity — is the defense to those claims. That defense is addressed in Section XIV, *infra*. Punitive damages are sought against the individual defendants, Compl. § VI.B, and punitive damages under § 1983 run against individual officials only. *Smith v. Wade*, 461 U.S. 30 (1983); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981). Plaintiffs seek punitive damages against Trooper Tobin individually, and damages against all defendants.

**Prospective relief is an *Ex parte Young* question, not a *Will* question.** *Ex parte Young*, 209 U.S. 123 (1908); *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002). Plaintiffs seek declaratory and injunctive relief, Compl. § VI, and the live prospective relief is correction

of the driving record — which must be directed at a named official with enforcement authority over the record. Plaintiffs preserve *Young* relief against every defendant with that authority, and they preserve the $500 reinstatement fee as part of the damages caused by the false submissions. Whether *Edelman v. Jordan*, 415 U.S. 651, 663–677 (1974), limits any of that relief is for the Court to decide.

**State-law claims for injunctive relief.** Plaintiffs preserve their state-law claims against Trooper Tobin. Whether *Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 103–106 (1984), bars them in federal court is for the Court to decide.

The 12(b)(1) ground, even if the Court sustains it, removes at most one slice of relief against one capacity of one defendant. It does not touch the individual-capacity damages claims that are the center of these motions.

## C. Plaintiff Northcross and Rule 11: the defect, if any, is curable — and the cure is filed with this opposition (Doc. 64, § B; Doc. 63, Rule 11 ground as incorporated)

The motions ask the Court to dismiss all of Plaintiff Northcross's claims because he "failed to sign the complaint." Doc. 64, pp. 6–7. Rule 11(a) provides: "The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention." Fed. R. Civ. P. 11(a). The rule names **striking the paper** as the remedy — not dismissal of the claims — and only if the omission is **not** promptly corrected. The defect is not jurisdictional and not automatically fatal. *Becker v. Montgomery*, 532 U.S. 757, 763–64 (2001) (unanimous): "For want of a signature on a timely notice, the appeal is not automatically lost… [the case] may proceed so long as the appellant promptly supplies the signature once the omission is called to his attention."

**The memorandum's own authority cuts against dismissal.** *Casanova v. Dubois*, 289 F.3d 142, 145–46 (1st Cir. 2002) — cited by the memorandum at page 7 — applied *Becker* and did **not** dismiss the six non-signing co-plaintiffs: the First Circuit directed the Clerk to serve each with instructions to sign and return within 14 days; all six did so timely, and the appeal proceeded as to them. The memorandum misdescribes *Casanova* as a case about "all defendants required to sign notice of appeal." The non-signers were co-plaintiff appellants, not defendants. The pattern in the cases is consistent: courts give a short window (14 to 30 days) and dismiss — without prejudice — only if the party ignores it. No case dismisses a co-plaintiff's claims with prejudice on the merits for a first, promptly corrected signature omission.

**Plaintiff Northcross is a real participant, and the defendants' own filings prove the arrangement was communicated in writing before they filed.** Plaintiff Northcross is a named plaintiff with his own injuries and his own $3,000,000 claim. Compl. §§ III, IV.C, IV.H, VI.B. He works through Plaintiff White's email; the two Plaintiffs put the fight together, go over all edits, and submit together. That is not a post-hoc assertion. Defendant Tobin's own counsel, Daniel J. Moynihan Jr., was told in writing on November 20, 2026: "As for my brother, Sincere Northcross, he has requested that all communications be handled through me. I will relay any correspondence to him, and his responses will be communicated through my email address." Doc. 65, ¶ 2 (quoting Plaintiff White's November 20 email). His certificate then states: "As of this date, I have not heard from Mr. Northcross." Doc. 65, ¶ 3. That sentence is literally true — and it omits that he was told why. The same pattern appears in the companion filing: Defendant Sobrinho Silva's counsel, Joseph Donnellan, was told in writing on November 17, 2026, at 11:40 a.m., that Plaintiff Northcross "would like to proceed with communications through my email address," Doc. 60-1, Ex. 1, and replied at 11:54 a.m.: "As for your brother, I must deal with him

directly, and not through you." *Id.* His certificate then states: "I have not heard at all from Mr. Northcross." Doc. 60, ¶ 6. The memorandum's further claim — that Plaintiff Northcross's failure to provide contact information "has interfered with counsel's ability to confer with him pursuant to L.R. 7.1" (Doc. 64, p. 7) — is contradicted by counsel's own filing. The movant had a working channel, used it, and was told how to reach Plaintiff Northcross. A movant given a channel, who rejects it, then complains he heard nothing through the channel he rejected, has not shown Plaintiffs' non-cooperation. And Rule 11(a) does not require a party to speak directly to opposing counsel or answer a conferral email; it requires a signature and contact information on papers.

**The cure.** Plaintiffs file with this opposition: (1) the Declaration of Sincere Northcross, signed by Plaintiff Northcross himself, in which he states that he believes he signed the complaint in this action, and asks the Court — if his signature does not appear on the complaint — to treat that omission as a harmless error and to accept his signature on the declaration as his acknowledgment that he is a full participant and litigant in this action against the defendants; (2) this opposition, signed by **both** Plaintiffs, each with his own complete Rule 11(a) contact block; and (3) a request for leave to file a signed First Amended Complaint under Rule 15(a)(1)(B) — as of course within 21 days after service of a Rule 12(b) motion — signed by both Plaintiffs, with Plaintiff Northcross also signing the § 1746 verification, re-pleading all claims. The 21-day window runs to December 13, 2026; filing with this opposition on December 7, 2026 is safely inside it. The Advisory Committee Notes to the 1983 Amendment to Rule 11(a) state the cure expressly: "Correction can be made by signing the paper on file or by submitting a duplicate that contains the signature." The cure attaches to the unsigned paper itself — the Complaint. Plaintiffs do not ask the Court to treat a signed opposition alone as the cure.

**Two points.** First, Plaintiffs do not concede the signature point on the basis of the copy of the Complaint in their own files: the copy on file here is not the original. Plaintiffs state that they both signed the original complaint and that Plaintiff Northcross went to the court with Plaintiff White. If the filed original lacks Plaintiff Northcross's signature, he will sign again with no problem, and the cure sequence above does exactly that. Second, The rule of 28 U.S.C. § 1654 and *Herrera-Venegas v. Sanchez-Rivera*, 681 F.2d 41, 42 (1st Cir. 1982): an individual may appear in federal court only pro se or through legal counsel, and a pro se party cannot represent anyone other than himself. *Hootstein v. Amherst-Pelham Reg'l Sch. Comm.*, 361 F. Supp. 3d 94, 101 (D. Mass. 2019). Plaintiff Northcross acts for himself, not through Plaintiff White as counsel. In *Hootstein* the grandson was not a named plaintiff and never signed anything. Plaintiff Northcross **is** a named plaintiff with his own claims; the defect, if any, is his missing signature — not his absence. Two pro se plaintiffs can file a joint complaint if each signs it. Plaintiff White's signature validates the Complaint as to Plaintiff White; it is ineffective as to Plaintiff Northcross. The Complaint is not void as a whole; it is unsigned as to Plaintiff Northcross, if at all — and the cure is filed with this opposition. The Court should deem the Complaint signed, or deny the Rule 11 ground as moot. In the alternative, Plaintiffs request leave to amend and sign. In the further alternative, any dismissal as to Plaintiff Northcross should be without prejudice. And if the Rule 11 ground succeeds at all, it threatens only Plaintiff Northcross's claims against Trooper Tobin; Plaintiff White's claims are unaffected.

**The conferral point does not help the motions.** The duty to confer is the movant's. D. Mass. L.R. 7.1(a)(2). A plaintiff's missing contact information does not shift it, and does not convert a conferral failure into a ground to dismiss the plaintiff's claims. If conferral was defective, the consequence — if any — falls on the movant's motion. *Hootstein*, 361 F. Supp. 3d at 103;

*Gerakaris v. Champagne*, 913 F. Supp. 646, 651 (D. Mass. 1996); *Safeguard Props. Mgmt., LLC*, No. 1:22-cv-11004-DJC, Doc. 35 (D. Mass. Nov. 8, 2022) (Casper, J.). Plaintiffs do not ask the Court to deny the motions on Local Rule 7.1 grounds. They use the certificates only defensively: to show that the claim that conferral was "impossible" is contradicted by the movant's own filing. One internal tension in Doc. 65 is worth noting for the record: ¶ 1 claims conferral with "the pro se plaintiffs" (plural), while ¶ 3 admits no contact with Plaintiff Northcross. The conferral was with Plaintiff White only; Plaintiff Northcross's position was relayed by Plaintiff White in writing.

### D. Oral argument (Doc. 63, p. 2; L.R. 7.1(d))

Doc. 63, page 2, states: "Pursuant to Local Rule 7.1(d), Defendant Trooper Christopher Tobin respectfully requests oral argument on this Motion." Oral argument is requested, not granted — the Court may decide on the papers. Plaintiffs do not object to oral argument if the Court wants it, and if argument is granted, the pro se Plaintiffs will be prepared to argue the Rule 12 points in person. In the alternative, Plaintiffs ask the Court to decide the motions on the papers, as the issues are fully briefed and turn on the Complaint's allegations and the record already before the Court. Plaintiffs make no separate request for oral argument of their own at this time.

---

## IV. COUNT I — FOURTH AMENDMENT (§ 1983): THE STOP AND ARREST WERE WITHOUT PROBABLE CAUSE, AND TROOPER TOBIN PARTICIPATED IN THE SEIZURE AFTER HEARING THE ARREST WAS ABOUT A MAN BEING AN "ASSHOLE"

### A. The elements, and what the Complaint pleads against Trooper Tobin

A Fourth Amendment false-arrest claim requires a seizure without lawful justification. "Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which

they had reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Information the officer knows or should know is false is not "reasonably trustworthy." A stop needs reasonable suspicion; an arrest needs probable cause. *Terry v. Ohio*, 391 U.S. 1 (1968); *Heien v. North Carolina*, 574 U.S. 54 (2014) (a reasonable mistake of law can support a **stop** — it does not supply probable cause for an **arrest**).

The Complaint pleads the claim against Trooper Tobin directly, by name, in specific terms. Compl. § IV.B: Trooper Sobrinho Silva followed Plaintiff White for several miles, tailgating closely, before activating emergency lights; Plaintiff White pulled into the breakdown lane; Trooper Sobrinho Silva later falsely claimed he stopped in a travel lane — "an assertion contradicted by body-worn camera footage." Compl. § IV.C: Trooper Sobrinho Silva "called for a tow and backup **without probable cause**"; Trooper Tobin "arrived and stood **gripping his firearm in a threatening posture**"; Trooper Sobrinho Silva and Trooper Tobin "forcibly opened Plaintiff White's door, removed him from the vehicle, handcuffed, and arrested him **without lawful justification**. No weapons or contraband were found." Compl. §§ IV.F, IV.I: the Dudley District Court dismissed the charges on October 22, 2025, finding materially false information submitted by Trooper Sobrinho Silva, and multiple judges found her testimony not credible after reviewing body-worn camera footage. Those allegations, taken as true, state a Fourth Amendment claim against Trooper Tobin as a participant in the seizure. The memorandum's answer is to ask the Court to believe a different set of facts. That is not a Rule 12(b)(6) argument.

## B. The memorandum's probable-cause case is the police report — the very document alleged to be false

The memorandum's Count I argument (Doc. 64, pp. 8–10) is built on Exhibit C, the police report: a 94 mph radar/lidar observation (Doc. 64, p. 8, citing Doc. No. 1-1, p. 19), a footnote

quoting the report's "over 100mph" passage, and the proposition that Trooper Sobrinho Silva was monitoring traffic on Interstate 84 to detect motorists operating in violation of the Commonwealth's traffic laws. But Exhibit C is the document the Complaint alleges is false. Compl. §§ IV.F, IV.I. At the pleading stage, the Complaint controls — not the exhibit the Complaint says is false. A court does not resolve a falsity allegation by crediting the allegedly false document. *Cf. Glik v. Cunniffe*, 655 F.3d 78, 79, 88 (1st Cir. 2011) (qualified immunity denied at Rule 12(b)(6) on a false-arrest claim where state charges had been dismissed as baseless).

The memorandum's framing contradicts its own exhibit in its opening paragraph. It says Trooper Sobrinho Silva "issued White a speeding ticket for operating a motor vehicle at ninety-four (94) miles per hour" in a 65 mph zone. Doc. 64, p. 1. **She did not.** Citation 329626AD — the citation issued on the basis of that alleged observation — has its SPEEDING box **completely blank**: no speed, no zone, no method of detection checked. The memorandum's first factual sentence is contradicted by the charging instrument itself. And Trooper Sobrinho Silva admitted it under oath:

> Q: "You left all that blank." A: "No. The speeding charge is here. So —" Q: "I'm asking you about the specific section about the speeding, how fast he's going, the ways that you measured that speed. You left that entire section blank, correct?" A: "Yes, because he just didn't allow me to." Q: "He stopped you from filing a citation?" A: "No. That's not what I said, actually." Ex. N, Transcript Pg 38, l. 25 – Transcript Pg 39, l. 9 (Ex. N, Transcript Pgs 38–39).

She admits the entire speeding section — speed and method — was left blank, and the explanation she offered was withdrawn by her in the same exchange. She also testified that she does not remember what the citation looked like or how many infractions it contained. Ex. N, Transcript Pg 38, ll. 1–7. A citation that documents no speed and no measurement method is the charging instrument for a speeding-based stop and arrest. The memorandum never addresses the

blank citation. It cannot — the blank citation is fatal to the claim that a 94 mph observation was documented at the time.

## C. Her sworn speed figures do not match her report — and there is no record of any speed

The memorandum treats the speed as a settled fact: 94 mph. Doc. 64, pp. 1, 4–5, 8. Under oath, Trooper Sobrinho Silva gave different figures, and admitted there is no record behind any of them:

**Report:** RADAR lock 95 mph; LiDAR 92 mph, then 94 mph, then a third time 94 mph. Ex. C.

**Testimony:** radar "locked the vehicle's speed at 92. And from what I can remember, I believe it was up to 94 miles an hour. I then used my LiDAR… I locked the vehicle's speed on my LiDAR at 94 miles an hour as well." Ex. N, Transcript Pg 11, ll. 15–25; Ex. N, Transcript Pg 12, ll. 1–2. A single LiDAR lock — not three.

**To Trooper Tobin, before the arrest:** "like, 95 miles an hour." Ex. N, Transcript Pg 34, ll. 5–8.

**No independent record:** "Your radar and the LiDAR that you use, that doesn't create any independent record of the speeds that it's calculating, correct? There's no printout or anything that you can do with that." A: "No." Ex. N, Transcript Pg 29, ll. 10–15.

**How the number was tied to the car:** by her visual "tracking history" — "I'm observing the traffic and I'm seeing what car looks like they're moving faster than everybody else." Ex. N, Transcript Pg 27, ll. 1–7. She was on the Exit 5 on-ramp, not on the shoulder of I-84, with trees between her position and the travel lanes, and the radar in that position was front-only. Ex. N, Transcript Pg 24, ll. 20–24; Ex. N, Transcript Pg 25, ll. 6–9, 18–24; Ex. N, Transcript Pg 27, ll. 21–25; Ex. N, Transcript Pg 28, ll. 1–2.

The speed — the sole predicate for the stop, the arrest, the charges, and the RMV submission — rests entirely on her word, and her word changes between the report, the testimony, and the

briefing of Trooper Tobin. That is a credibility dispute, and credibility is not decided on a motion to dismiss. It is also, directly, the Complaint's allegation: the speed figures were fabricated, and the judges who reviewed the body-worn camera footage found her testimony not credible. Compl. §§ IV.F, IV.I.

## D. The stop location: her own body-worn camera still contradicts her — and she conceded it

The memorandum says Plaintiff White "initially pulled over in the far left portion of the highway" and that Trooper Sobrinho Silva directed him to the far right breakdown lane. Doc. 64, p. 5. The Complaint pleads the opposite: Plaintiff White pulled into the breakdown lane, and Trooper Sobrinho Silva later falsely claimed he stopped in a travel lane — "an assertion contradicted by body-worn camera footage." Compl. § IV.B. The memorandum's version is not pleaded anywhere in the Complaint. It is a factual dispute about the same event, and it is resolved by the full body-worn camera footage — not by the memorandum's characterization. Under oath, Trooper Sobrinho Silva conceded the point against herself. Shown a still from her own body-worn camera:

> Q: "It's fair to say that his car is not in the travel lane, correct?" A: "Once — he initially stopped in the travel lane and then he —" Q: "I'm just asking you a simple question. It's fair to say that his car is not stopped in the travel lane." A: "At that time, no." Ex. N, Transcript Pg 16, ll. 2–14 (Ex. N, Transcript Pg 16).

Her position depends entirely on the word "initially," repeated four times, Ex. N, Transcript Pg 17, ll. 12–21; Ex. N, Transcript Pg 22, l. 22 – Transcript Pg 23, l. 6, and on audio that does not exist for the first 30 seconds of the recording — the body-worn camera audio "doesn't kick in until after 30 seconds," Ex. N, Transcript Pg 18, ll. 13–15 — and on a cruiser-mounted camera she does not have. Ex. N, Transcript Pg 18, ll. 18–19. The stop-location claim was the factual

predicate she used to justify the reckless-operation charge and the "dangerous stop" narrative. Her own video, as she concedes it, does not support it.

### E. "I don't know if I was going that fast" is not an admission of 94 mph

The memorandum quotes Plaintiff White on the body-worn camera at Exhibit 1, 2:26–2:29: "I don't know if I was going that fast." Doc. 59, p. 7; Doc. 64 incorporates the same point. Plaintiffs address it directly, because the Court will have seen it. It is a statement of **uncertainty**, not an admission of 94 mph. It does not establish probable cause. A person who says he does not know whether he was going "that fast" has not admitted a speed. And at Rule 12(b)(6), a video excerpt must be authenticated and central, and cannot resolve disputed facts — see Section II, *supra*, and Section XV, *infra*. The Court should also read the statement in the context the Complaint pleads: Plaintiff White was in the midst of a panic attack and a mental-health breakdown during the encounter, Compl. § IV.D, and his words on the recording are the words of a man in crisis, not a calm admission. The memorandum quotes two seconds of audio as if it were a confession. It is not.

### F. The Dudley dismissal: materially false information — not a probable-cause finding, and not a failure to appear

The memorandum's probable-cause argument depends on a misstatement of what happened in Dudley District Court. The Complaint pleads it plainly: "On October 22, 2025, the Dudley District Court allowed Plaintiff White's motion to dismiss, finding materially false information submitted by Trooper Sobrinho [Silva]." Compl. § IV.F. The dismissal order is Complaint Exhibit B. The Complaint further pleads that "[m]ultiple judges found her testimony not credible after reviewing body-worn camera footage." Compl. § IV.I.

Plaintiffs make three points, and ask the Court to hold them in mind through the rest of this opposition:

**The dismissal was for materially false information.** It was not a finding that probable cause was "close" or "arguable" or "lacking on a technicality." A court found that the trooper who made the arrest had submitted materially false information to obtain the charges. That finding goes to the predicate fact on which probable cause supposedly rested. The memorandum's reliance on *Goddard v. Kelley*, 629 F. Supp. 2d 115, 130 (D. Mass. 2009) — that an acquittal or dismissal alone does not prove lack of probable cause — misses the point. *Goddard* was a summary-judgment case, and it does not address a judicial finding that the sole inculpatory fact was materially false. Plaintiffs do not argue "dismissal, therefore no probable cause." They argue: the Complaint pleads specific falsity facts — the blank citation, the body-worn camera contradiction, the shifting sworn figures — and the Dudley finding **corroborates** those allegations. At the pleading stage, that is more than enough.

**Plaintiffs do not have to disprove probable cause in this opposition.** The memorandum repeatedly frames the case as if Plaintiff White bears the burden of proving the absence of probable cause. That is wrong. At Rule 12(b)(6), the Court takes Plaintiffs' pleaded facts as true. The burden at this stage is plausibility, not proof. Probable cause is a defense the defendant must establish on the facts as pleaded — and on the facts as pleaded, there was no speed recorded, no lawful basis for the stop, and no lawful justification for the arrest. Compl. §§ IV.B–IV.C.

**A second body reached the same conclusion.** The probation violation proceedings ended in Plaintiff White's favor — twice. On July 9, 2025, after the body-worn camera video of the stop (Exhibits Probation 1–4) was admitted, the court found Plaintiff White 'Not found in violation of probation.' (Docket, Case No. 10YO0006RO, p. 12, printed Aug. 7, 2025; Hon. Peter M. Coyne, Presiding.) On August 21, 2025, the court dismissed the probation surrender by order of the court — 'Surrender Dismissed by Order of the Court. Defendant remains on probation.' (Suffolk

County Criminal Docket Report, Case No. 1084YO10516, pp. 14–15, printed Aug. 22, 2025; Hon. Christopher Belezos, Presiding.) The Commonwealth could not prove the violation with the information the trooper sent — the report and the video. The defendants keep carrying the same account from body to body, and where the evidence was actually tested, it did not hold — yet they continue to present it to the next body as if it had. Plaintiffs ask the Court to note the pattern: the violation could not be proved, and it is not Plaintiffs' burden to re-prove it here. 3. **Her failure to appear is not the cause of the dismissal.** The Complaint pleads that "Trooper Sobrinho [Silva] failed to appear for court-ordered summonses, prolonging proceedings and trauma." Compl. § IV.I. Her non-appearance is mentioned only as prolonging the proceedings — never as the cause of the dismissal. The dismissal was caused by her presenting materially false material. Plaintiffs will not let the memorandum reframe it otherwise.

The memorandum's further authorities do not change this. *Commonwealth v. Heughan*, 40 Mass. App. Ct. 102, 104 (1996); *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009); *Commonwealth v. Amado*, 474 Mass. 147, 151 (2016); *Commonwealth v. Larose*, 483 Mass. 323, 327–328 (2019) — all address reasonable suspicion for a stop on facts as found, not a stop whose predicate the complaint alleges was fabricated. *Harper v. Booth*, 382 F. Supp. 3d 124, 128 (2019), for the proposition that there is "[n]o right to operate a motor vehicle in violation of traffic laws," is a straw man: the right at issue is the right to be free from seizure without probable cause, not a right to speed. And *Nieves v. McSweeney*, 241 F.3d 46, 55 (1st Cir. 2001) — that court appearances do not themselves constitute a constitutional violation — is answered by the Complaint itself: the appearances are pleaded as **damages and consequences**, not as the violation. The violation is the arrest and prosecution without probable cause. Compl. §§ IV.G–IV.H.

### G. The fellow-officer rule: Trooper Tobin cannot borrow probable cause Trooper Sobrinho Silva never had — and what he was told on the scene defeats reasonable reliance

Trooper Tobin's Count I defense, at its core, is that he was entitled to rely on a fellow officer. The fellow-officer rule is real, but it has a limit the memorandum does not mention. "We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." *Whiteley v. Warden*, 401 U.S. 560, 568 (1971). The rule transmits probable cause; it does not manufacture it. "If the fellow officer himself lacks probable cause, there is nothing to impute." *Yessin v. City of Tampa*, No. 15-11278 (11th Cir. Aug. 17, 2015) (per curiam) (unpublished) — persuasive only, and Plaintiffs cite it as such. In *Yessin*, three backup officers who relied on a fourth officer's representations were denied qualified immunity on false arrest where, on the plaintiff's facts, there was no arguable probable cause.

The strongest statement of the defense is the Second Circuit's: "Absent significant indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest was lawful." *Loria v. Gorman*, 306 F.3d 1271, 1288 (2d Cir. 2002). The qualifier is the hinge. "Significant indications to the contrary" is a fact question: what Trooper Tobin saw and heard on the scene. *Bernard v. United States*, 25 F.3d 98, 103 (2d Cir. 1994) — the determination of probable cause does not turn on whether the fellow agent's observations were accurate, but on

whether the arresting agent "was reasonable in relying on those observations." Reasonableness of *reliance*, not accuracy of the report, is the test.

Here, what Trooper Tobin heard on the scene was not a clean report of a crime. He heard Trooper Sobrinho Silva tell him, before the arrest, that Plaintiff White was going "like, 95 miles an hour, cutting people off, weaving in and out of traffic," Ex. N, Transcript Pg 34, ll. 5–8 — language she admits is not in the police report — and that she "wanted to get him out and charge him with reckless [operation]," Ex. N, Transcript Pg 34, ll. 17–19, because he was being an "asshole," Ex. N, Transcript Pg 34, ll. 3–4. In her own words to Trooper Tobin on the scene: "I'm gonna get him out — he's being an asshole — but I kinda wanna take him on a reckless op." (BWC, Doc. 61, Ex. 1 — Trooper Tobin's arrival on scene.)

Trooper Tobin heard those words. He had a duty to communicate with his partner — what was the actual crime? There was no live threat; they were pulled over on the side of the road. Being an asshole is not a crime. "Kinda wanna" is not probable cause — either a crime was committed or it was not, and a stated desire to charge a man because of how he is acting is the opposite of probable cause. Her own words should have raised grave concern with him about any crime. Instead he backed her up, gripped his gun, put his hands on Plaintiff White as part of the arrest, and helped take him into custody. Plaintiffs ask the Court to point to the body-worn camera when the two interact and Trooper Tobin comes on the scene — it is already in the record, Doc. 61, Exhibit 1 — and to ask what a reasonable officer in Trooper Tobin's position would have understood from that exchange. That is a fact question about what he saw and heard on the scene, not a proposition of law decidable on a two-second video clip. *Hensley* confirms the same limit from the other direction: legality turns on whether the *issuing* officer possessed the requisite justification. *United States v. Hensley*, 469 U.S. 221, 229–233 (1985). And *Hensley* is a

suppression case about reasonable suspicion for a *Terry* stop, not a § 1983 damages case about a full custodial arrest; it does not hold that reliance is reasonable when the assisting officer has reason to doubt the source.

**The knowledge question.** The Complaint pleads what Trooper Tobin knew through the briefing he received and the inferences the Court draws for Plaintiffs at this stage: he was present for the whole roadside encounter; the stop's stated basis was a speed he never observed; the citation recorded no speed; and he was told, in words, that the arrest was wanted because the man was being an "asshole." The transcript supplies what Trooper Sobrinho Silva told Trooper Tobin when she called for backup — the briefing is now in the record, from Trooper Sobrinho Silva's own sworn testimony — and the briefing itself supplies the reason to doubt. Plaintiffs seek leave to amend — the Rule 15(a)(1)(B) amended complaint described in Section III.C is the vehicle — to plead Trooper Tobin's knowledge expressly, if the facts support it. The briefing evidence and the amendment answer the argument that a backup officer's reliance on a fellow trooper's on-scene report was objectively reasonable even if the report was false.

**Two further points.** First, Trooper Tobin elides stop with arrest. A stop needs reasonable suspicion (*Terry*); an arrest needs probable cause. *Heien*, 574 U.S. at 54, holds a reasonable mistake of law can support a **stop** — it does not supply probable cause for the **arrest**. *Devenpeck v. Alford*, 543 U.S. 146, 152–153 (2004), helps Trooper Tobin only if facts known at the arrest supported *some* crime: probable cause need not match the offense invoked, but it still requires **facts known** supporting some crime. If the only facts known were the (allegedly false) speed figures, there is no fallback crime. The report's own ¶ 4 concedes Plaintiff White "did not physically resist once he was stepping out of the vehicle," foreclosing any fallback resistance predicate. Second, the memorandum adds a new fact at page 17: Plaintiff White was removed

"after he refused to exit" the vehicle. **The Complaint does not allege a refusal to exit**; it alleges a forcible opening of the door. That is a factual dispute, not a pleading concession, and it cannot supply probable cause at Rule 12(b)(6).

## H. Trooper Tobin's participation is pleaded as his own act — and his name is on the charges

The Complaint alleges Trooper Tobin *participated* in opening the door, removing Plaintiff White, handcuffing and arresting him (§ IV.C). Under *Iqbal*, 556 U.S. at 676, that is personal action, not vicarious liability: "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." If the arrest lacked probable cause, a participant in the arrest is a participant in the seizure. The memorandum itself concedes the participation ("assisted… as they forcibly opened…," Doc. 64, p. 8) while disputing its characterization. The "minimal role" label does not answer the question; the question is whether *his* acts contributed to an unlawful seizure.

And the Complaint pleads more than the roadside acts. It pleads that the false criminal charges were "initiated by Ysmin Sobrinho and Christopher tobin on April 9 2025." Compl. § III. A trooper has a duty to examine the evidence and what his name is put on as a witness and as a document. Trooper Tobin chose not to. He stayed quiet in calling out any lies, and physically supported the arrest knowing it was because Trooper Sobrinho Silva felt Plaintiff White was acting like an asshole and she kinda wanted to do it. The information he had before and after should have triggered him to know this was suspicious and a lie. Plaintiffs seek leave to amend to plead the report-name facts expressly, once verified — they do not ask the Court to treat an unverified account as a pleaded fact.

## I. Plaintiff Northcross: a passenger is seized, and his detention lasted hours after the mission ended

Plaintiff Northcross was a passenger in the car. A passenger is seized during a traffic stop and may challenge it. *Brendlin v. California*, 551 U.S. 249, 251 (2007). The Complaint pleads that he "was questioned while being held on scene, threatened, and made to feel unsafe and not free to leave. He was stranded in an unfamiliar location for hours, left without transportation or shelter, and forced to remain in the state police barracks until bail arrangements could be made for his Brother." Compl. § IV.C. That is not a complaint about the stop itself. It is a complaint about **hours** of post-arrest detention and stranding after the traffic mission ended. Trooper Tobin's own authority holds that detention beyond the stop's purpose violates the Fourth Amendment: *United States v. Starks*, 301 F. Supp. 2d 76, 86–87 (D. Mass. 2004); *Rodriguez v. United States*, 575 U.S. 431, 439–40 (2015) (mission prolongation unlawful).

The memorandum reframes the hours-long holding as an "offered ride": because Plaintiff Northcross "did not have a valid driver's license, he was not allowed to drive the rental car," and "[i]nstead, he was offered transportation to the barracks so that he could wait for White to be bailed." Doc. 64, p. 5 (citing Doc. No. 1-1, pp. 20, 23). That assertion comes from the police report — Trooper Sobrinho Silva's own document — not from the Complaint. Whether Plaintiff Northcross was free to leave is a factual dispute. An "offer" of transport to a barracks where he was then held for hours, without transportation or shelter, is not freedom of movement. Plaintiffs do not concede the license assertion, which the memorandum sources only to the report. The Complaint's allegation — held on scene, threatened, not free to leave, stranded for hours — governs at this stage. And Trooper Tobin was the officer who questioned Plaintiff Northcross on the scene and kept him there while doing so.

**Count I states a claim against Trooper Tobin, and his qualified immunity does not defeat it on the Complaint's facts.** See Section XIV, *infra*.

---

## V. COUNT II — EXCESSIVE FORCE (§ 1983): A COMPLIANT MAN, NO CONTRABAND, A GUN GRIPPED IN A THREATENING POSTURE, AND A FORCIBLE REMOVAL

The memorandum (Doc. 64, pp. 10–11) argues that handcuffing a compliant subject is not force, citing 555 CMR 6.04, *Conlon v. City of Newton*, Civil Action 23-10026-FDS (D. Mass. June 21, 2024), *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007), *Dean v. City of Worcester*, 924 F.2d 364, 368–369 (1st Cir. 1991), and *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). It adds the body-worn camera timestamp Exhibit 1, 9:58–10:00 (hand on the shoulder, two to three seconds) and the assertion that Trooper Tobin never drew his firearm.

Plaintiffs answer with the Complaint's facts, which the memorandum does not quote. Compl. § IV.C: Trooper Tobin "stood gripping his firearm in a threatening posture"; Trooper Sobrinho Silva and Trooper Tobin "forcibly opened Plaintiff White's door, removed him from the vehicle, handcuffed, and arrested him." No weapons or contraband were found. The police report itself states: "WHITE did not physically resist once he was stepping out of the vehicle." Ex. C, ¶ 4. Under *Graham v. Connor*, 490 U.S. 386, 396–397 (1989), force is judged by objective reasonableness under the circumstances — the severity of the crime, the immediate threat, and whether the person was resisting or fleeing. A compliant, non-resisting person, no weapons, no contraband, and a forcible removal from his car while a trooper grips a firearm in a threatening posture are facts that bear directly on *Graham* reasonableness. The memorandum's regulation, 555 CMR 6.04, is a state regulation about handcuffing; it is not a Fourth Amendment holding, and it does not answer whether the force used here — the forcible opening of the door, the

removal, the handcuffing, the firearm gripped in a threatening posture — was objectively reasonable.

*Dean*, 924 F.2d at 368–369, holds that handcuffing without injury does not state an excessive-force claim. Count II is not pleaded as "handcuffing alone." It is pleaded as a forcible removal of a compliant man at gunpoint-posture, as part of an arrest without lawful justification. *Mlodzinski v. Lewis*, 648 F.3d 24, 35–37 (1st Cir. 2011) — gun display against a non-threatening person — supports the proposition that a show of force against a person who poses no threat can be unreasonable. The memorandum will draw a distinction, that *Mlodzinski* involved pointing a weapon and the Complaint alleges gripping a holstered firearm; Plaintiffs ask the Court to treat that as a question of fact (duration, proximity, whether the weapon was visible, Plaintiff White's perception) rather than a pleading defect. At Rule 12(b)(6), the Court takes "threatening posture" as pleaded. Trooper Tobin says he never drew his firearm (Doc. 64, p. 8). The Complaint does not allege he drew it. It alleges he gripped it in a threatening posture while participating in a forcible removal. That is the allegation the Court must take as true.

Two further points belong in this section. **First**, the force did not stop at the car door. Plaintiff White's account, supported by the body-worn camera, is that Trooper Sobrinho Silva opened the car door, ripped off his seatbelt, turned him around, and put him in cuffs — while Trooper Tobin held his gun and stared at him as if he were going to kill him, and Trooper Sobrinho Silva fidgeted as if she were about to shoot her gun, her hands and body moving aggressively. She opened the car door without cause and without any lawful basis. The seatbelt and fidgeting facts are not pleaded in the Complaint as filed; Plaintiffs offer them here as body-worn-camera-supported context for the pleaded excessive-force count, and seek leave to amend under Rule 15 to plead them expressly. See Section XVI, *infra*. **Second**, the search of the SUV: Plaintiff

White's account: Trooper Tobin searched the vehicle over and over again — way more than an inventory search — the SUV's insides and personal belongings inside it, and he is seen on his own body camera looking within the trunk. The search is not pleaded in the Complaint as filed. Plaintiffs offer it as body-worn-camera-supported context for the pleaded seizure and as a Rule 15 amendment point — a search of a vehicle and its trunk, conducted as part of an arrest without lawful justification, is part of the same unlawful seizure that began at the car The argument structure is the same in both instances: force and search conducted during an unlawful arrest lack lawful justification.

Count II should proceed with Count I. In the alternative, Plaintiffs request leave to amend to plead the force and injury facts expressly. A trooper who grips his firearm in a threatening posture while forcibly removing a compliant, non-resisting man from his car — and then, on Plaintiff White's account, searches the man's SUV over and over, through the trunk — has done more than handcuff a compliant subject. That is the *Graham* question, and it is a question of fact.

---

## VI. COUNT III — MALICIOUS PROSECUTION (§ 1983): HE HELPED MAKE THE ARREST, HIS NAME IS ON THE CHARGES, AND THE CHARGES WERE DISMISSED BECAUSE THE INFORMATION WAS MATERIALLY FALSE

The memorandum (Doc. 64, pp. 12–13) argues that probable cause existed and that no allegation shows Trooper Tobin initiated charges. *Meehan v. Town of Plymouth*, 167 F.3d 85, 89–90 (1st Cir. 1999); *Goddard*, 629 F. Supp. 2d at 130. It adds state cases for the proposition that probable cause is "considerably less exacting" than proof of conviction. *Commonwealth v. O'Dell*, 292 Mass. 445, 451 (1984); *Commonwealth v. Levesque*, 436 Mass. 443, 447 (2002); *Commonwealth v. Santaliz*, 413 Mass. 238, 241 (1992).

Plaintiffs answer with what the Complaint actually pleads against Trooper Tobin — and with candor about where the pleading needs strengthening.

**The Complaint names Trooper Tobin as an initiator of the false charges.** Compl. § III: the RMV suspension was "based on False criminal charges initiated by Ysmin Sobrinho and Christopher tobin on April 9 2025." That allegation is pleaded against Trooper Tobin by name. The memorandum's claim that the Complaint attributes the false submissions only to Trooper Sobrinho Silva is contradicted by the Complaint's own words. A Fourth Amendment malicious-prosecution claim requires that the defendant "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 100–101 (1st Cir. 2013). Each element is pleaded, as to Trooper Tobin, as follows:

**Caused a seizure pursuant to legal process.** Trooper Tobin participated in the seizure itself — the forcible removal, handcuffing, and arrest, Compl. § IV.C — and the Complaint pleads that the false criminal charges were initiated by him as well as by Trooper Sobrinho Silva, Compl. § III. The "caused" element is broader than "initiated": an officer who participates in the seizure that leads directly to the charges, and whose name is on the charges and the reports that carried them into probation, parole, and the RMV, has caused the seizure pursuant to legal process. *Hernandez-Cuevas*, 723 F.3d at 96: it has "long been clearly established law that the Fourth Amendment prohibits a police officer from manufacturing probable cause by knowingly including false statements in a warrant affidavit."

**Unsupported by probable cause.** The blank citation. Ex. N, Transcript Pgs 38–39. The shifting speed figures. Ex. N, Transcript Pg 11; Ex. C. No independent record of any speed. Ex. N, Transcript Pg 29. The stop-location dispute, conceded against her own video still. Ex. N,

Transcript Pg 16. *Franks v. Delaware*, 438 U.S. 154, 155–156, 171 (1978) supplies the structure: a false statement made knowingly and intentionally, or with reckless disregard for the truth, by the affiant, and necessary to probable cause. Set the false speed figures aside and ask whether anything remains to support probable cause for the arrest: nothing does. The report's own ¶ 4 concedes Plaintiff White "did not physically resist," foreclosing any fallback resistance predicate. And the "refused to exit" fact the memorandum adds at page 17 is Trooper Tobin's assertion, not the Complaint's — it cannot supply probable cause at Rule 12(b)(6).

**Terminated in Plaintiff's favor.** The October 22, 2025 Dudley dismissal. Compl. §§ IV.F, IV.I; Ex. B. Favorable termination requires only that the prosecution "ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 49 (2022). No showing of innocence is required. The dismissal satisfies this element.

**Malice.** She called Plaintiff White "an asshole" to Trooper Tobin. Ex. N, Transcript Pg 34, ll. 3–4. She told Trooper Tobin she "wanted to get him out and charge him with reckless [operation]" before re-approaching him. Ex. N, Transcript Pg 34, ll. 17–19. She briefed Trooper Tobin with "cutting people off, weaving in and out of traffic" — language she admits is not in the report. Ex. N, Transcript Pg 34, ll. 5–8; Ex. N, Transcript Pg 35, ll. 18–21. And she filed the RMV petition two days later, on the same day as his first public post. Ex. N, Transcript Pgs 39–41; Ex. N, Transcript Pg 50, ll. 2–10. Trooper Tobin heard the malice stated, in words, before he participated in the arrest. That is the malice this count requires, stated by the defendant herself, to her backup, before the arrest was made — and Trooper Tobin acted on it.

**Her own words to Trooper Tobin on the scene.** When Trooper Tobin arrived on the scene, Trooper Sobrinho Silva told him, in her own words: "I'm gonna get him out — he's being an asshole — but I kinda wanna take him on a reckless op." (BWC, Doc. 61, Ex. 1 — Trooper

Tobin's arrival on scene. The substance is confirmed under oath: she admitted she referred to Plaintiff White as "an asshole" to Trooper Tobin, Ex. N, Transcript Pg 34, ll. 3–4, and that she told Trooper Tobin she "wanted to get him out and charge him with reckless [operation]," Ex. N, Transcript Pg 34, ll. 17–19.) Being an "asshole" is not a crime. "Kinda wanna" take someone on a reckless-operation charge is not probable cause — either a crime was committed or it was not, and a stated desire to charge a man because of how he is acting is the opposite of probable cause. Trooper Tobin heard it, and he backed her up anyway.

**Count III against Trooper Tobin as pleaded.** The *Hernandez-Cuevas* defendants were the **affiants** themselves; the case does not hold a non-affiant backup officer liable for another's false affidavit. And *Hernandez-Cuevas II*, 836 F.3d 116 (1st Cir. 2016): after remand, the same plaintiff **lost** on judgment as a matter of law for insufficient evidence — pleading a *Franks* theory and proving it are different things. *Franks* by its terms ("deliberate falsity… is only that of the affiant, not of any nongovernmental informant," 438 U.S. at 171) does not automatically extend to a non-affiant who repeats or acts on another's statement. The *Franks* pleading template is still the right structure: (1) the specific false statement; (2) knowing/reckless falsity **by the defendant sued** — for Trooper Tobin, the link is the briefing he received and his choice to act on it after hearing the "asshole / kinda wanna" statement, plus his name on the charges and reports; and (3) materiality — set the false speed aside and ask whether anything remains to support probable cause for the arrest (not merely the stop). Section IV.E attributes the RMV submission to Trooper Sobrinho Silva, not to Trooper Tobin. Plaintiffs seek leave to amend to plead Trooper Tobin's role in the charging process and his knowledge expressly, if the facts support them — and they will not invent any facts for the amendment. *Meehan*, 167 F.3d at 89–90, requires absence of probable cause to initiate; Plaintiffs plead that absence through the falsity

allegations, and *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562–563 (2024), which assesses malicious prosecution charge by charge, helps Plaintiffs here: probable cause for one charge does not categorically defeat a claim on a baseless charge, and the baseless charges here — reckless operation, speeding, and the RMV Immediate Threat — caused the seizure and the year-long suspension.

The memorandum's *Goddard* point is answered in Section IV.F, *supra*: dismissal alone does not prove lack of probable cause, but a judicial finding that the sole inculpatory fact was materially false is not "dismissal alone." Count III states a claim against Trooper Tobin on the Complaint as pleaded, and Plaintiffs seek leave to amend to plead the knowledge and causation facts expressly.

## VII. COUNT IV — FOURTEENTH AMENDMENT DUE PROCESS (FABRICATION OF EVIDENCE): THE FALSE REPORT WAS USED ACROSS EVERY BODY THAT TOOK PLAINTIFF WHITE'S LIBERTY

The memorandum (Doc. 64, § F) argues, in substance, that the Complaint sets forth no facts against Trooper Tobin to support a due-process violation. Plaintiffs answer narrowly, and candidly.

**What the Complaint pleads.** Compl. §§ IV.F, IV.I: the institutional defendants — including the Massachusetts State Police, Investigator John Banik, the probation departments, Massachusetts state parole, and the RMV — continued to rely on the false narrative after body-worn camera footage and judicial findings showed it false. The Complaint pleads a set of policies and customs, § IV.I(a)–(f), including "[a]llowing false police reports to be relied upon across multiple legal systems — criminal court, probation, parole, and RMV — without independent verification," and "[r]etaliation against individuals who criticize police misconduct, including the use of administrative mechanisms such as RMV license suspensions to punish protected speech." And the second § IV.G pleads that "probation and parole officials knowingly proceeded with

violations" and that Plaintiff White "was subjected to GPS monitoring, curfews, travel restrictions, and repeated court appearances." The fabrication narrative is pleaded as a course of conduct that continued after the evidence showed it false.

**The frame.** Plaintiffs do not plead a free-standing Fourteenth Amendment "shocks the conscience" claim for conduct the Fourth Amendment covers. *Graham*, 490 U.S. at 395; *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality). Count IV is pleaded as the fabrication and post-arrest continuation theory: the knowing use of fabricated evidence across criminal court, probation, parole, and the RMV, after body-worn camera footage and judicial findings showed it false. Compl. §§ IV.F, IV.I. That is a due-process claim the Fourth Amendment does not swallow whole. *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004) — "the right not to be framed by law enforcement agents was clearly established in 1967." The deprivation is the seizure and the prosecution caused by the fabricated evidence, not only a conviction. *Hernandez-Cuevas*, 723 F.3d at 99–101.

**Count IV against Trooper Tobin — and the answer.** Count IV is pleaded against Trooper Tobin on the facts the Complaint alleges: his participation in the arrest — which is already Count I — the Complaint's attribution of the false submissions to Trooper Sobrinho Silva, and his own tie pleaded in § III — the false charges were "initiated by Ysmin Sobrinho and Christopher tobin" — and his name on the reports that carried the false narrative into probation, parole, and the RMV, which he had a duty to examine and did not. Plaintiffs ask the Court to let Count IV stand with Count I on the fabrication theory, and they seek leave to amend to plead any Tobin-specific due-process facts that exist — and they will not invent any. A fabrication claim needs a deprivation caused by the fabricated evidence; mere manufacture without a resulting seizure or charge is not actionable. Here the deprivation is pleaded: an arrest, charges, months of liberty

deprivation (GPS monitoring, curfews, travel restrictions, repeated court appearances), and a year-long license suspension, all caused by false information. Compl. §§ IV.C, IV.F–IV.I. *County of Sacramento v. Lewis*, 523 U.S. 833, 849–854 (1998) — in a custodial, deliberative setting, deliberate indifference can shock the conscience; negligence alone is not enough, *Daniels v. Williams*, 474 U.S. 327, 328 (1986) — and Plaintiffs plead deliberate conduct, not negligence: a trooper who heard the arrest was wanted because the man was being an "asshole," who participated in it anyway, and whose name stayed on the reports that kept the false narrative alive in every body that took Plaintiff White's liberty.

**The *Weichel* point, for completeness.** Trooper Tobin's memorandum does not make the fabrication-test argument that Trooper Sobrinho Silva's memorandum makes, and Plaintiffs do not attribute it to him. For the record: *Weichel v. Town of Braintree*, No. 1:20-CV-11456-IT, 2025 WL 1756871, at 6 *(D. Mass. June 25, 2025), is a single district-judge decision, not binding on this Court, and Plaintiffs have not verified its full context or posture. If a fabrication claim required a conviction, no plaintiff whose charges were dismissed — the favorable outcome — could ever bring one, which would make* Thompson*, 596 U.S. at 49, meaningless.

## VIII. COUNT V — ADA, TITLE II (42 U.S.C. § 12132): A TRAINED, EXPERIENCED TROOPER WHO ESCALATED INSTEAD OF ACCOMMODATING

The memorandum (Doc. 64, § G) argues that Title II does not apply to an officer's on-the-street responses, that there is no duty to engage in an interactive process during a traffic stop, and that nothing about Plaintiffs' disability was open and obvious. It cites *DeBoise v. Taser Int'l, Inc.*, 760 F.3d 892, 899 (8th Cir. 2014); *Bahl v. County of Ramsey*, 695 F.3d 778, 784–85 (8th Cir. 2012); *Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2009); *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000); *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th

Cir. 2014); *Roell v. Hamilton County*, 870 F.3d 471, 489 (6th Cir. 2017); *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1085 (11th Cir. 2007); *Gray v. Cummings*, 917 F.3d 1, 17–18 (1st Cir. 2019); and *Conlon v. Scaltreto*, 158 F.4th 211, 225–26 (1st Cir. 2025).

**What the Complaint pleads.** Compl. § IV.D: "Plaintiffs are individuals with mental health disabilities protected under the ADA and Plaintiff Onyx White receive treatment through the Massachusetts Department of Mental Health. Defendants failed to accommodate these disabilities and escalated the encounter despite visible distress, causing panic attacks and acute psychological harm." Mental-health documentation from a licensed social worker is Complaint Exhibit I. The First Circuit's elements are: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000).

**Two limits, and the memorandum is wrong about the rest.**

*First limit — individual capacity.* Title II runs against "**public entities**," 42 U.S.C. § 12132, and several circuits hold there is no individual liability under Title II. *Walker v. Snyder*, 213 F.3d 344, 347 (7th Cir. 2000); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc); *Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009). The First Circuit has not decided it but "noted this emerging consensus in *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 290 (1st Cir. 2006)." Plaintiffs do not concede Count V against Trooper Tobin **in his individual capacity**: whether individual liability lies under Title II is for the Court to decide, and Plaintiffs preserve the claim as pleaded. The Title II claim is also pleaded against the public-entity defendants in their official capacity — where the *United States v. Georgia*, 546 U.S. 151, 159

(2006), claim-by-claim analysis belongs, as briefed in the Doc. 32 opposition. Whether punitive damages are available under Title II is likewise for the Court to decide on *Barnes v. Gorman*, 536 U.S. 181 (2002). This is about capacity, not about conduct: Trooper Tobin's conduct — escalation instead of accommodation, in the presence of visible distress — is pleaded, and it is part of the entity claim.

*Second — amendment to plead the* Parker* elements.* Plaintiffs seek leave to amend Count V to plead, in so many words, what the disability is, how it limits a major life activity, what service or program was denied, what reasonable modification was requested or denied, and how any denial was "by reason of" disability — the *Parker* elements — if the facts support them. See Section XVI, *infra*.

*What the memorandum gets wrong.* **The memorandum's authorities do not decide this claim against Plaintiffs.** *Gray*, 917 F.3d at 7, 17–18 — the First Circuit "decide[d] the case on the narrowest available grounds," **assumed** Title II applied, and decided on deliberate-indifference grounds, declining to enter the circuit debate about when during an arrest Title II begins to apply. *Gray* did not hold Title II inapplicable to arrests, and it was a summary-judgment case, not a Rule 12(b)(6) case. *Conlon*, 158 F.4th at 225–26, affirmed dismissal on the facts of a fatal shooting; it does not hold that no accommodation is ever owed — and Plaintiffs do not minimize it: it is Trooper Tobin's best First Circuit authority on this count. And *Hainze* — the memorandum's lead authority — draws the very line the memorandum omits: "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents… prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze*, 207 F.3d at 801–02. **But at 802:** when the situation is "secure" and without "threat to human safety, [law enforcement officers are] under a duty to reasonably accommodate [an

arrestee's] disability in handling and transporting him to a mental health facility." The ADA-relevant conduct here — the transport, the barracks detention, the hours-long holding of Plaintiff Northcross — occurred **after** the scene was secured. There was no live threat; they were pulled over on the side of the road. The majority approach treats exigency as weighing in the reasonableness balance, not as a categorical bar. *Sheehan*, 743 F.3d at 1232 ("[c]ircumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment").

**The training point cuts for Plaintiffs, not against them.** Trooper Tobin is a trained, experienced state trooper. He encounters people with mental-health conditions and various mental illnesses in the course of his work — that is the job. A trained officer should not be escalating situations and threatening people in crisis. The Complaint pleads that Defendants "escalated the encounter despite visible distress, causing panic attacks and acute psychological harm." Compl. § IV.D. Visible distress — panic attacks in the course of the encounter — is precisely the kind of open and obvious need that triggers the duty to accommodate under the very test the memorandum's companion filing cites: a disability and concomitant need for an accommodation that are "open and obvious." *Montanez v. Price*, 154 F.4th 127, 148 (3d Cir. 2025). Whether the need was open and obvious, whether a reasonable modification (de-escalation, a supervisor, time and space, a mental-health response) was available, and whether Trooper Tobin acted with deliberate indifference — knowledge that harm to a federally protected right was substantially likely, and a failure to act on that likelihood, *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138–39 (9th Cir. 2001) — are questions for amendment and discovery, not dismissal on a Complaint that pleads visible distress and escalation. Title II damages require

intentional discrimination, and the standard is deliberate indifference. Plaintiffs seek leave to amend to plead that standard expressly.

**He was never given the chance to ask.** In the back of the car, after being placed in handcuffs, Plaintiff White was going through a mental health crisis. The officers should have recognized it — and their failure to note it in the report is part of the same disregard. He was never given any opportunity to state any type of request for reasonable accommodation, because he was immediately barraged with questions and escalations from the officers, especially Trooper Sobrinho Silva, from the start. A plaintiff who is going through a mental health crisis in handcuffs while being interrogated has not "failed to request" an accommodation — he was given no opportunity to request one. The need was open and obvious, and the escalation that denied him the chance is itself the violation. Trooper Tobin was present for the arrest that put Plaintiff White in that car, gripping his firearm while it happened. Plaintiffs ask the Court to deny dismissal of Count V as to the entity defendants, to note the claim as preserved above, and to grant leave to amend to plead the *Parker* elements expressly.

---

## IX. COUNT VI — FIRST AMENDMENT RETALIATION AND RELIGIOUS DISCRIMINATION: HE WATCHED THE PROFILE, AND THE MEMORANDUM SAYS THERE IS "NO EVIDENCE" HE WAS AWARE OF THE POSTINGS

The memorandum (Doc. 64, p. 15) makes the argument this section answers. It states, in full on this point:

> "There is no evidence that Tpr. Tobin arrested plaintiff White. Nor is there evidence to support any of the claims, as shown by the BWC during the time Tpr. Tobin made his minimal contact with the plaintiff (See Sobrinho Motion to Dismiss, Exhibit 1 at (9:58-10:00). Similarly, there is no evidence that Tpr. Tobin was involved in any First Amendment Retaliation or Religious Discrimination.

> Plaintiff has failed to allege any connection with Tpr. Tobin on this point or that Tpr. Tobin was aware of any social media posting by the plaintiff. Without that action and reaction even being alleged, White has failed to make out a claim of retaliation against Tpr. Tobin."

Each sentence is addressed in turn. Two of them are contradicted by the Complaint itself. One is contradicted by an exhibit.

**First, "there is no evidence that Tpr. Tobin arrested plaintiff White."** The Complaint pleads that Trooper Sobrinho Silva and Trooper Tobin "forcibly opened Plaintiff White's door, removed him from the vehicle, handcuffed, and arrested him without lawful justification." Compl. § IV.C. Plaintiffs do not allege Trooper Tobin was the arresting officer of record. They allege he participated in the arrest — he gripped his firearm in a threatening posture, he helped forcibly remove, handcuff, and arrest Plaintiff White, and he did so after hearing the arrest was wanted because the man was being an "asshole." That is the allegation. The memorandum's sentence rewrites it into a claim Plaintiffs never made, and then denies the rewritten claim.

**Second, "no evidence that Tpr. Tobin was involved in any First Amendment Retaliation or Religious Discrimination" — the TikTok exhibit.** The memorandum states that Plaintiff White "has failed to allege any connection with Tpr. Tobin on this point or that Tpr. Tobin was aware of any social media posting by the plaintiff." Doc. 64, p. 15. The exhibit attached to this opposition as Exhibit Q contradicts that statement. It shows:

Plaintiff White's TikTok activity feed, which records: **"Chris Tobin viewed your profile. 15h ago."**

The profile reached by clicking through from that entry: **Chris Tobin, @christobin10**, 31 Following, 15 Followers, 0 Likes, "No videos yet."

Trooper Tobin viewed Plaintiff White's TikTok profile — the account on which Plaintiff White posts about this incident, as the activity feed itself shows: the videos in the feed are about the

incident, including footage of Trooper Sobrinho Silva and captions identifying her by name and badge number. The screenshots were taken in 2025, and the view occurred about 15 hours before they were taken; the exact date within 2025 is not known. Plaintiffs do not claim the view occurred on November 22, 2026, or on the day these motions were filed. Plaintiff White states that Trooper Tobin has watched his TikTok many times. The memorandum's categorical claim — "no evidence" that Trooper Tobin was aware of any social-media posting — is contradicted by the record: he viewed the profile on which the postings appear. If he had nothing to do with this, why keep watching the profile? The defendants keep watching Plaintiff White online while telling the judge that Trooper Tobin had no connection to the postings.

Plaintiffs are precise about what the exhibit proves and what it does not. It proves that Trooper Tobin viewed Plaintiff White's TikTok profile in 2025, about 15 hours before the screenshots were taken. It does not prove, by itself, that Trooper Tobin saw any particular posting, or that he knew of the April 2025 postings at the time of the RMV filing. The April 2025 knowledge link — what the postings said, when they occurred relative to the suspension, and who knew of them — must be pleaded by amendment if the facts support it, from Complaint Exhibit L (the social-media posts) and the transcript. Plaintiffs do not invent those facts here. What the exhibit does prove is that the memorandum's "no evidence" and "no connection" assertions are wrong, and that the question of Trooper Tobin's awareness is a question of fact, not a pleading defect to be decided on the memorandum's say-so.

**Third, the religion interrogation and the retaliation theory.** The religion interrogation during transport is pleaded against Trooper Sobrinho Silva, not Trooper Tobin. Compl. § IV.E. Trooper Tobin is not alleged to have asked Plaintiff White whether he was Christian or Catholic. The Count VI claim against Trooper Tobin runs through a different route: his participation in the

arrest that followed a stop the Complaint pleads was racially and religiously discriminatory, Compl. §§ I, IV.B; his continued online monitoring of Plaintiff White's postings about the incident, Ex. Q; and his name on the reports that carried the false narrative into probation, parole, and the RMV — the administrative machinery the Complaint pleads was used to punish protected speech, Compl. § IV.I(f). The elements are protected conduct, an adverse action that would chill a person of ordinary firmness, and a causal connection (substantial/motivating factor). *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Motive **is** an element here. *Crawford-El v. Britton*, 523 U.S. 574, 593–594 (1998).

The retaliation theory that matters is the **RMV Immediate Threat submission**: after Plaintiff White spoke publicly about the incident, false information was submitted to the RMV, resulting in an indefinite driver's license suspension. Compl. § IV.E. A license suspension is an RMV administrative action, not an arrest; *Nieves* by its terms governs **arrest**, and *Hartman v. Moore*, 547 U.S. 250, 265–266 (2006), governs **prosecution**. The First Circuit recognizes retaliation via **regulatory and administrative** action, governed by the *Mt. Healthy* substantial/motivating-factor and same-decision framework — not by the *Nieves* no-probable-cause rule. *McCue v. Bradstreet*, 807 F.3d 334 (1st Cir. 2015); *Mt. Healthy*, 429 U.S. at 287. The timing is not "temporal connection only" — and the transcript proves the coincidence: Trooper Sobrinho Silva admitted under oath that she filed the Immediate Threat petition on April 11, 2025 — two days after the stop — and that she did **not** file it on the day of the arrest. Ex. N, Transcript Pg 39, ll. 22–25; Ex. N, Transcript Pg 41, ll. 5–17 (Ex. N, Transcript Pgs 39–41). Plaintiff White testified that his first social-media post was April 11, 2025, and that the post date "coincides with when the petition was filed for an immediate threat on your license." Ex. N, Transcript Pg 50, ll. 2–10. He testified that he posted "utilizing my First Amendment rights… I wanted the world to know

she's a danger." Ex. N, Transcript Pg 49, ll. 20–25. And she admitted the petition's purpose was license suspension: "It eventually gets somebody's license suspended if you provide the proper documentation narrative." Ex. N, Transcript Pg 40, ll. 12–15. A driver she believed was an "immediate threat" on April 9 was left licensed for two more days, and the petition went in on the same day he first spoke publicly. That undercuts any claim that the suspension was an urgent safety response — and it supports the retaliation inference.

What the transcript does not prove. Trooper Sobrinho Silva does **not** admit she saw the posts before filing, and does not admit retaliatory motive: "Eventually I saw them, but I don't know what date that was." Ex. N, Transcript Pg 39, ll. 19–21. The opposition argues the same-day inference; it does not quote her as admitting it. And the memorandum's "temporal connection only" point is answered by amendment: **what** the postings said, **when** they occurred relative to the suspension, or **that Trooper Tobin knew of them**. Those facts are essential to causation and must be pleaded — by amendment, from Complaint Exhibit L and the transcript, if the facts support them. Plaintiffs seek leave to amend for that purpose. See Section XVI, *infra*. They do not invent those facts here.

The comparator point fails for the same reason *Nieves* does not apply. The memorandum's companion filing argues Plaintiff White "does not suggest that others who committed similar violations… were not subject to the same treatment," invoking *Nieves*, 587 U.S. at 407. But the *Nieves* comparator framework governs retaliatory **arrest**. The RMV claim is a *McCue* administrative claim, so the comparator framework does not apply to it at all. In the alternative, even under *Nieves*, the *Gonzalez* exception is an **alternative** to pleading absence of probable cause, not a pleading requirement for every retaliation claim — and here absence of probable cause **is** pleaded through the falsity allegations. *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024)

(per curiam). If the Court does apply *Nieves*, the objective evidence that the RMV typically does not seek immediate-threat suspension on this kind of predicate is a discovery and amendment point, not a pleading-stage defect. *Gericke v. Flores*, 753 F.3d 1, 6 (1st Cir. 2014), cited by the memorandum's companion filing for the knowledge point, is answered the same way: by amendment, from Exhibit L and the record, if the facts support it.

**Count VI states a claim against Trooper Tobin on the retaliation theory, and Plaintiffs seek leave to amend to plead the causation and knowledge facts expressly.** The religion-discrimination theory as pleaded runs against Trooper Sobrinho Silva; as to Trooper Tobin, Plaintiffs preserve it through his participation in the arrest and the administrative continuation, and through amendment if the facts support a direct link.

---

## X. COUNT VII — MASSACHUSETTS CIVIL RIGHTS ACT (M.G.L. c. 12, §§ 11H–11I): THREATS AND COERCION USED TO COMPEL SUBMISSION TO AN UNLAWFUL ARREST

The memorandum (Doc. 64, pp. 15–17) argues that Plaintiffs plead no threats, intimidation, or coercion by Trooper Tobin. *Longval v. Comm'r of Corr.*, 404 Mass. 325, 333 (1989); *Bally v. Northeastern Univ.*, 403 Mass. 713, 718 (1989); *Freeman v. Planning Bd. of W. Boylston*, 419 Mass. 548, 565 (1995); *Turkowitz v. Provincetown*, 914 F. Supp. 2d 62, 76 (D. Mass. 2012); *Barbosa v. Conlon*, 962 F. Supp. 2d 316, 332 (D. Mass. 2013); *Ciolino v. Eastman*, 128 F. Supp. 3d 366, 380 (D. Mass. 2015); *Mercurio v. Town of Sherborn*, 287 F. Supp. 3d 109, 123 (D. Mass. 2017); *Santiago v. Keyes*, 890 F. Supp. 2d 149, 155–56 (D. Mass. 2012); *Jakuttis v. Town of Dracut*, 95 F.4th 22, 35 (1st Cir. 2024).

The MCRA has a two-part structure. *Goddard*, 629 F. Supp. 2d at 128 (quoting *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994)): "'threat' means the 'intentional exertion of pressure to make another fearful or apprehensive of injury or harm'"; "'[i]ntimidation' means putting a person in fear for the purpose of compelling or deterring his or her conduct"; "'[c]oercion' means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do." "Overall, the MCRA contemplates a two-part sequence: (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do."

**Step one is pleaded — against Trooper Tobin by name.** Compl. § IV.C: Trooper Tobin "stood gripping his firearm in a threatening posture"; Trooper Sobrinho Silva and Trooper Tobin "forcibly opened Plaintiff White's door, removed him from the vehicle, handcuffed, and arrested him." Plaintiff Northcross "was questioned while being held on scene, threatened, and made to feel unsafe and not free to leave." A firearm gripped in a "threatening posture" plus a forcible removal is, on its face, "intentional exertion of pressure to make another fearful or apprehensive of injury or harm." The memorandum's own authorities confirm the definition; the fight is over step two. The memorandum's own words concede the point it tries to avoid: "Beyond assisting in an arrest for motor vehicle infractions, and Tobin allegedly gripping his firearm in a 'threatening' posture, White does not set forth any conduct that he was told to engage in against his will, or to refrain from engaging in against his will." Doc. 64, p. 16. The gripping of the firearm in a "threatening posture" is admitted to be in the Complaint. That is step one.

**Step two is pleaded, and it is not a right to resist arrest.** *Longval* and *Bally* hold that "A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion."

*Longval*, 404 Mass. at 333. The further purpose here is pleaded from the Complaint's own facts: the threats and coercion were used to compel Plaintiff White to submit to an unlawful arrest — to exit his vehicle, submit to handcuffing, and give up his right to be free from unreasonable seizure and his freedom of movement — and to compel Plaintiff Northcross to remain on scene and refrain from leaving. That is not a right to resist arrest, which the memorandum's *Farrah v. Gondella*, 725 F. Supp. 2d 238, 248 (D. Mass. 2010), point would block. It is the right to be free from seizure and the right to freedom of movement, given up under threat of a gripped firearm and physical force. The memorandum's "no right to resist an arrest, even an illegal one" (Doc. 64, p. 16) answers a claim Plaintiffs do not make. And its invocation of *Arizona v. Johnson*, 555 U.S. at 330–31 — that once a stop is lawful, officers are "empowered with complete command of the situation" and plaintiffs "must comply with the directives of a law enforcement officer" (Doc. 64, p. 16) — presupposes a lawful stop. The lawfulness of the stop is the dispute.

**The memorandum's closest case must be distinguished, not ignored.** *Santiago*, 890 F. Supp. 2d at 155–56, 159, dismissed an MCRA claim at Rule 12(b)(6) where a passenger was wrongfully arrested on mistaken identity: "a plaintiff cannot rely on the same conduct to show both the right that was interfered with and the threats, coercion, or intimidation." Three distinctions matter. First, *Santiago* involved no firearm gripped in a threatening posture and no prolonged post-arrest detention — here the firearm threat and the hours-long holding of Plaintiff Northcross are **independent coercive conduct**, not merely the arrest itself. Second, *Santiago* did not involve a fabrication narrative: here the threats were used to compel submission to an arrest the Complaint alleges was built on knowingly false information, and the coercion continued for months through the RMV, probation, and parole. Third, the memorandum's other MCRA authorities — *Barbosa, Ciolino, Mercurio* — all lost at **summary judgment**, not Rule 12(b)(6).

*Mercurio*, 287 F. Supp. 3d at 123, held the MCRA claim failed "although the plaintiff here has adduced sufficient evidence to proceed to trial on a claim of excessive force" — a summary-judgment weighing of evidence, not a pleading-stage ruling. At the pleading stage, the Court takes the Complaint's facts as true. *Freeman*, 419 Mass. at 565, and *Bally*, 403 Mass. at 718, state the same two-part test Plaintiffs meet here: a threat (the gripped firearm, the forcible removal) used to compel the giving up of a secured right (freedom from unreasonable seizure, freedom of movement).

**Qualified immunity tracks § 1983.** *Jakuttis*, 95 F.4th at 35 — the First Circuit applied the same qualified-immunity analysis to the MCRA claim as to the § 1983 claim where based on the same rights. If the Fourth Amendment right was clearly established and violated, the MCRA qualified-immunity defense falls with it. See Section XIV, *infra*. An individual officer is a "person" under the MCRA; the Commonwealth and its agencies are not. *Williams v. O'Brien*, 78 Mass. App. Ct. 169, 173 (2010). Count VII is pleaded against Trooper Tobin individually, and it states a claim.

## XI. COUNT VIII — DEFAMATION AND FALSE LIGHT: THE MEMORANDUM DOES NOT MOVE ON IT

The memorandum lists Count VIII among the state-based claims in its Introduction (Doc. 64, p. 2: "through Counts VII, VIII, and IX, Plaintiff seek to utilize state-based claims") but contains **no argument section on Count VIII**. It addresses Counts I–VII, IX, and X. Plaintiffs note that expressly and ask the Court to deny any relief as to Count VIII, or to treat it as unopposed.

The false statements are pleaded against Trooper Sobrinho Silva by name — she **is** the alleged publisher. Compl. §§ IV.F, IV.I: her materially false information, found not credible by multiple judges after body-worn camera review; the institutional defendants' continued reliance on the false narrative. Compl. § IV.I, policy (d): "Allowing false police reports to be relied upon across

multiple legal systems — criminal court, probation, parole, and RMV — without independent verification." The report itself is Complaint Exhibit C, and the images of the Emmy Award and Edward R. Murrow Award — reputation and professional standing — are Complaint Exhibit K. The transcript confirms the inconsistencies between her accounts, which go to falsity and to her credibility, though it contains no new defamatory statement and no testimony about the contents of the RMV submission.

**Count VIII against Trooper Tobin as pleaded.** Trooper Tobin is not alleged to have authored the report. His link to the false statements is the one pleaded in § III — the false criminal charges were "initiated by Ysmin Sobrinho and Christopher tobin" — and his name on the reports that carried the false narrative into probation, parole, and the RMV. Plaintiffs seek leave to amend to plead a republication or adoption allegation expressly — that he repeated, relied on, or put his name to the false statements in the probation, parole, or RMV proceedings — if the facts support it, and they will not invent any facts for the amendment. Two notes: defamation and false light are intentional torts barred against a **public employer** by G.L. c. 258, § 10(c), but an **individual** employee sued in individual capacity is not protected by § 10(c) as such; and whether Plaintiffs ever made presentment under G.L. c. 258, § 4 is not established on this record — Plaintiffs do not assert a Massachusetts Tort Claims Act claim against Trooper Tobin individually on the basis of presentment, and they flag the point rather than assume it. Count VIII should not be dismissed on motions that do not address it.

**The "R0" remark is part of the same course of conduct.** When Trooper Sobrinho Silva first arrived at the barracks, she hung her body-worn camera on a hanger — it was still recording — and told the other troopers in the office: "This guy's R0, and because you're white he's gonna think you're racist, so just letting you know right now, good luck asking him questions." (Doc.

61, Ex. 1.) She said it to make Plaintiff White look bad to her fellow troopers. "R0" is Massachusetts State Police slang for an "utter skell" — a completely disreputable person, in plain terms a bum. That is slander, and it is something Plaintiff White is not. The remark is Trooper Sobrinho Silva's publication, and it goes to Count VIII as well as to Counts VI and IX; Trooper Tobin's link to Count VIII is as pleaded above — his name on the reports that carried the false narrative into probation, parole, and the RMV.

## XII. COUNT IX — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS: NOT ONE ARREST — A COURSE OF CONDUCT

The memorandum (Doc. 64, pp. 17–18) argues that Trooper Tobin's conduct was not extreme and outrageous, citing *Howard Johnson Co.*, 371 Mass. 140, 144 (1976) (by name *Agis v. Howard Johnson Co.*), *Caputo v. Boston Edison Co.*, 924 F.2d 11, 14 (1st Cir. 1991), *Miller v. Pugliese*, 693 F. Supp. 3d 163, 184 (D. Mass. 2023), and *Sietins v. Joseph*, 238 F. Supp. 2d 366, 379 (D. Mass. 2003). It adds: "there is no claim of any physical injury as Tobin's contact with White was limited to his assistance in helping Tpr. Sobrinho as she was removing him from the vehicle, after he refused to exit, handcuffing him and escorting him to a cruiser. Moreover, there is no allegation at all that Tobin ever came in physical contact with Northcross."

The memorandum's core error is the same one that runs through its Count I and Count VI arguments: it treats the case as if the only conduct at issue were a two-to-three-second touch on the roadside. It was not. The Complaint pleads a **course of conduct**, and the memorandum's "no coercion, no threat" argument is contradicted by the Complaint's own words.

**The elements.** *Agis*, 371 Mass. at 144–45: (1) the defendant intended to inflict emotional distress or knew or should have known the conduct would cause it; (2) the conduct was "extreme and outrageous"; (3) the conduct caused distress; (4) the distress was severe. "Extreme and

outrageous" means conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d, adopted in *Agis*. The inquiry is fact-bound, which favors surviving Rule 12(b)(6) where the complaint pleads the fabrication narrative with specificity.

**The course of conduct pleaded.** Plaintiff White was intimidated and threatened — not just by the arrest, but by everything that followed from it, all of it set in motion by the false information on which Trooper Tobin put his name and his hands:

**The arrest itself**, carried out by an armed trooper who approached in a hostile and aggressive manner, forcibly opened his door, removed him from his vehicle, handcuffed him, and arrested him without lawful justification, while another trooper gripped his firearm in a threatening posture. Compl. §§ IV.B–IV.C. Plaintiff White testified he was "treated like a dog," that he "felt afraid for my life, with this woman screaming with a gun." Ex. N, Transcript Pg 47, ll. 14–22.

**The lies to the RMV** — the Immediate Threat submission that suspended his license for a year, filed two days after the stop on the same day he first spoke publicly. Compl. § IV.E. The license was his livelihood: the suspension cost him a paid-for CDL preparation path, mental-health employment requiring a valid license, and the ability to visit and assist close family members. Compl. § IV.G.

**The lies to probation** — probation violation proceedings initiated and knowingly continued on the false narrative, with GPS monitoring, curfews, and travel restrictions for months. Compl. §§ IV.F, IV.G, IV.I.

**The lies to parole** — parole violation proceedings on the same false predicate, with a parole hearing on Thursday, April 17, 2025, at 11:00 a.m., a guilty finding, a GPS bracelet, and a 10:00 p.m. curfew, and a monitor worn for months. Compl. § IV.G.

**All of it came out to be lies.** The Dudley District Court found materially false information. Multiple judges found her testimony not credible after reviewing body-worn camera footage. Compl. §§ IV.F, IV.I. That was the threat — and the use of the RMV, probation, and parole against him. The threat was not a single shouted word at the roadside. It was a year of liberty deprivation, imposed through institutions, on a record Trooper Tobin helped make and put his name to.

**The fabrication doctrine supports this count.** *Limone v. United States*, 579 F.3d 79, 91 (1st Cir. 2009) — the First Circuit **affirmed** IIED liability where FBI agents framed four men for murder, suppressed exculpatory intelligence, and covered it up. At 91, quoting *Agis*: an individual is liable for IIED when he, "by extreme and outrageous conduct and without privilege, causes severe emotional distress to another." *Limone* proves that fabrication and cover-up can be extreme and outrageous as a matter of Massachusetts law. *Limone* was a bench-trial record after a 22-day trial, on decades-long wrongful incarceration — far stronger facts than a roadside stop. It proves the doctrine permits the claim, not that this Complaint pleads it. This Complaint pleads it through the fabrication narrative: a knowingly false report, an arrest, a prosecution, months of liberty deprivation, and a judicial finding that the information was materially false. And *Gill v. United States*, 588 F. Supp. 3d 134, 139 (D. Mass. 2022), holds that "[a]n officer's actions may be [deemed extreme and outrageous] if he uses excessive force" and that "[a]ctions by law enforcement officers that are objectively unreasonable under the Fourth Amendment… may be [extreme and outrageous]."

**The memorandum's authorities do not defeat the claim at the pleading stage.** *Caputo*, 924 F.2d at 14, was a **summary-judgment affirmance** on injury and causation after years of discovery — not a Rule 12(b)(6) gatekeeping case. *Miller*, 693 F. Supp. 3d at 184, holds that unprovoked punches to the head and back are "**not necessarily** extreme and outrageous." "Not necessarily" is not "never" — it is a fact-specific holding, and it does not address fabrication-based IIED. *Sietins*, 238 F. Supp. 2d at 379 — where officers "'merely carr[y] out their obligations as law enforcement officials[,]...' their conduct 'as a matter of law cannot be deemed extreme and outrageous'" — was summary judgment, and the officers there had probable cause based on credible complainant information. It is distinguishable if probable cause collapses on the falsity allegations, as pleaded here. And the "refused to exit" fact the memorandum relies on (Doc. 64, p. 17) is Trooper Tobin's assertion, not the Complaint's — the Complaint alleges a forcible opening of the door.

**The "no physical contact with Northcross" point is not a defense.** IIED does not require physical contact. The distress pleaded for Plaintiff Northcross is specific: "Severe emotional distress, fear, and anxiety," "Physical manifestations of stress," "Trauma from witnessing the unlawful arrest and mistreatment of his brother," "Ongoing psychological harm." Compl. § IV.H. The fabrication narrative is the conduct, not the touching — and Plaintiff Northcross's own declaration, filed herewith upon signature, adds what he personally heard at the barracks: the other troopers talking about his brother's criminal history, laughing and making fun of him, after Trooper Sobrinho Silva had labeled him an "R0" to them. The severity pleaded for Plaintiff White is equally specific: "Severe anxiety, panic attacks, PTSD symptoms, night terrors," asthma complications, hair loss, skin breakouts, physical pain. Compl. § IV.G. Trooper Tobin was the officer who questioned Plaintiff Northcross on the scene, kept him there, and made him feel

unsafe and not free to leave. Count IX states a claim against Trooper Tobin. Trooper Sobrinho Silva is the alleged author of the false report on which the entire course of conduct rests. Against Trooper Tobin it runs through his participation in the arrest, his gun gripped in a threatening posture, his questioning and stranding of Plaintiff Northcross, and his name on the charges and reports that kept the false narrative alive.

---

## XIII. COUNT X — EIGHTH AMENDMENT (CRUEL AND UNUSUAL PUNISHMENT): PLAINTIFFS PRESERVE THE CLAIM AND SEEK THE FOURTEENTH AMENDMENT REFRAME IN THE ALTERNATIVE

The memorandum (Doc. 64, p. 18) argues that "[s]ince White was not convicted as a result of his arrest, the Eighth Amendment does not apply," citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991), and *Gonzalez-Mercado v. Municipality of Guaynabo*, 206 F. Supp. 2d 257, 260–61 (D.P.R. 2002).

**Plaintiffs do not concede the label.** The memorandum's authorities hold the Eighth Amendment "prohibits the infliction of cruel and unusual punishments on those convicted of crimes," *Wilson*, 501 U.S. at 296–97, and that "[t]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law," *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). *Martinez-Rivera v. Ramos*, 498 F.3d 3, 9 (1st Cir. 2007), held that "[b]ecause there had been no formal adjudication of guilt against [plaintiffs] at the time of the alleged constitutional deprivation, the Eighth Amendment is inapplicable and any claim brought on that theory was properly dismissed." Whether that line of authority defeats Count X as labeled is for the Court to decide. Plaintiff White was not convicted, and Plaintiffs preserve Count X as pleaded. Count X is

not pleaded on conviction alone: it is pleaded on the full course of punishment the fabrication set in motion. In the alternative, Plaintiffs seek the Fourteenth Amendment reframe below.

**The substance survives under the Fourteenth Amendment.** "Under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535, 538–39 (1979). The test is whether there was express intent to punish, or whether the condition or restriction is "reasonably related to a legitimate governmental objective" versus "arbitrary or purposeless" — in which case a court "may permissibly infer that the purpose of the governmental action is punishment." *Id.* A pretrial detainee's excessive-force claim needs only objectively unreasonable force, judged from the perspective of a reasonable officer on the scene. *Kingsley*, 576 U.S. at 397. And the Fourth Amendment governs pretrial detention without probable cause after legal process begins. *Manuel v. City of Joliet*, 580 U.S. 357 (2017). Plaintiffs ask the Court for leave to amend Count X's label to the Fourteenth Amendment, under Federal Rule of Civil Procedure 15(a)(2) ("The court should freely give leave when justice so requires") — the reframe the Complaint's facts support: the post-arrest pretrial detention, the $1,000 bail, the months of GPS monitoring, curfews, and travel restrictions, and the year-long license suspension imposed without a lawful predicate. That punishment was foreseeable to the officer who fabricated its predicate, and it is still standing: the suspension and the record it created continue to injure Plaintiff White — including in the insurance market, where Allstate declined him outright on that record (Doc. 32 opposition, Ex. G). Plaintiffs seek leave to amend to plead any further bail or conditions facts the record supports. Plaintiff White's position is that the $1,000 bail was excessive for a falsified traffic violation — bail imposed on a charge that rested on materially false information. The Excessive Bail Clause applies pre-conviction. *Stack v. Boyle*, 342 U.S. 1 (1951). In the alternative,

Plaintiffs ask that Count X's facts be folded into Counts I, II, and IV, and that any dismissal of Count X as labeled be without prejudice.

---

## XIV. QUALIFIED IMMUNITY: PROBABLE-CAUSE-DEPENDENT, AND IT FAILS WITH PROBABLE CAUSE

Trooper Tobin invokes qualified immunity — but, unlike the structure of his memorandum, his argument is entirely probable-cause-dependent. There is **no standalone qualified-immunity section** in Doc. 64. Qualified immunity is invoked only at page 17 for the MCRA count ("the same qualified immunity analysis applies," citing *Jakuttis v. Town of Dracut*, 95 F.4th 22, 35 (1st Cir. 2024)). Trooper Tobin's operative theory is prong one: no violation, because Trooper Sobrinho Silva had probable cause and his role was minimal. There is no standalone prong-two, clearly-established analysis in the memorandum. Qualified immunity is decidable at Rule 12(b)(6), but only on the plaintiff's facts. *Glik*, 655 F.3d at 79–81 (affirming denial of a Rule 12(b)(6) qualified-immunity motion). The two prongs are: (1) violation of a constitutional right; and (2) the right clearly established at the time, in a particularized sense. *Harlow*, 457 U.S. at 818; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (either prong first). The defendant must plead qualified immunity, *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); once raised, the plaintiff bears the burden on clearly-established law. *McGrath v. Tavares*, 757 F.3d 20, 29 (1st Cir. 2014).

**Prong one is pleaded, count by count, in Sections IV through XIII above.** The violation alleged is not a close call on the Complaint's facts: a stop and arrest without probable cause, built on speed figures the Complaint alleges were fabricated and that the lead trooper's own sworn testimony contradicts; a prosecution initiated on a report the Dudley District Court found materially false; a license suspension imposed on the same false predicate; and a course of

conduct — RMV, probation, parole — that continued after body-worn camera footage and judicial findings showed the predicate false. Trooper Tobin participated in the seizure, gripped his firearm in a threatening posture, questioned and detained Plaintiff Northcross for hours, and put his name on the charges and reports that carried the false narrative forward.

**Prong two is clearly established.** It has "long been clearly established law that the Fourth Amendment prohibits a police officer from manufacturing probable cause by knowingly including false statements in a warrant affidavit." *Hernandez-Cuevas*, 723 F.3d at 96 — decided on a motion-to-dismiss / qualified-immunity posture, affirming denial of qualified immunity. "The right not to be framed by law enforcement agents was clearly established in 1967." *Limone*, 372 F.3d at 44–45. *Glik*, 655 F.3d at 79, 88 — arrest without probable cause violates clearly established Fourth Amendment rights, qualified immunity denied at Rule 12(b)(6). For the force points, *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 51, 55 (1st Cir. 2005), and *Mlodzinski*, 648 F.3d at 35–37 (gun display against a non-threatening person), supply the clearly-established law, subject to the factual distinctions noted in Section V, *supra*. *Torres-Rivera* is the closest First Circuit case on point for a backup officer: the backup officer "got into a minivan and drove after Espada to provide backup," then "restrained Ernid against a wall by training his gun on the boy" while the other officer beat him, and the court held the failure-to-intervene claim was "a straightforward Fourth Amendment excessive force claim," *id.* at 51, and: "O'Neill is not entitled to qualified immunity because the law was clearly established in 1998 that an officer in O'Neill's circumstances had a duty to intervene." *Id.* at 55. It defeats the proposition that "backup" is itself a defense. *Torres-Rivera* was a jury-verdict case with an egregious beating in progress and a gun *trained* on the victim — far from a two-to-three-second shoulder touch — The failure-to-intervene theory is preserved for amendment, and the direct-participation theory is the one the

Complaint pleads: Trooper Tobin helped effect the seizure. *Davis v. Rennie*, 264 F.3d 86, 97–98, 102 & n.10 (1st Cir. 2001); *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990); *Martinez v. Colon*, 54 F.3d 980, 985 & n.4 (1st Cir. 1995) (liability also lies where the onlooker was "instrumental in assisting the actual attacker to place the victim in a vulnerable position"); *Calvi v. Knox County*, 470 F.3d 422, 428 (1st Cir. 2006) ("mere presence at the scene" is not enough). Trooper Tobin was not merely present: on the Complaint he *participated* in the removal, which is the *Martinez* "instrumental in assisting" route, not a pure nonfeasance route. Qualified immunity is objective — subjective malice is irrelevant to the defense, *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) — but intent **is** an element of the underlying claims (retaliation, *Franks* false statements, fabrication) and must be proved as part of prong one. *Id.* at 593–594. And qualified immunity cannot be resolved on disputed facts. *Mlodzinski*, 648 F.3d at 32; *Johnson v. Jones*, 515 U.S. 304, 313–314 (1995). The disputed facts here — whether there was a 94 mph observation at all, whether the citation recorded it, what Trooper Tobin was told on the scene, what he did with the SUV, whether the stop location was as claimed — are the case.

**Arguable probable cause does not save him.** "For [officers] to establish qualified immunity, they need not show that they had actual probable cause, but rather merely that 'the presence of probable cause [was] at least arguable' at the time they arrested [plaintiff]." *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir. 1992). But "qualified immunity does not attach where the absence of probable cause is not 'arguable or subject to legitimate question.'" *Wilber v. Curtis*, 872 F.3d 15, 21 (1st Cir. 2017). And arguable probable cause still fails where "there clearly was no probable cause at the time the arrest was made." *Topp v. Wolkowski*, 994 F.2d 45, 48 (1st Cir. 1993). On the Complaint's facts — no speed recorded on the citation, a report contradicted by body-worn

camera footage, and judicial findings that the trooper's testimony was not credible — the absence of probable cause was not "arguable." The fellow-officer question is the same question in a different form: whether a reasonable officer in Trooper Tobin's position, having heard the arrest described as a desire to charge a man for being an "asshole," could have believed probable cause existed. That is a fact question, not a pleading-stage conclusion. Qualified immunity does not defeat these motions.

## XV. THE BODY-WORN CAMERA AND THE TRANSCRIPT: WHAT THE COURT SHOULD — AND SHOULD NOT — DO WITH THEM

**The body-worn camera.** The memorandum asks the Court to consider Trooper Sobrinho Silva's body-worn camera video (Doc. 61, Exhibit 1) at the pleading stage. Doc. 64, pp. 3–4. Plaintiffs ask the Court to do three things. First, the complete video is already in the record — Doc. 61, Exhibit 1, already filed electronically. The Court should consider the complete video as submitted, not the two-to-three-second excerpts the memorandum cites. The memorandum cites timestamps (9:32; 9:58–10:00) as if each excerpt settled the fact it is cited for. An excerpt cannot settle what happened before or after it. The 9:58–10:00 clip shows, at most, a few seconds of a longer encounter: it cannot show what Trooper Tobin was told before he arrived, what he heard when Trooper Sobrinho Silva briefed him, how long he gripped his firearm, or what he did with the SUV. Second, note what the video **cannot** show: speed is not visible on body-worn camera; the audio is silent for the first 30 seconds, Ex. N, Transcript Pg 18, ll. 13–15, so the video cannot show the horn and sirens Trooper Sobrinho Silva claims she used, or the initial stop; and there is no cruiser-mounted camera at all, Ex. N, Transcript Pg 18, ll. 18–19. Third, in the alternative, if the Court is inclined to weigh the video against the Complaint, convert the motions under Rule 12(d), with notice and a reasonable opportunity for Plaintiffs to present all pertinent material.

The video does not "incontrovertibly" resolve the disputed facts. The January 8, 2026 transcript records the **same video** being characterized differently by Trooper Sobrinho Silva and by defense counsel on the record, with the judge reserving judgment: Judge Hillman said he would make his own credibility determination from the video and declined to adopt another judge's assessment. Ex. N, Transcript Pg 42, l. 21 – Transcript Pg 43, l. 16. Where video is ambiguous or open to multiple interpretations, the Complaint governs at Rule 12(b)(6) and the dispute goes to summary judgment. *Scott,* 550 U.S. at 380, is a summary-judgment case on a full record, requiring a **"blatant"** contradiction. A two-second clip of a hand on a shoulder, or a still photograph, does not blatantly contradict the Complaint's account of the stop, the arrest, and the months of proceedings that followed. Plaintiffs do not ask the Court to ignore the video. They ask the Court to consider the complete video already in the record, to note what the clip cannot show, and — in the alternative — to convert under Rule 12(d) with an opportunity to respond. If the Court follows *Bowman* and watches the full body-worn camera footage and finds it "incontrovertibly contradicts" the Complaint on Trooper Tobin's role, *Esco v. City of Chicago*, 107 F.4th 673, 678–679 (7th Cir. 2024) (persuasive only), shows a court can dismiss on that basis. Plaintiffs submit that a two-to-three-second excerpt does not meet that bar for the propositions Trooper Tobin needs: no threat, no force, and probable cause for the arrest.

**The transcript.** Plaintiffs cite the transcript of Trooper Sobrinho Silva's sworn testimony of January 8, 2026, in Dudley District Court, No. 2564CR000979 — a civil-infraction bench trial on the three remaining civil motor-vehicle infractions after the October 22, 2025 dismissal of the criminal reckless-operation charge for materially false information. The matter was taken under advisement; no decision appears in the transcript. **Trooper Tobin did not testify in that proceeding.** Everything about him in the transcript comes from Trooper Sobrinho Silva's

testimony, and the transcript therefore neither confirms nor contradicts the memorandum's account of his physical role (the hand near the shoulder, two to three seconds). Its value for these motions is narrow but real: it proves Trooper Tobin was briefed with an inflated account — 95 mph, "cutting people off, weaving in and out of traffic" — that was **not in the police report**, before he participated in the arrest. That bears on what Trooper Tobin knew (or was told) when he acted, which matters to both probable cause and qualified immunity, and it undercuts any claim that Trooper Tobin reasonably relied on the written report alone. Plaintiffs attach **only the cited pages** as Exhibit N — not the whole transcript — and cite it herein as 'Ex. N, Transcript Pg __,' for what it is: sworn testimony, usable to show what Trooper Sobrinho Silva has said under oath and where it conflicts with her report, her citation, and her own video. It is impeachment and credibility material, and support for the Complaint's allegations at the pleading stage. Plaintiffs do **not** cite the transcript as the source of the October 22, 2025 falsity finding — that finding is established by the dismissal order itself, Complaint Exhibit B, and is stated on the transcript record only through counsel's statements and the Commonwealth's confirmation. Ex. N, Transcript Pg 4, ll. 19–23; Ex. N, Transcript Pg 6, ll. 2–6. And Plaintiffs do not use Plaintiff White's testimony as if it were Trooper Sobrinho Silva's: where this opposition relies on his testimony, it is labeled as his account.

Plaintiffs request Rule 12(d) treatment to the extent the Court considers the transcript pages, for the reasons in Section II, *supra*. The Complaint's allegations independently state the claims in this opposition; the transcript corroborates them and contradicts the memorandum. The motions cannot be granted on the memorandum's version of the facts while the lead trooper's own sworn testimony says otherwise.

## XVI. IF THE COURT FINDS ANY GAP, THE REMEDY IS LEAVE TO AMEND — NOT DISMISSAL

Plaintiffs ask the Court to deny the motions. In the alternative, they request leave to amend the Complaint under Federal Rule of Civil Procedure 15(a)(2): "The court should freely give leave when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962). A Rule 12(b)(6) dismissal is ordinarily without prejudice with leave to amend, unless amendment would be futile. Trooper Tobin's memorandum asks for dismissal "with prejudice and costs awarded to Tobin." Doc. 64, p. 18. That ask is aggressive, not standard. Costs under Federal Rule of Civil Procedure 54(d) are discretionary, and Plaintiffs ask that no costs be awarded. If the Court finds any gap in the Complaint as pleaded, Plaintiffs identify the amendments they seek:

**A signed First Amended Complaint under Rule 15(a)(1)(B)**, signed by both Plaintiffs, with Plaintiff Northcross signing the § 1746 verification, re-pleading all claims — the Rule 11 cure described in Section III.C, *supra*. The 21-day window runs to December 13, 2026.

**Trooper Tobin's knowledge and role** — what Trooper Sobrinho Silva told him when she called for backup and when he arrived on the scene (the "asshole / kinda wanna" briefing, Ex. N, Transcript Pg 34; the inflated "cutting people off, weaving" account not in the report, Ex. N, Transcript Pgs 34–36); his name on the charges and on the reports used in the probation, parole, and RMV proceedings, once verified; and the search of the SUV, including the trunk, as shown on his own body-worn camera — Sections IV, V, and VI, *supra*.

**Count III causation** — Trooper Tobin's role in the charging process and his knowledge, if the facts support them — Section VI, *supra*.

**Count IV Tobin-specific facts** — any due-process facts tying Trooper Tobin to the fabrication and continuation theory, if the facts support them — Section VII, *supra*.

**ADA *Parker* elements** — the disability, the major life activity, the service or program denied, the reasonable modification requested or denied, and the "by reason of" link — if the facts support them, Section VIII, *supra*.

**Retaliation causation facts** — what the social-media postings said, when they occurred, and Trooper Tobin's knowledge of them, from Complaint Exhibit L and the record — Section IX, *supra*.

**Count VIII adoption/republication** — Trooper Tobin's repetition of, reliance on, or putting his name to the false statements in the probation, parole, or RMV proceedings, if the facts support it — Section XI, *supra*.

**Force facts** — the seatbelt, the fidgeting as if about to shoot, and the search of the SUV — as body-worn-camera-supported context for Count II, Section V, *supra*.

**Barracks conduct** — the "R0" remark and the officers' discussion of Plaintiff White's criminal history — as context for Counts VI and IX, Sections IX and XII, *supra*.

**Count X reframe** to the Fourteenth Amendment (*Bell v. Wolfish*), Section XIII, *supra*.

**Probation-hearing finding** — the docket reports (Exhibit R) show the violation was not sustained on July 9, 2025 and the surrender was dismissed by order of the court on August 21, 2025; plead the final outcome expressly. Do not plead a 'no probable cause' finding — the docket records a preliminary 'Probable cause found' on May 7, 2025.

Plaintiffs will not invent any fact for the amendment. Each amendment will plead only facts Plaintiffs can verify. Any dismissal should be without prejudice, and no costs should be awarded.

---

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court:

---

## CERTIFICATE OF SERVICE

I, Onyx White, hereby certify that on ~~December 7~~ 11-24, 2026 2025, I served a copy of the foregoing Plaintiffs' Opposition to Defendant Christopher Tobin's Motion for Judgment on the Pleadings (Doc. 62) and Motion to Dismiss (Doc. 63), and the exhibits listed below, on all counsel of record by means of electronic filing via the Electronic Case Filing (ECF) system, and on any party not registered for ECF by first-class U.S. Mail, postage prepaid.

---

Onyx White, *pro se*

---

## EXHIBIT LIST — EXHIBITS TO THIS OPPOSITION

**Already in the record (Complaint Exhibits A–M, Doc. 1):** Ex. A (body-worn camera footage); Ex. B (Dudley dismissal order, Oct. 22, 2025); Ex. C (police report and statement of facts); Ex. D (RMV Immediate Threat letter and suspension notice); Ex. E (Trooper Sobrinho Silva's request to the RMV); Ex. F (body-camera footage of the religion inquiry); Ex. G (parole/probation violation proceedings); Ex. H (State Trooper Investigator statement and emails); Ex. I (mental-health documentation from a licensed social worker); Ex. J (vehicle registration cancellation); Ex. K (Emmy Award and Edward R. Murrow Award images); Ex. L (social-media posts); Ex. M (audio recording of the RMV hearing). **Doc. 61, Exhibit 1** (Trooper Sobrinho Silva's body-worn camera video, April 9, 2025) is already filed electronically; Plaintiffs cite timestamps and do not re-attach the video.

D (RMV Immediate Threat letter and suspension notice); Ex. E (Trooper Sobrinho Silva's request to the RMV); Ex. F (body-camera footage of the religion inquiry); Ex. G (parole/probation violation proceedings); Ex. H (State Trooper Investigator statement and emails); Ex. I (mental-health documentation from a licensed social worker); Ex. J (vehicle registration cancellation); Ex. K (Emmy Award and Edward R. Murrow Award images); Ex. L (social-media posts); Ex. M (audio recording of the RMV hearing). **Doc. 61, Exhibit 1** (Trooper Sobrinho Silva's body-worn camera video, April 9, 2025) is already filed electronically; Plaintiffs cite timestamps and do not re-attach the video.

**New Exhibit G (as in the Doc. 32 opposition, v5):** Allstate North American Insurance Co. declination letter and rights notice (photos, both labeled p. 1 of 2) — another insurer acting on the same driving record, showing the RMV suspension's continuing injury.

FILED IN CLERKS OFFICE 2026 NOV 25 P 1:57

**Exhibit N — Transcript of Trooper Sobrinho Silva's sworn testimony, January 8, 2026, Dudley District Court, No. 2564CR000979 (cited pages only — not the whole transcript):** Transcript Pgs 11–12 (speed figures; "upwards of 100 miles an hour" to catch up); Transcript Pg 16 (BWC still concession — car not in the travel lane); Transcript Pg 29 (no printout or independent record of speed; radar front-only; tracking history); Transcript Pgs 34–36 (briefing of Trooper Tobin — "asshole," "like, 95," "cutting people off, weaving," "wanted to get him out and charge him with reckless [operation]"; "cutting people off / weaving" not in the report); Transcript Pgs 38–39 (blank citation — entire speeding section blank; explanation given and retracted); Transcript Pgs 39–41 (RMV Immediate Threat petition filed April 11; "Eventually I saw them, but I don't know what date that was"; two-day delay; did not file on the day of the arrest); Transcript Pgs 49–50 (Plaintiff White's testimony — "$1,000 bail for speeding"; first social-media post April 11, 2025; license valid until the RMV petition).

**Exhibit O — Declaration of Sincere Northcross** (participation, communications through Plaintiff White's email, belief he signed the complaint, harmless-error request).

**Exhibit P — Declaration of Sincere Northcross Regarding the Barracks on April 9, 2025** (what he personally heard in the visitors' area: the other troopers talking about Plaintiff White's criminal history, laughing and making fun of him; states expressly that he did **not** personally hear Trooper Sobrinho Silva's remarks).

**Exhibit Q — Probation violation proceedings (docket entries).** (1) Docket, Case No. 10YO0006RO, p. 12 (printed Aug. 7, 2025): entry of July 9, 2025 — 'Not found in violation of probation.' (Hon. Peter M. Coyne, Presiding), after the body-worn camera video of the stop (Exhibits Probation 1–4) was admitted. (2) Suffolk County Criminal Docket Report, Case No. 1084YO10516, pp. 14–15 (printed Aug. 22, 2025): entry of August 21, 2025 — 'Surrender Dismissed by Order of the Court. Defendant remains on probation.' (Hon. Christopher Belezos, Presiding; M. Ridore, Probation Officer.)

---

**Deny** Defendant Christopher Tobin's Motion for Judgment on the Pleadings (Doc. 62) and Motion to Dismiss (Doc. 63) in full, and treat Doc. 62 as a Rule 12(b)(6) motion;

In the alternative, **grant Plaintiffs leave to amend** the Complaint under Federal Rule of Civil Procedure 15(a)(2), including by a signed First Amended Complaint under Rule 15(a)(1)(B);

In the further alternative, order that any dismissal be **without prejudice** and without costs;

Grant such other and further relief as the Court deems just.

Plaintiffs are pro se. They ask the Court to read their Complaint as the law requires — liberally, in their favor, on the facts they pleaded under oath — and to hold the memorandum to the record: to the Complaint as written, to the citation as it was actually issued, to the body-worn camera as it actually shows, to Trooper Sobrinho Silva's own sworn testimony about what she told Trooper Tobin before the arrest, and to the record of Trooper Tobin's own viewing of Plaintiff White's social-media profile. Trooper Tobin was not a passerby. He arrived gripping his firearm, he helped forcibly remove, handcuff, and arrest Plaintiff White, he questioned and detained Plaintiff Northcross for hours, and his name is on the false charges. On that record, the motions should be denied.

Respectfully submitted,

---

Onyx White, *pro se* 50 Causeway Street, Apt. 708 Boston, MA 02114 ogtlwhite3@gmail.com 857-247-9359 Date: December 7, 2026 [signature]

---

Sincere Northcross, *pro se* Address: 857-995-3437 Telephone: Northcross728a@gmail.com Email: 11/24/26 Date:

______________________

**New Exhibit G (as in the Doc. 32 opposition, v5):** Allstate North American Insurance Co. declination letter and rights notice (photos, both labeled p. 1 of 2) — another insurer acting on the same driving record, showing the RMV suspension's continuing injury.

**Exhibit N — Transcript of Trooper Sobrinho Silva's sworn testimony, January 8, 2026, Dudley District Court, No. 2564CR000979 (cited pages only — not the whole transcript):** Transcript Pgs 11–12 (speed figures; "upwards of 100 miles an hour" to catch up); Transcript Pg 16 (BWC still concession — car not in the travel lane); Transcript Pg 29 (no printout or independent record of speed; radar front-only; tracking history); Transcript Pgs 33–36 (briefing of Trooper Tobin — "asshole," "like, 95," "cutting people off, weaving," "wanted to get him out and charge him with reckless [operation]"; "cutting people off / weaving" not in the report; re-approach and arrest after Tobin arrived); Transcript Pgs 38–39 (blank citation — entire speeding section blank; explanation given and retracted); Transcript Pgs 39–41 (RMV Immediate Threat petition filed April 11; "Eventually I saw them, but I don't know what date that was"; two-day delay; did not file on the day of the arrest); Transcript Pgs 47, 49–50 (Plaintiff White's testimony — "treated like a dog," afraid for his life; "ripped the door open"; $1,000 bail "for speeding"; first social-media post April 11, 2025; license valid until the RMV petition).

**Exhibit O — Declaration of Sincere Northcross** (participation, communications through Plaintiff White's email, belief he signed the complaint, harmless-error request).

**Exhibit P — Declaration of Sincere Northcross Regarding the Barracks on April 9, 2025** (what he personally heard in the visitors' area: the other troopers talking about Plaintiff White's criminal history, laughing and making fun of him; states expressly that he did **not** personally hear Trooper Sobrinho Silva's remarks).

**Exhibit Q — TikTok screenshots (Trooper Tobin viewed Plaintiff White's profile):** (1) Activity feed screenshot showing "Chris Tobin viewed your profile. 15h ago"; (2) profile screenshot of Chris Tobin, @christobin10, 31 Following, 15 Followers, 0 Likes, "No videos yet"; (3) second profile screenshot, same account. The screenshots were taken in 2025, and the profile view occurred about 15 hours before they were taken; the exact date within 2025 is not known. Plaintiffs do not claim the view occurred on November 22, 2026, or on the day Docs. 62/63 were filed. The exhibit is offered to rebut the memorandum's statement (Doc. 64, p. 15) that there is "no evidence" Trooper Tobin was aware of any social-media posting by Plaintiff White.

**Exhibit Q-1 — Activity feed:** "Chris Tobin viewed your profile. 15h ago."