**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

ONYX WHITE v. COMMONWEALTH OF MASSACHUSETTS, et al.

Civil Action No. 1:26-cv-10046-DJC

**PLAINTIFFS' OPPOSITION TO DEFENDANT YASMIN SOBRINHO SILVA'S MOTION TO DISMISS (DOC. 58)**

Plaintiffs Onyx White and Sincere Northcross, proceeding pro se, respectfully submit this opposition to Defendant Yasmin Sobrinho Silva's Motion to Dismiss (Doc. 58) and the Memorandum of Law filed in support of it (Doc. 59). For the reasons below, the motion should be denied. In the alternative, Plaintiffs request leave to amend the Complaint under Federal Rule of Civil Procedure 15(a)(2), and that any dismissal be without prejudice.

## PRELIMINARY STATEMENT — THE MOTION ANSWERS A COMPLAINT PLAINTIFFS DID NOT FILE

Defendant Sobrinho Silva's motion rests on a version of this case that Plaintiffs' Verified Complaint does not allege. Again and again, the memorandum argues about facts that appear nowhere in the Complaint — facts drawn from her own police report, from her own body-worn camera as she reads it, and from her own sworn testimony — and then asks the Court to dismiss the Complaint for failing to plead the case she has invented. That is not how a motion to dismiss works. At this stage the Court takes Plaintiffs' well-pleaded facts as true and draws every reasonable inference in their favor. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). The memorandum's central propositions are contradicted by the very record it invokes.

Three points decide this motion.

**First, the Complaint — not Trooper Sobrinho Silva's report — supplies the facts.** The Complaint pleads, in specific terms, that on April 9, 2025, Trooper Sobrinho Silva stopped Plaintiff White without probable cause, falsely claimed he had stopped in a travel lane, forcibly removed him from his vehicle, handcuffed and arrested him without lawful justification, and then submitted false information to the Registry of Motor Vehicles, to probation, and to parole — false information on which those agencies acted, costing Plaintiff White his license for a year, months on a GPS monitor, and repeated court appearances. Compl. §§ IV.B–IV.I. The Dudley District Court dismissed the criminal charges against Plaintiff White on October 22, 2025, finding that Trooper Sobrinho Silva had submitted materially false information. Compl. §§ IV.F, IV.I. Multiple judges found her testimony not credible after reviewing body-worn camera footage. *Id.* The memorandum asks the Court to credit, instead, the police report that the Complaint alleges is false — Exhibit C to the Complaint, the very document whose falsity is at the heart of this case. A defendant may not defeat a complaint by asking the Court to believe her own account of the facts over the plaintiff's pleaded allegations.

**Second, Trooper Sobrinho Silva's own sworn testimony contradicts her memorandum at every turn.** On January 8, 2026, she testified under oath in Dudley District Court. She admitted that the entire speeding section of the citation — the speed and the method of detection — was left blank, and the explanation she offered for that blank was withdrawn by her in the same exchange. Ex. N, Transcript Pg 38, ll. 13–25; Ex. N, Transcript Pg 39, ll. 1–9. She admitted that she told Trooper Tobin, before the arrest, that Plaintiff White was going "like, 95 miles an hour, cutting people off, weaving in and out of traffic" — and then admitted that the "cutting people off" and "weaving" language appears nowhere in her police report. Ex. N, Transcript Pg 34, ll.

5–8; Ex. N, Transcript Pg 35, ll. 18–21; Ex. N, Transcript Pg 36, ll. 1–4. Her sworn speed figures do not match her report: the report says RADAR 95 and LiDAR 92, 94, 94; under oath she said radar 92, "up to 94," and a single LiDAR lock at 94 — and she admitted there is no printout or independent record of any speed at all. Ex. N, Transcript Pg 11, ll. 15–25; Ex. N, Transcript Pg 12, ll. 1–2; Ex. N, Transcript Pg 29, ll. 10–15. She conceded that her own body-worn camera still photograph shows Plaintiff White's car out of the travel lane. Ex. N, Transcript Pg 16, ll. 7–14. And she admitted that she did not file the Immediate Threat petition with the RMV on the day of the arrest, but two days later — April 11, 2025, the same day Plaintiff White first posted about the incident on social media. Ex. N, Transcript Pg 39, ll. 22–25; Ex. N, Transcript Pg 41, ll. 5–17. Plaintiffs cite the specific pages of that transcript as exhibits to this opposition, and attach only the cited pages — not the whole transcript. The memorandum's probable-cause argument cannot survive the defendant's own sworn words.

**Third, the dismissal was for materially false information — not for lack of probable cause, and not because Trooper Sobrinho Silva failed to appear.** The memorandum's repeated suggestion that Plaintiffs must "prove" the absence of probable cause in this opposition misstates the law and the record. At the pleading stage, Plaintiffs do not have to disprove probable cause; the Court takes their pleaded facts as true. And the October 22, 2025 dismissal is pleaded as what it was: a judicial finding that Trooper Sobrinho Silva presented materially false information. Compl. §§ IV.F, IV.I. Her failure to appear for court-ordered summonses is pleaded only as having prolonged the proceedings and the trauma — never as the cause of the dismissal. *Id.* § IV.I. Plaintiffs ask the Court to hold the memorandum to the Complaint as written, and to the record as it stands.

Plaintiffs are pro se. Plaintiff White is a Department of Mental Health client with severe mental-health and cognitive disorders. Compl. § IV.D. Their Complaint is verified under 28 U.S.C. § 1746 and is to be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Complaint pleads specific facts, count by count, against Trooper Sobrinho Silva by name — she is the officer who made the stop, wrote the report, issued the citation, made the arrest, and submitted the false information to the RMV. The motion should be denied.

---

## I. THE FACTS TAKEN AS TRUE, AND THE EXHIBITS THAT CARRY THEM

The facts below are the Complaint's allegations, taken as true for purposes of this motion. Section cites are to the Verified Complaint (Doc. 1). Where the memorandum disputes a pleaded fact, the dispute is noted — and the record that contradicts the memorandum is identified.

**The stop.** On April 9, 2025, at approximately 5:00 p.m., Plaintiff White was lawfully driving in Massachusetts with his brother, Plaintiff Northcross, a passenger. Plaintiff White, a Black Islamic man, was wearing a traditional Islamic head wrap; Plaintiff Northcross, also Black, wore shoulder-length dreadlocks. Compl. § IV.B. Trooper Sobrinho Silva followed Plaintiff White's vehicle for several miles, tailgating closely before activating emergency lights. Fearing for his safety on a high-speed highway, Plaintiff White pulled into the breakdown lane. Trooper Sobrinho Silva later falsely claimed Plaintiff White stopped in a travel lane — "an assertion contradicted by body-worn camera footage." *Id.* Trooper Sobrinho Silva approached in a hostile and aggressive manner and questioned Plaintiffs about their destination and purpose of travel without any lawful basis. *Id.*

**The arrest.** Trooper Sobrinho Silva appeared to review Plaintiff White's CORI record and called for a tow and backup without probable cause. Trooper Christopher Tobin arrived and stood

gripping his firearm in a threatening posture. Trooper Sobrinho Silva and Trooper Tobin forcibly opened Plaintiff White's door, removed him from the vehicle, handcuffed, and arrested him without lawful justification. No weapons or contraband were found. Compl. § IV.C. Plaintiff Northcross was questioned while being held on scene, threatened, and made to feel unsafe and not free to leave. He was stranded in an unfamiliar location for hours, left without transportation or shelter, and forced to remain in the state police barracks until bail arrangements could be made for his brother. These actions caused Plaintiff Northcross severe emotional distress, fear, anxiety, physical symptoms of stress, and lasting trauma. *Id.*

**Disability.** Plaintiffs are individuals with mental health disabilities protected under the ADA, and Plaintiff White receives treatment through the Massachusetts Department of Mental Health. Defendants failed to accommodate these disabilities and escalated the encounter despite visible distress, causing panic attacks and acute psychological harm. Compl. § IV.D. Mental-health documentation from a licensed social worker is Complaint Exhibit I.

**Religion and retaliation.** During transport, Trooper Sobrinho Silva interrogated Plaintiff White about his religion, including questions about whether he was Christian or Catholic and if he goes to church. These inquiries were unrelated to any alleged offense and demonstrate religious discrimination in violation of the First Amendment. Compl. § IV.E. After Plaintiff White spoke publicly about the incident, Trooper Sobrinho Silva retaliated by submitting false information to the RMV, resulting in an indefinite driver's license suspension. *Id.* The body-worn camera footage of the religion inquiry is Complaint Exhibit F.

**The judicial findings and the continuing harm.** On October 22, 2025, the Dudley District Court allowed Plaintiff White's motion to dismiss, finding materially false information submitted by Trooper Sobrinho Silva. Multiple judges found her testimony not credible after reviewing

body-worn camera footage. Compl. §§ IV.F, IV.I. Despite possessing such exonerating evidence, the institutional defendants — including the Massachusetts State Police, Investigator John Banik, the probation departments, Massachusetts state parole, and the RMV — continued to rely on the false narrative. *Id.* The RMV suspended Plaintiff White's driver's license based on the false submissions, and required him to pay $500 to reinstate it. Compl. § III. Plaintiffs' license has since been reinstated, on January 12, 2026, upon payment of the $500 reinstatement fee. The live prospective relief is correction of the driving record. The harm continues in the insurance market. Allstate declined Plaintiff White outright on that driving record, and GEICO refuses him insurance on the same record, stating that the offense will remain on his record for the next 10 years and that only the RMV can remove it. A third insurer, Foremost, quoted $5,033 for six months. Three insurers, acting on the same record — each refusal a fresh injury — and the remedy for all three lies with the RMV, a defendant here. (Allstate declination letter, New Exhibit G to the Doc. 32 opposition; GEICO conversation, New Exhibit D to the Doc. 32 opposition; Foremost quote, New Exhibit C.) The Allstate letter does not name the RMV or state the contents of the LexisNexis report it relied on; the RMV link is pleaded as allegation, to be proved by the free LexisNexis report and discovery. Probation and parole officials knowingly proceeded with violations. Plaintiff White was subjected to GPS monitoring, curfews, travel restrictions, and repeated court appearances. Compl. § IV.G. The injuries pleaded include severe anxiety, panic attacks, PTSD symptoms, night terrors, asthma complications, hair loss, skin breakouts, physical pain, loss of professional and employment opportunities, and ongoing emotional, physical, and financial harm. Compl. §§ IV.G–IV.H.

**The exhibits.** The Complaint incorporates Exhibits A through M, each verified under 28 U.S.C. § 1746 as a true and correct copy. They include the body-worn camera footage (Ex. A), the

Dudley dismissal order (Ex. B), the police report and statement of facts (Ex. C), the RMV Immediate Threat letter and suspension notice (Ex. D), Trooper Sobrinho Silva's request to the RMV (Ex. E), the body-camera footage of the religion inquiry (Ex. F), the parole and probation violation proceedings (Ex. G), the State Trooper Investigator's statement and emails (Ex. H), mental-health documentation (Ex. I), the vehicle registration cancellation (Ex. J), images of the Emmy Award and Edward R. Murrow Award (Ex. K), social-media posts (Ex. L), and the audio recording of the RMV hearing (Ex. M). This opposition also relies on the transcript of Trooper Sobrinho Silva's sworn testimony of January 8, 2026, cited by page and line and attached only as to the cited pages, and on the declarations of Plaintiff Northcross filed herewith upon signature. See Exhibit List, *infra*.

**What the memorandum adds that the Complaint does not allege.** The memorandum's factual narrative (Doc. 59, pp. 4–5) is Trooper Sobrinho Silva's version, not the Complaint's. Where it departs from the Complaint, Plaintiffs identify the departure in the count-by-count argument below. By way of summary, the memorandum asserts: that Plaintiff White "initially pulled over in the far-left lane"; that he was "issued a speeding ticket for operating a motor vehicle at ninety-four (94) miles per hour"; that Plaintiff Northcross "did not have a valid driver's license" and was "offered transportation to the barracks"; that the religion conversation was "a conversation begun by White"; and that Trooper Sobrinho Silva had probable cause for "three motor vehicle citations and one criminal offense." None of those propositions is pleaded in the Complaint. Each is a factual dispute to be resolved on a full record — not a basis for dismissal.

## II. THE STANDARD THE COURT MUST APPLY — PRO SE, VERIFIED, AND READ IN PLAINTIFFS' FAVOR

**The sole inquiry** on a motion to dismiss is "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Hernández*, 640 F.3d at 7. The Court applies the two-step analysis of *Ashcroft v. Iqbal*, 556 U.S. 662, 678–679 (2009): first strip legal conclusions, then test the remaining facts for plausibility. The Complaint is read as a whole, for its cumulative effect, not parsed piece by piece. *Ocasio-Hernández*, 640 F.3d at 13–14. "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss." *Id.* at 14. Threadbare recitals and legal conclusions do not suffice — but the Complaint here does not rest on them. It pleads who did what, when, and with what consequences, section by section. The memorandum's invocation of *In re Citigroup, Inc.*, 535 F.3d 45, 52 (1st Cir. 2008), and *Glaros v. Perse*, 628 F.2d 679, 684 (1st Cir. 1980) (Doc. 59, p. 3), adds nothing to that standard: both state the same first step of *Iqbal*. Plaintiffs meet it by pointing to the Complaint's specific factual allegations, not labels.

**Pro se liberal construction.** "A document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94; *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). Judge Casper applies this in this District. *Daniels v. Varela*, No. 19-10623-DJC (D. Mass. Sept. 9, 2020). Plaintiffs do not ask the Court to excuse *Twombly/Iqbal* plausibility — pro se status does not excuse Rule 8 compliance. *Boivin v. Black*, 225 F.3d 36, 43 (1st Cir. 2000). They ask only for what the law already gives them: a Complaint read in their favor, with its specific facts credited. Plaintiff White is a Department of Mental Health client with severe mental-health and cognitive disorders, Compl. § IV.D, and Plaintiffs proceed without counsel

after the Court denied Plaintiff White's renewed motion for appointed counsel (Doc. 51). The Court should weigh that in reading a Complaint that pleads its facts plainly and in order.

**Verification.** The Complaint is verified under 28 U.S.C. § 1746. Verification does not change the Rule 12(b)(6) test — the Court already takes the allegations as true. Its weight comes later: at summary judgment, a verified complaint is "the functional equivalent of an affidavit to the extent that it satisfies the standards explicated in Rule 56." *Sheinkopf v. Stone*, 927 F.2d 1259, 1262, 1271 (1st Cir. 1991); Fed. R. Civ. P. 56(c)(4). Plaintiffs note it here for one reason: the Complaint's verification means the factual allegations the memorandum disputes are sworn allegations, not lawyer's argument — and they are corroborated, count by count, by the exhibits the Complaint incorporates and by Trooper Sobrinho Silva's own sworn testimony, cited below.

**The body-worn camera and the transcript at this stage.** The memorandum asks the Court to consider Trooper Sobrinho Silva's body-worn camera video (Doc. 61, Exhibit 1) at the pleading stage, citing *Bowman v. Monteiro*, No. 24-CV-10850-AK, 2025 WL 2174871, at *2 (D. Mass. July 31, 2025), and related authority (Doc. 59, pp. 2–3).* Bowman* holds only that properly authenticated body-worn camera footage that is central to a plaintiff's claims "may be considered" on a motion to dismiss. It does not hold that a defendant's excerpt displaces the Complaint whenever the defendant says it does. The First Circuit's rule is that "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56," subject to narrow exceptions. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *Beddall v. State Street Bank*, 137 F.3d 12, 17 (1st Cir. 1998). The video here is Trooper Sobrinho Silva's exhibit, not an exhibit to the Complaint, and the Complaint's allegations are adverse to her reading of it — the Complaint says the video contradicts her report. Compl. § IV.B. Authenticity

is not the question: even an authentic video does not show what the defendant claims it shows. If the Court is inclined to watch the video and weigh it against the Complaint, it must either exclude it or convert the motion under Federal Rule of Civil Procedure 12(d), with notice and a reasonable opportunity for Plaintiffs to present all pertinent material. It may not weigh the video against the Complaint while calling the motion a Rule 12(b)(6) motion. The same applies to the transcript pages attached to this opposition: they are offered to show what Trooper Sobrinho Silva has said under oath, and Plaintiffs request Rule 12(d) treatment to the extent the Court considers them. See Section XV, *infra*. What the video cannot do — on any reading — is supply probable cause: speed is not visible on body-worn camera, and a two-to-three-second excerpt cannot "blatantly contradict" the Complaint's account of the stop, the arrest, and the months of proceedings that followed. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (summary judgment; "blatant" contradiction standard).

---

## III. THRESHOLD ISSUES — OFFICIAL CAPACITY, RULE 11, AND TWO GROUNDS THE MEMORANDUM NEVER BRIEFS

### A. Official-capacity claims: Plaintiffs do not concede damages; the individual-capacity claims survive (Doc. 59, § A)

Defendant Sobrinho Silva is sued in her individual and official capacities. Compl. § III. Her 12(b)(1) argument is that a state official sued in official capacity is the State, not a § 1983 "person" for damages. *Will v. Michigan*, 491 U.S. 58, 71 (1989); *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 105 (1st Cir. 2015); *Fantini v. Salem State College*, 557 F.3d 22, 33 (1st Cir. 2009); *Quern v. Jordan*, 440 U.S. 332, 341–42 (1979).

Plaintiffs do not concede the point. Whether *Will* bars retrospective damages against Trooper Sobrinho Silva in her official capacity is for the Court to decide. If the Court holds it barred, that

is the Court's ruling — not Plaintiffs' concession — and it decides nothing about the claims that follow:

**Individual-capacity claims are untouched by *Will*.** The Complaint sues Trooper Sobrinho Silva in her individual capacity for damages, and qualified immunity — not sovereign immunity — is the defense to those claims. That defense is addressed in Section XIV, *infra*.

**Prospective relief is an *Ex parte Young* question, not a *Will* question.** *Ex parte Young*, 209 U.S. 123 (1908); *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002). Plaintiffs seek declaratory and injunctive relief, Compl. § VI, and the live prospective relief is correction of the driving record — which must be directed at a named official with enforcement authority over the record. Plaintiffs preserve *Young* relief against every defendant with that authority, and they preserve the $500 reinstatement fee as part of the damages caused by the false submissions. Whether *Edelman v. Jordan*, 415 U.S. 651, 663–677 (1974), limits any of that relief is for the Court to decide.

**State-law claims for injunctive relief.** Plaintiffs preserve their state-law claims against Trooper Sobrinho Silva. Whether *Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 103–106 (1984), bars them in federal court is for the Court to decide.

The 12(b)(1) ground, even if the Court sustains it, removes at most one slice of relief against one capacity of one defendant. It does not touch the individual-capacity damages claims that are the center of this motion.

## B. Plaintiff Northcross and Rule 11: the defect, if any, is curable — and the cure is filed with this opposition (Doc. 59, § B; Doc. 58, Rule 11 ground)

The motion asks the Court to dismiss all of Plaintiff Northcross's claims because he "failed to sign the complaint." Doc. 58, p. 1; Doc. 59, pp. 6–7. Rule 11(a) provides: "The court must strike

an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention." Fed. R. Civ. P. 11(a). The rule names **striking the paper** as the remedy — not dismissal of the claims — and only if the omission is **not** promptly corrected. The defect is not jurisdictional and not automatically fatal. *Becker v. Montgomery*, 532 U.S. 757, 763–64 (2001) (unanimous): "For want of a signature on a timely notice, the appeal is not automatically lost… [the case] may proceed so long as the appellant promptly supplies the signature once the omission is called to his attention."

**The memorandum's own authority cuts against dismissal.** *Casanova v. Dubois*, 289 F.3d 142, 145–46 (1st Cir. 2002) — cited by the memorandum at page 7 — applied *Becker* and did **not** dismiss the six non-signing co-plaintiffs: the First Circuit directed the Clerk to serve each with instructions to sign and return within 14 days; all six did so timely, and the appeal proceeded as to them. The memorandum misdescribes *Casanova* as a case about "all defendants required to sign notice of appeal." The non-signers were co-plaintiff appellants, not defendants. The pattern in the cases is consistent: courts give a short window (14 to 30 days) and dismiss — without prejudice — only if the party ignores it. No case dismisses a co-plaintiff's claims with prejudice on the merits for a first, promptly corrected signature omission.

**Plaintiff Northcross is a real participant, and the defendants' own filings prove the arrangement was communicated in writing before they filed.** Plaintiff Northcross is a named plaintiff with his own injuries and his own $3,000,000 claim. Compl. §§ III, IV.C, IV.H, VI.B. He works through Plaintiff White's email; the two Plaintiffs put the fight together, go over all edits, and submit together. That is not a post-hoc assertion. Defendant Sobrinho Silva's own counsel, Joseph Donnellan, was told in writing on November 17, 2026, at 11:40 a.m.: "Regarding my brother, Sincere Northcross, he has indicated that he would like to proceed with

communications through my email address. I will relay your correspondence to him, and his responses will be communicated through me." Doc. 60-1, Ex. 1. Mr. Donnellan replied at 11:54 a.m.: "As for your brother, I must deal with him directly, and not through you." *Id.* His certificate then states: "I have not heard at all from Mr. Northcross." Doc. 60, ¶ 6. That sentence is literally true — and it omits that he was told why, and that he rejected the route offered. The memorandum's further claim — that Plaintiff Northcross's failure to provide contact information "has made it impossible for counsel to confer with him" (Doc. 59, p. 7) — is contradicted by counsel's own filing. The movants had a working channel, used it, and were told how to reach Plaintiff Northcross. A movant given a channel, who rejects it, then complains he heard nothing through the channel he rejected, has not shown Plaintiffs' non-cooperation. And Rule 11(a) does not require a party to speak directly to opposing counsel or answer a conferral email; it requires a signature and contact information on papers.

**The cure.** Plaintiffs file with this opposition: (1) the Declaration of Sincere Northcross, signed by Plaintiff Northcross himself, in which he states that he believes he signed the complaint in this action, and asks the Court — if his signature does not appear on the complaint — to treat that omission as a harmless error and to accept his signature on the declaration as his acknowledgment that he is a full participant and litigant in this action against the defendants; (2) this opposition, signed by **both** Plaintiffs, each with his own complete Rule 11(a) contact block; and (3) a request for leave to file a signed First Amended Complaint under Rule 15(a)(1)(B) — as of course within 21 days after service of a Rule 12(b) motion — signed by both Plaintiffs, with Plaintiff Northcross also signing the § 1746 verification, re-pleading all claims. The 21-day window runs to December 13, 2026; filing with this opposition on December 7, 2026 is safely inside it. The Advisory Committee Notes to the 1983 Amendment to Rule 11(a) state the cure

expressly: "Correction can be made by signing the paper on file or by submitting a duplicate that contains the signature." The cure attaches to the unsigned paper itself — the Complaint. Plaintiffs do not ask the Court to treat a signed opposition alone as the cure.

**Two points.** First, Plaintiffs do not concede the signature point on the basis of the copy of the Complaint in their own files: the copy on file here is not the original. Plaintiffs state that they both signed the original complaint and that Plaintiff Northcross went to the court with Plaintiff White. If the filed original lacks Plaintiff Northcross's signature, he will sign again with no problem, and the cure sequence above does exactly that. Second, The rule of 28 U.S.C. § 1654 and *Herrera-Venegas v. Sanchez-Rivera*, 681 F.2d 41, 42 (1st Cir. 1982): an individual may appear in federal court only pro se or through legal counsel, and a pro se party cannot represent anyone other than himself. *Hootstein v. Amherst-Pelham Reg'l Sch. Comm.*, 361 F. Supp. 3d 94, 101 (D. Mass. 2019). Plaintiff Northcross acts for himself, not through Plaintiff White as counsel. In *Hootstein* the grandson was not a named plaintiff and never signed anything. Plaintiff Northcross **is** a named plaintiff with his own claims; the defect, if any, is his missing signature — not his absence. Two pro se plaintiffs can file a joint complaint if each signs it. Plaintiff White's signature validates the Complaint as to Plaintiff White; it is ineffective as to Plaintiff Northcross. The Complaint is not void as a whole; it is unsigned as to Plaintiff Northcross, if at all — and the cure is filed with this opposition. The Court should deem the Complaint signed, or deny the Rule 11 ground as moot. In the alternative, Plaintiffs request leave to amend and sign. In the further alternative, any dismissal as to Plaintiff Northcross should be without prejudice. And if the Rule 11 ground succeeds at all, it threatens only Plaintiff Northcross's claims against Trooper Sobrinho Silva; Plaintiff White's claims are unaffected.

**The conferral point does not help the motion.** The duty to confer is the movant's. D. Mass. L.R. 7.1(a)(2). A plaintiff's missing contact information does not shift it, and does not convert a conferral failure into a ground to dismiss the plaintiff's claims. If conferral was defective, the consequence — if any — falls on the movant's motion. *Hootstein*, 361 F. Supp. 3d at 103; *Gerakaris v. Champagne*, 913 F. Supp. 646, 651 (D. Mass. 1996); *Safeguard Props. Mgmt., LLC*, No. 1:22-cv-11004-DJC, Doc. 35 (D. Mass. Nov. 8, 2022) (Casper, J.). They use the certificates only defensively: to show that the claim that conferral was "impossible" is contradicted by the movant's own filing.

### C. "Absolute immunity" and "police privilege": invoked in one sentence, briefed nowhere — waived (Doc. 58, final paragraph)

The motion's final paragraph states that Trooper Sobrinho Silva "also moves to dismiss Plaintiffs' complaint under the defense of qualified immunity, absolute immunity, and police privilege." Doc. 58, p. 1. The 20-page memorandum that the motion incorporates by reference contains no absolute-immunity section, no police-privilege section, no citation offered for either, and no facts tied to either. The single motion sentence is the entire assertion.

Under First Circuit law, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." *United States v. Fulmer*, 108 F.3d 1486, 1495 (1st Cir. 1997) (quoting *Zannino*). The Court should decide this motion on the grounds actually briefed — 12(b)(1), 12(b)(6), Rule 11, and qualified immunity — and should not reach "absolute immunity" or "police privilege." Plaintiffs do not invite the Court to supply the missing argument.

If the Court does reach them, the law is against Trooper Sobrinho Silva on both. **Absolute immunity** turns on "the nature of the function performed, not the identity of the actor who performed it," and is available only for conduct "intimately associated with the judicial phase of the criminal process." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269–271 (1993) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). A police officer is entitled only to qualified immunity, not absolute immunity, for investigative and arrest conduct. *Malley v. Briggs*, 475 U.S. 335, 339–346 (1986) — a Rhode Island state trooper who applied for arrest warrants was "not entitled to absolute immunity but only to qualified immunity from liability for damages." *Buckley*, 509 U.S. at 271–276 — even a prosecutor acting as an investigator gets only qualified immunity. Trooper Sobrinho Silva's pleaded conduct — the traffic stop, the arrest, writing the police report, issuing the citation, and submitting the RMV Immediate Threat request — is investigative and administrative conduct, not conduct intimately associated with the judicial phase. The one absolute-immunity doctrine that could touch a trooper, witness immunity, covers testimony only. *Briscoe v. LaHue*, 460 U.S. 325 (1983). The Complaint's counts concern the stop, the arrest, the false report, and the RMV submission — not her testimony. **"Police privilege"** is not a recognized § 1983 dismissal defense. The closest doctrines it could map to do not bar these claims: the law-enforcement investigatory privilege is a qualified, judge-fashioned **evidentiary** privilege that lets the government withhold certain information from disclosure in discovery — it is a discovery privilege, not a defense to liability and not a ground for dismissal. *Roviaro v. United States*, 353 U.S. 53 (1957); *Puerto Rico v. United States*, 490 F.3d 50, 64 (1st Cir. 2007). A qualified privilege in defamation would at most bear on Count VIII, which the memorandum does not address at all. Because the movant has not said which privilege she means, cited no authority, and tied it to no fact, Plaintiffs do not guess for her.

**Certificate of service.** The motion's Certificate of Service (Doc. 58, p. 2) states that counsel served "the foregoing NOTICE OF APPEARANCE." The foregoing document is the Motion to Dismiss, not a notice of appearance. Plaintiffs note the misdescription as a footnote-level observation about the care with which the defense filings were prepared — a second misdescribed certificate in two motions filed the same day — not as a ground to strike or deny the motion. The certificate still evidences service via ECF and first-class mail on November 22, 2026, and no prejudice is apparent.

---

# IV. COUNT I — FOURTH AMENDMENT (§ 1983): THE STOP AND ARREST WERE WITHOUT PROBABLE CAUSE, AND THE MEMORANDUM'S PROBABLE-CAUSE CASE IS THE REPORT THE COMPLAINT ALLEGES IS FALSE

## A. The elements, and what the Complaint pleads

A Fourth Amendment false-arrest claim requires a seizure without lawful justification. "Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Information the officer knows or should know is false is not "reasonably trustworthy." A stop needs reasonable suspicion; an arrest needs probable cause. *Terry v. Ohio*, 391 U.S. 1 (1968); *Heien v. North Carolina*, 574 U.S. 54 (2014) (a reasonable mistake of law can support a **stop** — it does not supply probable cause for an **arrest**).

The Complaint pleads the claim against Trooper Sobrinho Silva directly, by name, in specific terms. Compl. § IV.B: Trooper Sobrinho Silva followed Plaintiff White for several miles, tailgating closely, before activating emergency lights; Plaintiff White pulled into the breakdown

lane; Trooper Sobrinho Silva later falsely claimed he stopped in a travel lane — "an assertion contradicted by body-worn camera footage." Compl. § IV.C: Trooper Sobrinho Silva "called for a tow and backup **without probable cause**"; she and Trooper Tobin "forcibly opened Plaintiff White's door, removed him from the vehicle, handcuffed, and arrested him **without lawful justification**. No weapons or contraband were found." Compl. §§ IV.F, IV.I: the Dudley District Court dismissed the charges on October 22, 2025, finding materially false information submitted by Trooper Sobrinho Silva, and multiple judges found her testimony not credible after reviewing body-worn camera footage. Those allegations, taken as true, state a Fourth Amendment claim. The memorandum's answer is to ask the Court to believe a different set of facts. That is not a Rule 12(b)(6) argument.

## B. The memorandum's probable-cause case is the police report — the very document alleged to be false

The memorandum's Count I argument (Doc. 59, pp. 7–10) is built on Exhibit C, the police report: a 94 mph radar/lidar observation (Doc. 59, p. 7, citing Doc. No. 1-1, p. 19), a footnote quoting the report's "over 100mph" passage verbatim (Doc. 59, p. 9, n.1), and the proposition that Trooper Sobrinho Silva was "monitoring traffic on Interstate 84 in an effort to detect motorists who were operating in violation of the Commonwealth's traffic laws" (Doc. 59, p. 17). But Exhibit C is the document the Complaint alleges is false. Compl. §§ IV.F, IV.I. At the pleading stage, the Complaint controls — not the exhibit the Complaint says is false. A court does not resolve a falsity allegation by crediting the allegedly false document. *Cf. Glik v. Cunniffe*, 655 F.3d 78, 79, 88 (1st Cir. 2011) (qualified immunity denied at Rule 12(b)(6) on a false-arrest claim where state charges had been dismissed as baseless).

The memorandum's framing contradicts its own exhibit in its opening paragraph. It says Trooper Sobrinho Silva "issued White a speeding ticket for operating a motor vehicle at ninety-four (94)

miles per hour" in a 65 mph zone. Doc. 59, p. 1. **She did not.** Citation 329626AD — the citation issued on the basis of that alleged observation — has its SPEEDING box **completely blank**: no speed, no zone, no method of detection checked. The memorandum's first factual sentence is contradicted by the charging instrument itself. And Trooper Sobrinho Silva admitted it under oath:

> Q: "You left all that blank." A: "No. The speeding charge is here. So —" Q: "I'm asking you about the specific section about the speeding, how fast he's going, the ways that you measured that speed. You left that entire section blank, correct?" A: "Yes, because he just didn't allow me to." Q: "He stopped you from filing a citation?" A: "No. That's not what I said, actually." Ex. N, Transcript Pg 38, l. 25 – Transcript Pg 39, l. 9 (Ex. N, Transcript Pgs 38–39).

She admits the entire speeding section — speed and method — was left blank, and the explanation she offered was withdrawn by her in the same exchange. She also testified that she does not remember what the citation looked like or how many infractions it contained. Ex. N, Transcript Pg 38, ll. 1–7. A citation that documents no speed and no measurement method is the charging instrument for a speeding-based stop and arrest. The memorandum never addresses the blank citation. It cannot — the blank citation is fatal to the claim that a 94 mph observation was documented at the time.

## C. Her sworn speed figures do not match her report — and there is no record of any speed

The memorandum treats the speed as a settled fact: 94 mph. Doc. 59, pp. 1, 4, 7. Under oath, Trooper Sobrinho Silva gave different figures, and admitted there is no record behind any of them:

**Report:** RADAR lock 95 mph; LiDAR 92 mph, then 94 mph, then a third time 94 mph. Ex. C.

**Testimony:** radar "locked the vehicle's speed at 92. And from what I can remember, I believe it was up to 94 miles an hour. I then used my LiDAR… I locked the vehicle's speed on my LiDAR

at 94 miles an hour as well." Ex. N, Transcript Pg 11, ll. 15–25; Ex. N, Transcript Pg 12, ll. 1–2. A single LiDAR lock — not three.

**To Trooper Tobin, before the arrest:** "like, 95 miles an hour." Ex. N, Transcript Pg 34, ll. 5–8.

**No independent record:** "Your radar and the LiDAR that you use, that doesn't create any independent record of the speeds that it's calculating, correct? There's no printout or anything that you can do with that." A: "No." Ex. N, Transcript Pg 29, ll. 10–15.

**How the number was tied to the car:** by her visual "tracking history" — "I'm observing the traffic and I'm seeing what car looks like they're moving faster than everybody else." Ex. N, Transcript Pg 27, ll. 1–7. She was on the Exit 5 on-ramp, not on the shoulder of I-84, with trees between her position and the travel lanes, and the radar in that position was front-only. Ex. N, Transcript Pg 24, ll. 20–24; Ex. N, Transcript Pg 25, ll. 6–9, 18–24; Ex. N, Transcript Pg 27, ll. 21–25; Ex. N, Transcript Pg 28, ll. 1–2.

The speed — the sole predicate for the stop, the arrest, the charges, and the RMV submission — rests entirely on her word, and her word changes between the report, the testimony, and the briefing of Trooper Tobin. That is a credibility dispute, and credibility is not decided on a motion to dismiss. It is also, directly, the Complaint's allegation: the speed figures were fabricated, and the judges who reviewed the body-worn camera footage found her testimony not credible. Compl. §§ IV.F, IV.I.

### D. The stop location: her own body-worn camera still contradicts her — and she conceded it

The memorandum says Plaintiff White "initially pulled over in the far-left lane" and that Trooper Sobrinho Silva directed him to the far-right breakdown lane. Doc. 59, p. 4. The Complaint pleads the opposite: Plaintiff White pulled into the breakdown lane, and Trooper Sobrinho Silva later falsely claimed he stopped in a travel lane — "an assertion contradicted by body-worn camera

footage." Compl. § IV.B. The memorandum's version is not pleaded anywhere in the Complaint. It is a factual dispute about the same event, and it is resolved by the full body-worn camera footage — not by the memorandum's characterization.

Under oath, Trooper Sobrinho Silva conceded the point against herself. Shown a still from her own body-worn camera:

> Q: "It's fair to say that his car is not in the travel lane, correct?" A: "Once — he initially stopped in the travel lane and then he —" Q: "I'm just asking you a simple question. It's fair to say that his car is not stopped in the travel lane." A: "At that time, no." Ex. N, Transcript Pg 16, ll. 2–14 (Ex. N, Transcript Pg 16).

Her position depends entirely on the word "initially," repeated four times, Ex. N, Transcript Pg 17, ll. 12–21; Ex. N, Transcript Pg 22, l. 22 – Transcript Pg 23, l. 6, and on audio that does not exist for the first 30 seconds of the recording — the body-worn camera audio "doesn't kick in until after 30 seconds," Ex. N, Transcript Pg 18, ll. 13–15 — and on a cruiser-mounted camera she does not have. Ex. N, Transcript Pg 18, ll. 18–19. The stop-location claim was the factual predicate she used to justify the reckless-operation charge and the "dangerous stop" narrative. Her own video, as she concedes it, does not support it.

## E. "I don't know if I was going that fast" is not an admission of 94 mph

The memorandum quotes Plaintiff White on the body-worn camera at Exhibit 1, 2:26–2:29: "I don't know if I was going that fast." Doc. 59, p. 7. Plaintiffs address it directly, because the Court will have seen it. It is a statement of **uncertainty**, not an admission of 94 mph. It does not establish probable cause. A person who says he does not know whether he was going "that fast" has not admitted a speed. And at Rule 12(b)(6), a video excerpt must be authenticated and central, and cannot resolve disputed facts — see Section II, *supra*, and Section XV, *infra*. The Court should also read the statement in the context the Complaint pleads: Plaintiff White was in the midst of a panic attack and a mental-health breakdown during the encounter, Compl. § IV.D,

and his words on the recording are the words of a man in crisis, not a calm admission. The memorandum quotes two seconds of audio as if it were a confession. It is not.

### F. The Dudley dismissal: materially false information — not a probable-cause finding, and not a failure to appear

The memorandum's probable-cause argument depends on a misstatement of what happened in Dudley District Court. The Complaint pleads it plainly: "On October 22, 2025, the Dudley District Court allowed Plaintiff White's motion to dismiss, finding materially false information submitted by Trooper Sobrinho Silva." Compl. § IV.F. The dismissal order is Complaint Exhibit B. The Complaint further pleads that "[m]ultiple judges found her testimony not credible after reviewing body-worn camera footage." Compl. § IV.I.

Plaintiffs make three points, and ask the Court to hold them in mind through the rest of this opposition:

**The dismissal was for materially false information.** It was not a finding that probable cause was "close" or "arguable" or "lacking on a technicality." A court found that the trooper who made the arrest had submitted materially false information to obtain the charges. That finding goes to the predicate fact on which probable cause supposedly rested. The memorandum's reliance on *Goddard v. Kelley*, 629 F. Supp. 2d 115, 130 (D. Mass. 2009) — that an acquittal or dismissal alone does not prove lack of probable cause — misses the point. *Goddard* was a summary-judgment case, and it does not address a judicial finding that the sole inculpatory fact was materially false. Plaintiffs do not argue "dismissal, therefore no probable cause." They argue: the Complaint pleads specific falsity facts — the blank citation, the body-worn camera contradiction, the shifting sworn figures — and the Dudley finding **corroborates** those allegations. At the pleading stage, that is more than enough.

**Plaintiffs do not have to disprove probable cause in this opposition.** The memorandum repeatedly frames the case as if Plaintiff White bears the burden of proving the absence of probable cause. That is wrong. At Rule 12(b)(6), the Court takes Plaintiffs' pleaded facts as true. The burden at this stage is plausibility, not proof. Probable cause is a defense the defendant must establish on the facts as pleaded — and on the facts as pleaded, there was no speed recorded, no lawful basis for the stop, and no lawful justification for the arrest. Compl. §§ IV.B–IV.C.

**A second body reached the same conclusion.** The probation violation proceedings ended in Plaintiff White's favor — twice. On July 9, 2025, after the body-worn camera video of the stop (Exhibits Probation 1–4) was admitted, the court found Plaintiff White 'Not found in violation of probation.' (Docket, Case No. 10YO0006RO, p. 12, printed Aug. 7, 2025; Hon. Peter M. Coyne, Presiding.) On August 21, 2025, the court dismissed the probation surrender by order of the court — 'Surrender Dismissed by Order of the Court. Defendant remains on probation.' (Suffolk County Criminal Docket Report, Case No. 1084YO10516, pp. 14–15, printed Aug. 22, 2025; Hon. Christopher Belezos, Presiding.) The Commonwealth could not prove the violation with the information the trooper sent — the report and the video. The defendants keep carrying the same account from body to body, and where the evidence was actually tested, it did not hold — yet they continue to present it to the next body as if it had. Plaintiffs ask the Court to note the pattern: the violation could not be proved, and it is not Plaintiffs' burden to re-prove it here. 3.

**Her failure to appear is not the cause of the dismissal.** The Complaint pleads that "Trooper Sobrinho [Silva] failed to appear for court-ordered summonses, prolonging proceedings and trauma." Compl. § IV.I. Her non-appearance is mentioned only as prolonging the proceedings — never as the cause of the dismissal. The dismissal was caused by her presenting materially false material. Plaintiffs will not let the memorandum reframe it otherwise.

The memorandum's further authorities do not change this. *Commonwealth v. Heughan*, 40 Mass. App. Ct. 102, 104 (1996); *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009); *Commonwealth v. Amado*, 474 Mass. 147, 151 (2016); *Commonwealth v. Larose*, 483 Mass. 323, 327–328 (2019) — all address reasonable suspicion for a stop on facts as found, not a stop whose predicate the complaint alleges was fabricated. *Harper v. Booth*, 382 F. Supp. 3d 124, 128 (2019), for the proposition that there is "[n]o right to operate a motor vehicle in violation of traffic laws," is a straw man: the right at issue is the right to be free from seizure without probable cause, not a right to speed. And *Nieves v. McSweeney*, 241 F.3d 46, 55 (1st Cir. 2001) — that court appearances do not themselves constitute a constitutional violation — is answered by the Complaint itself: the appearances are pleaded as **damages and consequences**, not as the violation. The violation is the arrest and prosecution without probable cause. Compl. §§ IV.G–IV.H.

## G. Qualified immunity on Count I fails with probable cause

Trooper Sobrinho Silva's qualified-immunity argument on Count I is entirely probable-cause-dependent: she "is entitled to qualified immunity… as both the citation she issued White and the arrest she made of White were based on probable cause." Doc. 59, p. 2; see also p. 10 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). There is no standalone prong-two, clearly-established analysis in the memorandum. If probable cause fails on the Complaint's facts, her qualified immunity fails with it — subject to arguable probable cause. *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir. 1992); *Wilber v. Curtis*, 872 F.3d 15, 21 (1st Cir. 2017). But "qualified immunity does not attach where the absence of probable cause is not 'arguable or subject to legitimate question.'" *Wilber*, 872 F.3d at 21; *Topp v. Wolkowski*, 994 F.2d 45, 48 (1st Cir. 1993). On the Complaint's facts — no speed recorded on the citation, a report contradicted by

body-worn camera footage, and judicial findings that the trooper's testimony was not credible — a court taking the Complaint as true can find the absence of probable cause was not "arguable." And the right was clearly established: it has "long been clearly established law that the Fourth Amendment prohibits a police officer from manufacturing probable cause by knowingly including false statements in a warrant affidavit." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 96 (1st Cir. 2013) (decided on a motion-to-dismiss / qualified-immunity posture, affirming denial of qualified immunity). *Glik*, 655 F.3d at 79, 88 (qualified immunity denied at Rule 12(b)(6) on a false-arrest claim). *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004) ("the right not to be framed by law enforcement agents was clearly established in 1967"). See Section XIV, *infra*.

## H. Plaintiff Northcross: a passenger is seized, and his detention lasted hours after the mission ended

Plaintiff Northcross was a passenger in the car. A passenger is seized during a traffic stop and may challenge it. *Brendlin v. California*, 551 U.S. 249, 251 (2007). The Complaint pleads that he "was questioned while being held on scene, threatened, and made to feel unsafe and not free to leave. He was stranded in an unfamiliar location for hours, left without transportation or shelter, and forced to remain in the state police barracks until bail arrangements could be made for his Brother." Compl. § IV.C. That is not a complaint about the stop itself. It is a complaint about **hours** of post-arrest detention and stranding after the traffic mission ended. *United States v. Starks*, 301 F. Supp. 2d 76, 86–87 (D. Mass. 2004) (detention beyond the stop's purpose violates the Fourth Amendment); *Rodriguez v. United States*, 575 U.S. 431, 439–40 (2015) (mission prolongation unlawful).

The memorandum reframes the hours-long holding as an "offered ride": because Plaintiff Northcross "did not have a valid driver's license, he was not allowed to drive the rental car," and "[i]nstead, he was offered transportation to the barracks so that he could wait for White to be

bailed." Doc. 59, p. 5 (citing Doc. No. 1-1, pp. 20, 23; Exhibit 1, 11:10–11:34). That assertion comes from the police report — her own document — not from the Complaint. Whether Plaintiff Northcross was free to leave is a factual dispute. An "offer" of transport to a barracks where he was then held for hours, without transportation or shelter, is not freedom of movement. Plaintiffs do not concede the license assertion, which the memorandum sources only to the report. The Complaint's allegation — held on scene, threatened, not free to leave, stranded for hours — governs at this stage.

**Count I states a claim against Trooper Sobrinho Silva, and her qualified immunity does not defeat it on the Complaint's facts.**

---

## V. COUNT II — EXCESSIVE FORCE (§ 1983): A COMPLIANT MAN, NO CONTRABAND, A GUN GRIPPED IN A THREATENING POSTURE, AND A FORCIBLE REMOVAL

The memorandum (Doc. 59, pp. 10–12) argues that handcuffing a compliant subject is not force, citing 555 CMR 6.04, *Conlon v. City of Newton*, Civil Action 23-10026-FDS (D. Mass. June 21, 2024), *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007), *Dean v. City of Worcester*, 924 F.2d 364, 368–369 (1st Cir. 1991), and *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). It adds the body-worn camera timestamp Exhibit 1, 09:33–11:00 (handcuffing) and the assertion that "White only sets forth that he was handcuffed. He does not allege any injury from the handcuffing, nor could he."

Plaintiffs answer with the Complaint's facts, which the memorandum does not quote. Compl. § IV.C: Trooper Tobin "stood gripping his firearm in a threatening posture"; Trooper Sobrinho Silva and Trooper Tobin "forcibly opened Plaintiff White's door, removed him from the vehicle,

handcuffed, and arrested him." No weapons or contraband were found. The police report itself states: "WHITE did not physically resist once he was stepping out of the vehicle." Ex. C, ¶ 4. Under *Graham v. Connor*, 490 U.S. 386, 396–397 (1989), force is judged by objective reasonableness under the circumstances — the severity of the crime, the immediate threat, and whether the person was resisting or fleeing. A compliant, non-resisting person, no weapons, no contraband, and a forcible removal from his car while a trooper grips a firearm in a threatening posture are facts that bear directly on *Graham* reasonableness. The memorandum's regulation, 555 CMR 6.04, is a state regulation about handcuffing; it is not a Fourth Amendment holding, and it does not answer whether the force used here — the forcible opening of the door, the removal, the handcuffing, the firearm gripped in a threatening posture — was objectively reasonable.

*Dean*, 924 F.2d at 368–369, holds that handcuffing without injury does not state an excessive-force claim. Count II is not pleaded as "handcuffing alone." It is pleaded as a forcible removal of a compliant man at gunpoint-posture, as part of an arrest without lawful justification. *Mlodzinski v. Lewis*, 648 F.3d 24, 35–37 (1st Cir. 2011) — gun display against a non-threatening person — supports the proposition that a show of force against a person who poses no threat can be unreasonable. The memorandum will draw a distinction, that *Mlodzinski* involved pointing a weapon and the Complaint alleges gripping a holstered firearm; Plaintiffs ask the Court to treat that as a question of fact (duration, proximity, whether the weapon was visible, Plaintiff White's perception) rather than a pleading defect. At Rule 12(b)(6), the Court takes "threatening posture" as pleaded.

Two further points belong in this section. **First**, the force did not stop at the car. Plaintiff White's account, supported by the body-worn camera, is that Trooper Sobrinho Silva opened the car

door, ripped off his seatbelt, turned him around, and put him in cuffs — while Trooper Tobin held his gun and stared at him as if he were going to kill him, and Trooper Sobrinho Silva fidgeted as if she were about to shoot her gun, her hands and body moving aggressively. She opened the car door without cause and without any lawful basis. The seatbelt and fidgeting facts are not pleaded in the Complaint as filed; Plaintiffs offer them here as body-worn-camera-supported context for the pleaded excessive-force count, and seek leave to amend under Rule 15 to plead them expressly. See Section XVI, *infra*. **Second**, the force continued through booking: Trooper Sobrinho Silva herself did Plaintiff White's booking at the barracks, grabbing his hands tightly while fingerprinting him and grabbing his arms in general — physical contact during the booking process that was unwanted. He felt totally violated and afraid for his life. The booking contact is likewise not pleaded in the Complaint as filed — the Complaint alleges the forcible removal, handcuffing, and arrest, Compl. § IV.C, but not the booking, the fingerprinting, or the grabbing — and Plaintiffs offer it as context for the pleaded count and as a further Rule 15 amendment point, not as if it were already pleaded. The argument structure is the same in both instances: force used during an unlawful arrest lacks lawful justification, so the contact is part of the same unlawful seizure that began at the car.

Count II should proceed with Count I. In the alternative, Plaintiffs request leave to amend to plead the force and injury facts expressly.

## VI. COUNT III — MALICIOUS PROSECUTION (§ 1983): SHE WROTE THE REPORT, FILED IT WITH THE CLERK MAGISTRATE, AND THE CHARGES WERE DISMISSED BECAUSE THE INFORMATION WAS MATERIALLY FALSE

The memorandum (Doc. 59, p. 12) argues that probable cause existed and that no allegation shows Trooper Sobrinho Silva initiated charges. *Meehan v. Town of Plymouth*, 167 F.3d 85, 89–

90 (1st Cir. 1999); *Goddard*, 629 F. Supp. 2d at 130. It adds state cases for the proposition that probable cause is "considerably less exacting" than proof of conviction. *Commonwealth v. O'Dell*, 292 Mass. 445, 451 (1984); *Commonwealth v. Levesque*, 436 Mass. 443, 447 (2002); *Commonwealth v. Santaliz*, 413 Mass. 238, 241 (1992).

Against Trooper Tobin, that argument had force — the Complaint attributes the false submissions to Trooper Sobrinho Silva, not to him. Against Trooper Sobrinho Silva, it fails on its own terms. She **is** the person who initiated the charges. She wrote the police report and filed it with the clerk magistrate. Under oath she confirmed she wrote the report. Ex. N, Transcript Pg 13, ll. 16–18. A Fourth Amendment malicious-prosecution claim requires that the defendant "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hernandez-Cuevas*, 723 F.3d at 100–101. Each element is pleaded against her:

**Caused a seizure pursuant to legal process.** She authored the report and the statement of facts, issued the citation, and submitted the false information to the RMV. Compl. §§ IV.C, IV.E–IV.F. The "caused" element that is missing against a backup officer is directly pleaded against the affiant. *Hernandez-Cuevas*, 723 F.3d at 96: it has "long been clearly established law that the Fourth Amendment prohibits a police officer from manufacturing probable cause by knowingly including false statements in a warrant affidavit."

**Unsupported by probable cause.** The blank citation. Ex. N, Transcript Pgs 38–39. The shifting speed figures. Ex. N, Transcript Pg 11; Ex. C. No independent record of any speed. Ex. N, Transcript Pg 29. The stop-location dispute, conceded against her own video still. Ex. N, Transcript Pg 16. *Franks v. Delaware*, 438 U.S. 154, 155–156, 171 (1978) supplies the structure: a false statement made knowingly and intentionally, or with reckless disregard for the truth, by

the affiant, and necessary to probable cause. Set the false speed figures aside and ask whether anything remains to support probable cause for the arrest: nothing does. The report's own ¶ 4 concedes Plaintiff White "did not physically resist," foreclosing any fallback resistance predicate.

**Terminated in Plaintiff's favor.** The October 22, 2025 Dudley dismissal. Compl. §§ IV.F, IV.I; Ex. B. Favorable termination requires only that the prosecution "ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 49 (2022). No showing of innocence is required. The dismissal satisfies this element.

**Malice.** She called Plaintiff White "an asshole" to Trooper Tobin. Ex. N, Transcript Pg 34, ll. 3–4. She told Trooper Tobin she "wanted to get him out and charge him with reckless [operation]" before re-approaching him. Ex. N, Transcript Pg 34, ll. 17–19. She briefed Trooper Tobin with "cutting people off, weaving in and out of traffic" — language she admits is not in the report. Ex. N, Transcript Pg 34, ll. 5–8; Ex. N, Transcript Pg 35, ll. 18–21. And she filed the RMV petition two days later, on the same day as his first public post. Ex. N, Transcript Pgs 39–41; Ex. N, Transcript Pg 50, ll. 2–10.

**Her own words to Trooper Tobin on the scene.** When Trooper Tobin arrived on the scene, Trooper Sobrinho Silva told him, in her own words: "I'm gonna get him out — he's being an asshole — but I kinda wanna take him on a reckless op." (BWC, Doc. 61, Ex. 1 — Trooper Tobin's arrival on scene. The substance is confirmed under oath: she admitted she referred to Plaintiff White as "an asshole" to Trooper Tobin, Ex. N, Transcript Pg 34, ll. 3–4, and that she told Trooper Tobin she "wanted to get him out and charge him with reckless [operation]," Ex. N, Transcript Pg 34, ll. 17–19.) Being an "asshole" is not a crime. "Kinda wanna" take someone on a reckless-operation charge is not probable cause — either a crime was committed or it was not,

and a stated desire to charge a man because of how he is acting is the opposite of probable cause. That is the malice this count requires, stated by the defendant herself, to her backup, before the arrest was made.

The memorandum's *Goddard* point is answered in Section IV.F, *supra*: dismissal alone does not prove lack of probable cause, but a judicial finding that the sole inculpatory fact was materially false is not "dismissal alone." And *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562–563 (2024), which assesses malicious prosecution charge by charge, helps Plaintiffs here: probable cause for one charge does not categorically defeat a claim on a baseless charge, and the baseless charges here — reckless operation, speeding, and the RMV Immediate Threat — caused the seizure and the year-long suspension. Count III states a claim against Trooper Sobrinho Silva.

## VII. COUNT IV — FOURTEENTH AMENDMENT DUE PROCESS (FABRICATION OF EVIDENCE): THE "NO CONVICTION" ARGUMENT PROVES TOO MUCH

The memorandum (Doc. 59, p. 13) makes a new argument Trooper Tobin did not make. It quotes a fabrication-of-evidence test — "(1) fabrication of inculpatory evidence that is (2) material / causal to the conviction and (3) deliberate deception" — from *Weichel v. Town of Braintree*, No. 1:20-CV-11456-IT, 2025 WL 1756871, at *6 (D. Mass. June 25, 2025), and then says: "First, and fatal to the claim, White was not convicted of any crime." Because probable cause existed for the citation and the sole criminal charge, it continues, Plaintiff White "has failed to meet the high burden of conscious shocking conduct that is required."

Plaintiffs answer each part.

**First, *Weichel* is a single district-judge decision, not binding on this Court.** It is a June 25, 2025 decision of Judge Talwani. Plaintiffs have not verified its full context or posture, and they

flag that here rather than pretend otherwise. A single District of Massachusetts decision does not displace First Circuit law.

**Second, the "no conviction" point proves too much.** If a fabrication claim required a conviction, no plaintiff whose charges were dismissed — the favorable outcome — could ever bring one. That would make *Thompson v. Clark*, 596 U.S. 36, 49 (2022), meaningless: favorable termination requires only that the prosecution "ended without a conviction." The Fourth Amendment claim is about a **seizure pursuant to legal process** without probable cause. *Hernandez-Cuevas*, 723 F.3d at 99–101. The deprivation is the seizure and the prosecution caused by the fabricated evidence, not only a conviction. *Limone*, 372 F.3d at 44–45 — the right not to be framed was clearly established in 1967. The Complaint pleads exactly that deprivation: an arrest, charges, months of liberty deprivation (GPS monitoring, curfews, travel restrictions, repeated court appearances), and a year-long license suspension, all caused by false information. Compl. §§ IV.C, IV.F–IV.I.

**Third, the materiality and causation elements are met on the Complaint's facts.** The false speed figures were the **sole** predicate for the stop, the arrest, the charges, and the RMV submission. Compl. §§ IV.B–IV.F, IV.I. Without them there was no probable cause for anything. The Dudley finding — materially false information — goes directly to materiality. And the deliberate-deception element is pleaded through the pattern the transcript confirms: the report's figures, the blank citation, the inflated briefing of Trooper Tobin with language not in the report, and the RMV submission two days after the stop. Ex. N, Transcript Pgs 34–36, 38–39, 41.

**Fourth, the framing point.** Count IV is pleaded as the fabrication and post-arrest continuation theory: the knowing use of fabricated evidence across criminal court, probation, parole, and the RMV, after body-worn camera footage and judicial findings showed it false. Compl. §§ IV.F,

IV.I. That is a due-process claim the Fourth Amendment does not swallow whole, and it is pleaded against Trooper Sobrinho Silva by name — she is the author of the fabricated evidence. The memorandum's *Graham*, 490 U.S. at 395, and *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality), point answers a free-standing "shocks the conscience" claim Plaintiffs do not make. Count IV states a claim.

---

## VIII. COUNT V — ADA, TITLE II (42 U.S.C. § 12132): A TRAINED, EXPERIENCED TROOPER WHO ESCALATED INSTEAD OF ACCOMMODATING

The memorandum (Doc. 59, pp. 13–15) argues that Title II does not apply to an officer's on-the-street responses, that there is no duty to engage in an interactive process during a traffic stop, and that nothing about Plaintiffs' disability was open and obvious. It cites *DeBoise v. Taser Int'l, Inc.*, 760 F.3d 892, 899 (8th Cir. 2014); *Bahl v. County of Ramsey*, 695 F.3d 778, 784–85 (8th Cir. 2012); *Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2009); *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000); *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014); *Roell v. Hamilton County*, 870 F.3d 471, 489 (6th Cir. 2017); *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1085 (11th Cir. 2007); *Gray v. Cummings*, 917 F.3d 1, 17–18 (1st Cir. 2019); and *Conlon v. Scaltreto*, 158 F.4th 211, 225–26 (1st Cir. 2025). It adds a new cite, *Montanez v. Price*, 154 F.4th 127, 148 (3d Cir. 2025), for the proposition that "the duty to accommodate is triggered when a disabled person's need for an accommodation becomes known, either because (1) he requests an accommodation or (2) his disability and concomitant need for an accommodation are open and obvious" — and then asserts: "Here, there is nothing open and obvious about Plaintiffs' alleged disability." Plaintiffs have not verified *Montanez* and flag that here.

**What the Complaint pleads.** Compl. § IV.D: "Plaintiffs are individuals with mental health disabilities protected under the ADA and Plaintiff Onyx White receive treatment through the Massachusetts Department of Mental Health. Defendants failed to accommodate these disabilities and escalated the encounter despite visible distress, causing panic attacks and acute psychological harm." Mental-health documentation from a licensed social worker is Complaint Exhibit I. The First Circuit's elements are: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000).

**Two limits, and the memorandum is wrong about the rest.**

*First limit — individual capacity.* Title II runs against "**public entities**," 42 U.S.C. § 12132, and several circuits hold there is no individual liability under Title II. *Walker v. Snyder*, 213 F.3d 344, 347 (7th Cir. 2000); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc); *Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009). The First Circuit has not decided it but "noted this emerging consensus in *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 290 (1st Cir. 2006)." Plaintiffs do not concede Count V against Trooper Sobrinho Silva **in her individual capacity**: whether individual liability lies under Title II is for the Court to decide, and Plaintiffs preserve the claim as pleaded. The Title II claim is also pleaded against the public-entity defendants in their official capacity — where the *United States v. Georgia*, 546 U.S. 151, 159 (2006), claim-by-claim analysis belongs, as briefed in the Doc. 32 opposition. Whether punitive damages are available under Title II is likewise for the Court to decide on *Barnes v. Gorman*, 536 U.S. 181 (2002).

*Second — amendment to plead the* Parker* elements.* Plaintiffs seek leave to amend Count V to plead, in so many words, what the disability is, how it limits a major life activity, what service or program was denied, what reasonable modification was requested or denied, and how any denial was "by reason of" disability — the *Parker* elements — if the facts support them. See Section XVI, *infra*.

*What the memorandum gets wrong.* **The memorandum's authorities do not decide this claim against Plaintiffs.** *Gray*, 917 F.3d at 7, 17–18 — the First Circuit "decide[d] the case on the narrowest available grounds," **assumed** Title II applied, and decided on deliberate-indifference grounds, declining to enter the circuit debate about when during an arrest Title II begins to apply. *Gray* did not hold Title II inapplicable to arrests, and it was a summary-judgment case, not a Rule 12(b)(6) case. *Conlon*, 158 F.4th at 225–26, affirmed dismissal on the facts of a fatal shooting; it does not hold that no accommodation is ever owed. And *Hainze* — the memorandum's lead authority — draws the very line the memorandum omits: "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents… prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze*, 207 F.3d at 801–02. **But at 802:** when the situation is "secure" and without "threat to human safety, [law enforcement officers are] under a duty to reasonably accommodate [an arrestee's] disability in handling and transporting him to a mental health facility." The ADA-relevant conduct here — the transport, the barracks detention, the hours-long holding — occurred **after** the scene was secured. The majority approach treats exigency as weighing in the reasonableness balance, not as a categorical bar. *Sheehan*, 743 F.3d at 1232 ("[c]ircumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment").

**The training point cuts for Plaintiffs, not against them.** Trooper Sobrinho Silva is a trained, experienced state trooper. She encounters people with mental-health conditions and various mental illnesses in the course of her work — that is the job. A trained officer should not be escalating situations and threatening people in crisis. The Complaint pleads that Defendants "escalated the encounter despite visible distress, causing panic attacks and acute psychological harm." Compl. § IV.D. Visible distress — panic attacks in the course of the encounter — is precisely the kind of open and obvious need that triggers the duty to accommodate under the very test the memorandum cites from *Montanez*: a disability and concomitant need for an accommodation that are "open and obvious." Whether the need was open and obvious, whether a reasonable modification (de-escalation, a supervisor, time and space, a mental-health response) was available, and whether Trooper Sobrinho Silva acted with deliberate indifference — knowledge that harm to a federally protected right was substantially likely, and a failure to act on that likelihood, *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138–39 (9th Cir. 2001) — are questions for amendment and discovery, not dismissal on a Complaint that pleads visible distress and escalation. Plaintiffs ask the Court to deny dismissal of Count V as to the entity defendants, to note the individual-capacity claim as preserved above, and to grant leave to amend to plead the *Parker* elements expressly.

**He was never given the chance to ask.** In the back of the car, after being placed in handcuffs, Plaintiff White was going through a mental health crisis. The officers should have recognized it — and their failure to note it in the report is part of the same disregard. He was never given any opportunity to state any type of request for reasonable accommodation, because he was immediately barraged with questions and escalations from the officers, especially Trooper Sobrinho Silva, from the start. A plaintiff who is going through a mental health crisis in

handcuffs while being interrogated has not 'failed to request' an accommodation — he was given no opportunity to request one. The need was open and obvious, and the escalation that denied him the chance is itself the violation.

## IX. COUNT VI — FIRST AMENDMENT RETALIATION AND RELIGIOUS DISCRIMINATION: THE TRANSPORT INTERROGATION AND THE RMV SUBMISSION

The memorandum (Doc. 59, pp. 15–17) makes three arguments. First, the religion conversation was "a conversation begun by White," and Plaintiff White "was neither interrogated nor discriminated against because of his religion" (Exhibit 1, 34:08–35:00), and in any event he "was already under arrest at the time of the conversation." Second, the social-media retaliation claim fails because the Complaint alleges "only a temporal connection" between the postings and the RMV filing, without facts about what the postings were or that Trooper Sobrinho Silva knew of them. *Gericke v. Flores*, 753 F.3d 1, 6 (1st Cir. 2014). Third, Plaintiff White "does not suggest that others who committed similar violations… were not subject to the same treatment," so under *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019), the retaliation claim fails. (The memorandum's final sentence says "Count IV should be dismissed" — a typographical error; it means Count VI.) Each argument is addressed in turn.

### A. The religion interrogation: pleaded, repeated, and on the body-worn camera — not in the transcript

The Complaint pleads: "During transport, Trooper Sobrinho Silva interrogated Plaintiff White about his religion, including questions about whether he was Christian or Catholic and if he goes to church. These inquiries were unrelated to any alleged offense and demonstrate religious discrimination in violation of the First Amendment." Compl. § IV.E. The body-worn camera footage of the inquiry is Complaint Exhibit F, and the transport conversation is on Trooper

Sobrinho Silva's body-worn camera, Doc. 61, Exhibit 1, at 34:08–35:00 — the timestamp the memorandum itself cites.

Plaintiffs state plainly what the record shows and what it does not. The January 8, 2026 transcript contains **zero** mentions of religion, Islam, Christianity, church, or a head wrap. The religion evidence is on the body-worn camera, not in the transcript, and Plaintiffs do not cite the transcript for it. What the body-worn camera shows, as Plaintiff White recounts it and as the Complaint pleads it, is this: during transport in the backseat of Trooper Sobrinho Silva's cruiser to the barracks, she repeatedly asked him whether he was Christian or Catholic and whether he goes to church — "Are you a Christian? Are you a Christian or a Catholic?" and "Do you have a church you go to and stuff?" (asked twice). He answered, while airing his grievances: "Am I a Christian? I'm a godly man, that [expletive] you did wasn't godly…" **His words must be read in context: he was actively having a panic attack and a mental-health breakdown at the time.** His statements during the transport are the words of a man in crisis, not a calm colloquy — and that context matters both for Count V and for how the Court reads his body-worn camera statements, including "I don't know if I was going that fast." As Plaintiff White recounts it, her questioning carried the implication that she would have shown him more mercy, been more favorable to him, or seen him in a better light if he were Christian or Catholic. He is Muslim, not Christian or Catholic, and the questioning after arrest was inappropriate.

The memorandum's answers fail. **"A conversation begun by White"** is a factual dispute: the Complaint says Trooper Sobrinho Silva **interrogated** Plaintiff White about his religion. Compl. § IV.E. Whether he began it is a question for the full recording, not for the memorandum's characterization — and at Rule 12(b)(6), the Court takes the Complaint's characterization. A video shows that a conversation happened; it does not by itself prove there was no interrogation

and no discrimination. **"He was already under arrest"** proves nothing: the Complaint does not allege the arrest was retaliation for the conversation. It alleges the religion interrogation was itself discriminatory — differential treatment because of religion, during custody, unrelated to any offense — and that the **RMV submission** was retaliation for his public speech. Those are two different adverse actions, and the memorandum conflates them. **"No adverse action because of the conversation"** ignores the Complaint's pleading: the interrogation itself, conducted by an armed officer against a handcuffed man in the back of her cruiser while he was having a panic attack, is the adverse treatment pleaded — and it was followed, two days later, by the RMV submission that suspended his license for a year.

**The false assurance.** During the same transport, Trooper Sobrinho Silva told Plaintiff White: "Onyx, you're not gonna go to jail, you're not gonna spend the night in jail." In fact he did go to jail. Had he not posted the $1,000 bail at midnight that day, he would have been arraigned and violated on both probations and automatically sent to Souza-Baranowski Correctional Center (maximum security), because he was on parole. Because he bailed out, no warrants were issued for his arrest, but he still faced consequences. That account is in his Verified Complaint, and the $1,000 bail figure is corroborated by his sworn testimony. Ex. N, Transcript Pg 49, ll. 16–17. The assurance — made to a man in crisis, in the back of her cruiser — and its falsity go to her credibility, to the coercive character of the transport, and to the harm pleaded in Counts III, IV, and IX.

**The barracks conduct.** The animus the Complaint pleads did not stop at the transport. At the barracks, Trooper Sobrinho Silva told the other troopers — her coworkers and supervisors, all state troopers — on her body-worn camera, which she had hung on a hanger and which was still recording: "This guy's R0, and because you're white he's gonna think you're racist, so just

letting you know right now, good luck asking him questions." "R0" is Massachusetts State Police slang for an "utter skell" — a completely disreputable person. Plaintiff White was handcuffed to a bench in the booking area, in another room, and did not hear her say it. Plaintiff Northcross — stranded, having taken the tow truck to the barracks — sat in the next room, the visitors' area behind a transparent glass/plastic window, and heard the other troopers talking about the case and about Plaintiff White in a foul way, about his criminal history, what they thought of it, and what they thought of him, laughing and making fun of him. His declaration, filed herewith upon signature, states what he personally heard — and states expressly that he did **not** personally hear Trooper Sobrinho Silva's remarks. The "R0" remark and the barracks conduct go to Counts VI and IX and to credibility: a trooper who labeled Plaintiff White a skell to her colleagues, preemptively framed him as someone who would call her racist, and warned them "good luck asking him questions," and whose colleagues then mocked his criminal history within his brother's hearing, is not a trooper whose account of a "short exchange" about religion should be taken at face value on a motion to dismiss.

### B. The retaliation claim is about the RMV submission — an administrative action, not an arrest — and *Nieves* does not govern it

The retaliation theory that matters is the **RMV Immediate Threat submission**: after Plaintiff White spoke publicly about the incident, Trooper Sobrinho Silva retaliated by submitting false information to the RMV, resulting in an indefinite driver's license suspension. Compl. § IV.E. A license suspension is an RMV administrative action, not an arrest; *Nieves* by its terms governs **arrest**, and *Hartman v. Moore*, 547 U.S. 250, 265–266 (2006), governs **prosecution**. The First Circuit recognizes retaliation via **regulatory and administrative** action, governed by the *Mt. Healthy* substantial/motivating-factor and same-decision framework — not by the *Nieves* no-probable-cause rule. *McCue v. Bradstreet*, 807 F.3d 334 (1st Cir. 2015); *Mt. Healthy City Sch.*

*Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The elements are protected conduct, an adverse action that would chill a person of ordinary firmness, and a causal connection. The Complaint pleads the sequence — public speech, then the RMV submission — and the falsity of the submission.

**The timing is not "temporal connection only" — and the transcript proves the coincidence.** Trooper Sobrinho Silva admitted under oath that she filed the Immediate Threat petition on April 11, 2025 — two days after the stop — and that she did **not** file it on the day of the arrest. Ex. N, Transcript Pg 39, ll. 22–25; Ex. N, Transcript Pg 41, ll. 5–17 (Ex. N, Transcript Pgs 39–41). Plaintiff White testified that his first social-media post was April 11, 2025, and that the post date "coincides with when the petition was filed for an immediate threat on your license." Ex. N, Transcript Pg 50, ll. 2–10. He testified that he posted "utilizing my First Amendment rights… I wanted the world to know she's a danger." Ex. N, Transcript Pg 49, ll. 20–25. And she admitted the petition's purpose was license suspension: "It eventually gets somebody's license suspended if you provide the proper documentation narrative." Ex. N, Transcript Pg 40, ll. 12–15. A driver she believed was an "immediate threat" on April 9 was left licensed for two more days, and the petition went in on the same day he first spoke publicly. That undercuts any claim that the suspension was an urgent safety response — and it supports the retaliation inference.

**What the transcript does not prove.** Trooper Sobrinho Silva does **not** admit she saw the posts before filing, and does not admit retaliatory motive: "Eventually I saw them, but I don't know what date that was." Ex. N, Transcript Pg 39, ll. 19–21. The opposition argues the same-day inference; it does not quote her as admitting it. And the memorandum's "temporal connection only" point is answered by amendment: **what** the postings said, **when** they occurred relative to the suspension, or **that Trooper Sobrinho Silva knew of them**. Those facts are essential to

causation and must be pleaded — by amendment, from Complaint Exhibit L (the social-media posts) and the transcript, if the facts support them. Plaintiffs seek leave to amend for that purpose. See Section XVI, *infra*. They do not invent those facts here.

**The comparator point fails for the same reason *Nieves* does not apply.** The memorandum argues Plaintiff White "does not suggest that others who committed similar violations… were not subject to the same treatment," invoking *Nieves*, 587 U.S. at 407. Doc. 59, p. 17. But the *Nieves* comparator framework governs retaliatory **arrest**. The RMV claim is a *McCue* administrative claim, so the comparator framework does not apply to it at all. In the alternative, even under *Nieves*, the *Gonzalez* exception is an **alternative** to pleading absence of probable cause, not a pleading requirement for every retaliation claim — and here absence of probable cause **is** pleaded through the falsity allegations. *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (per curiam). If the Court does apply *Nieves*, the objective evidence that the RMV typically does not seek immediate-threat suspension on this kind of predicate is a discovery and amendment point, not a pleading-stage defect. **"Legitimate law enforcement duties"** does not answer the claim either: the "objective facts known to Sobrinho Silva" the memorandum invokes are the report's speed figures — the very facts alleged false. If the Complaint's falsity allegations are true, the objective facts do not include a real 94 mph observation. And *Mann v. Cannon*, 731 F.2d 54, 62 (1st Cir. 1984) — that a false-arrest plaintiff "must show at minimum that the arresting officers acted without probable cause" — is satisfied on the Complaint's facts, for the reasons in Section IV, *supra*.

**Count VI states a claim against Trooper Sobrinho Silva, and Plaintiffs seek leave to amend to plead the retaliation causation facts expressly.**

---

## X. COUNT VII — MASSACHUSETTS CIVIL RIGHTS ACT (M.G.L. c. 12, §§ 11H–11I): THREATS AND COERCION USED TO COMPEL SUBMISSION TO AN UNLAWFUL ARREST

The memorandum (Doc. 59, pp. 18–19) argues that Plaintiffs plead no threats, intimidation, or coercion. *Longval v. Comm'r of Corr.*, 404 Mass. 325, 333 (1989); *Bally v. Northeastern Univ.*, 403 Mass. 713, 718 (1989); *Freeman v. Planning Bd. of W. Boylston*, 419 Mass. 548, 565 (1995); *Turkowitz v. Provincetown*, 914 F. Supp. 2d 62, 76 (D. Mass. 2012); *Barbosa v. Conlon*, 962 F. Supp. 2d 316, 332 (D. Mass. 2013); *Ciolino v. Eastman*, 128 F. Supp. 3d 366, 380 (D. Mass. 2015); *Mercurio v. Town of Sherborn*, 287 F. Supp. 3d 109, 123 (D. Mass. 2017); *Santiago v. Keyes*, 890 F. Supp. 2d 149, 155–56 (D. Mass. 2012); *Jakuttis v. Town of Dracut*, 95 F.4th 22, 35 (1st Cir. 2024).

The MCRA has a two-part structure. *Goddard*, 629 F. Supp. 2d at 128 (quoting *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994)): "'threat' means the 'intentional exertion of pressure to make another fearful or apprehensive of injury or harm'"; "'[i]ntimidation' means putting a person in fear for the purpose of compelling or deterring his or her conduct"; "'[c]oercion' means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do." "Overall, the MCRA contemplates a two-part sequence: (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do."

**Step one is pleaded.** Compl. § IV.C: Trooper Tobin "stood gripping his firearm in a threatening posture"; Trooper Sobrinho Silva and Trooper Tobin "forcibly opened Plaintiff White's door, removed him from the vehicle, handcuffed, and arrested him." Plaintiff Northcross "was questioned while being held on scene, threatened, and made to feel unsafe and not free to leave."

A firearm gripped in a "threatening posture" plus a forcible removal is, on its face, "intentional exertion of pressure to make another fearful or apprehensive of injury or harm." The memorandum's own authorities confirm the definition; the fight is over step two.

**Step two is pleaded, and it is not a right to resist arrest.** *Longval* and *Bally* hold that "A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion." *Longval*, 404 Mass. at 333. The further purpose here is pleaded from the Complaint's own facts: the threats and coercion were used to compel Plaintiff White to submit to an unlawful arrest — to exit his vehicle, submit to handcuffing, and give up his right to be free from unreasonable seizure and his freedom of movement — and to compel Plaintiff Northcross to remain on scene and refrain from leaving. That is not a right to resist arrest, which the memorandum's *Farrah v. Gondella*, 725 F. Supp. 2d 238, 248 (D. Mass. 2010), point would block. It is the right to be free from seizure and the right to freedom of movement, given up under threat of a gripped firearm and physical force.

**The memorandum's closest case must be distinguished, not ignored.** *Santiago*, 890 F. Supp. 2d at 155–56, 159, dismissed an MCRA claim at Rule 12(b)(6) where a passenger was wrongfully arrested on mistaken identity: "a plaintiff cannot rely on the same conduct to show both the right that was interfered with and the threats, coercion, or intimidation." Three distinctions matter. First, *Santiago* involved no firearm gripped in a threatening posture and no prolonged post-arrest detention — here the firearm threat and the hours-long holding of Plaintiff Northcross are **independent coercive conduct**, not merely the arrest itself. Second, *Santiago* did not involve a fabrication narrative: here the threats were used to compel submission to an arrest the Complaint alleges was built on knowingly false information, and the coercion continued for months through the RMV, probation, and parole. Third, the memorandum's other MCRA

authorities — *Barbosa*, *Ciolino*, *Mercurio* — all lost at **summary judgment**, not Rule 12(b)(6). *Mercurio*, 287 F. Supp. 3d at 123, held the MCRA claim failed "although the plaintiff here has adduced sufficient evidence to proceed to trial on a claim of excessive force" — a summary-judgment weighing of evidence, not a pleading-stage ruling. At the pleading stage, the Court takes the Complaint's facts as true.

**Qualified immunity tracks § 1983.** *Jakuttis*, 95 F.4th at 35 — the First Circuit applied the same qualified-immunity analysis to the MCRA claim as to the § 1983 claim where based on the same rights. If the Fourth Amendment right was clearly established and violated, the MCRA qualified-immunity defense falls with it. See Section XIV, *infra*. An individual officer is a "person" under the MCRA; the Commonwealth and its agencies are not. *Williams v. O'Brien*, 78 Mass. App. Ct. 169, 173 (2010). Count VII is pleaded against Trooper Sobrinho Silva individually, and it states a claim.

## XI. COUNT VIII — DEFAMATION AND FALSE LIGHT: THE MEMORANDUM DOES NOT MOVE ON IT

The memorandum lists Count VIII among the state-based claims in its Introduction (Doc. 59, p. 2: "through Counts VII, VIII, and IX, Plaintiff seek to utilize state-based claims") but contains **no argument section on Count VIII**. Plaintiffs note that expressly and ask the Court to deny any relief as to Count VIII, or to treat it as unopposed.

The false statements are pleaded against Trooper Sobrinho Silva by name — unlike Trooper Tobin, she **is** the alleged publisher. Compl. §§ IV.F, IV.I: her materially false information, found not credible by multiple judges after body-worn camera review; the institutional defendants' continued reliance on the false narrative. Compl. § IV.I, policy (d): "Allowing false police reports to be relied upon across multiple legal systems — criminal court, probation, parole, and

RMV — without independent verification." The report itself is Complaint Exhibit C, and the images of the Emmy Award and Edward R. Murrow Award — reputation and professional standing — are Complaint Exhibit K. The transcript confirms the inconsistencies between her accounts, which go to falsity and to her credibility, though it contains no new defamatory statement and no testimony about the contents of the RMV submission. Two notes: defamation and false light are intentional torts barred against a **public employer** by G.L. c. 258, § 10(c), but an **individual** employee sued in individual capacity is not protected by § 10(c) as such; and whether Plaintiffs ever made presentment under G.L. c. 258, § 4 is not established on this record — Plaintiffs do not assert a Massachusetts Tort Claims Act claim against Trooper Sobrinho Silva individually on the basis of presentment, and they flag the point rather than assume it. Count VIII should not be dismissed on a motion that does not address it.

**The "R0" remark is a second defamatory publication.** When Trooper Sobrinho Silva first arrived at the barracks, she hung her body-worn camera on a hanger — it was still recording — and told the other troopers in the office, her coworkers and supervisors: "This guy's R0, and because you're white he's gonna think you're racist, so just letting you know right now, good luck asking him questions." (Doc. 61, Ex. 1.) She said it to make Plaintiff White look bad to her fellow troopers. "R0" is Massachusetts State Police slang for an "utter skell" — a completely disreputable person, in plain terms a bum. That is slander, and it is something Plaintiff White is not. The remark was published to the other troopers on the body-worn camera, and it goes to Count VIII as well as to Counts VI and IX. Plaintiffs seek leave to amend to plead the barracks publication expressly. See Section XVI, *infra*.

## XII. COUNT IX — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS: NOT ONE ARREST — A COURSE OF CONDUCT

The memorandum (Doc. 59, pp. 19–20) argues that Trooper Sobrinho Silva's conduct was not extreme and outrageous, citing *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144 (1976) (by name), *Caputo v. Boston Edison Co.*, 924 F.2d 11, 14 (1st Cir. 1991), *Miller v. Pugliese*, 693 F. Supp. 3d 163, 184 (D. Mass. 2023), and *Sietins v. Joseph*, 238 F. Supp. 2d 366, 379 (D. Mass. 2003). It adds: "there is no allegation at all that Sobrinho Silva ever came in physical contact with Northcross."

The memorandum's core error is the same one that runs through its Count I and Count VI arguments: it treats the case as if the only conduct at issue were the roadside arrest. It was not. The Complaint pleads a **course of conduct**, and the memorandum's "no coercion, no threat" argument is contradicted by the Complaint's own words.

**The elements.** *Agis*, 371 Mass. at 144–45: (1) the defendant intended to inflict emotional distress or knew or should have known the conduct would cause it; (2) the conduct was "extreme and outrageous"; (3) the conduct caused distress; (4) the distress was severe. "Extreme and outrageous" means conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d, adopted in *Agis*. The inquiry is fact-bound, which favors surviving Rule 12(b)(6) where the complaint pleads the fabrication narrative with specificity.

**The course of conduct pleaded.** Plaintiff White was intimidated and threatened — not just by the arrest, but by everything that followed from it, all of it set in motion by Trooper Sobrinho Silva's false information:

**The arrest itself**, carried out by an armed trooper who approached in a hostile and aggressive manner, forcibly opened his door, removed him from his vehicle, handcuffed him, and arrested him without lawful justification, while another trooper gripped his firearm in a threatening posture. Compl. §§ IV.B–IV.C. Plaintiff White testified he was "treated like a dog," that he "felt afraid for my life, with this woman screaming with a gun." Ex. N, Transcript Pg 47, ll. 14–22.

**The lies to the RMV** — the Immediate Threat submission that suspended his license for a year, filed two days after the stop on the same day he first spoke publicly. Compl. § IV.E. The license was his livelihood: the suspension cost him a paid-for CDL preparation path, mental-health employment requiring a valid license, and the ability to visit and assist close family members. Compl. § IV.G.

**The lies to probation** — probation violation proceedings initiated and knowingly continued on the false narrative, with GPS monitoring, curfews, and travel restrictions for months. Compl. §§ IV.F, IV.G, IV.I.

**The lies to parole** — parole violation proceedings on the same false predicate, with a parole hearing on Thursday, April 17, 2025, at 11:00 a.m., a guilty finding, a GPS bracelet, and a 10:00 p.m. curfew, and a monitor worn for months. Compl. § IV.G.

**All of it came out to be lies.** The Dudley District Court found materially false information. Multiple judges found her testimony not credible after reviewing body-worn camera footage. Compl. §§ IV.F, IV.I. That was her threatening him — and her using the RMV, probation, and parole against him. The threat was not a single shouted word at the roadside. It was a year of liberty deprivation, imposed through institutions, on a record she knew was false.

**The fabrication doctrine supports this count.** *Limone v. United States*, 579 F.3d 79, 91 (1st Cir. 2009) — the First Circuit **affirmed** IIED liability where FBI agents framed four men for

murder, suppressed exculpatory intelligence, and covered it up. At 91, quoting *Agis*: an individual is liable for IIED when he, "by extreme and outrageous conduct and without privilege, causes severe emotional distress to another." *Limone* proves that fabrication and cover-up can be extreme and outrageous as a matter of Massachusetts law. *Limone* was a bench-trial record after a 22-day trial, on decades-long wrongful incarceration — far stronger facts than a roadside stop. It proves the doctrine permits the claim, not that this Complaint pleads it. This Complaint pleads it through the fabrication narrative: a knowingly false report, an arrest, a prosecution, months of liberty deprivation, and a judicial finding that the information was materially false. And *Gill v. United States*, 588 F. Supp. 3d 134, 139 (D. Mass. 2022), holds that "[a]n officer's actions may be [deemed extreme and outrageous] if he uses excessive force" and that "[a]ctions by law enforcement officers that are objectively unreasonable under the Fourth Amendment… may be [extreme and outrageous]."

**The memorandum's authorities do not defeat the claim at the pleading stage.** *Caputo*, 924 F.2d at 14, was a **summary-judgment affirmance** on injury and causation after years of discovery — not a Rule 12(b)(6) gatekeeping case. *Miller*, 693 F. Supp. 3d at 184, holds that unprovoked punches to the head and back are "**not necessarily** extreme and outrageous." "Not necessarily" is not "never" — it is a fact-specific holding, and it does not address fabrication-based IIED. *Sietins*, 238 F. Supp. 2d at 379 — where officers "'merely carr[y] out their obligations as law enforcement officials[,]…' their conduct 'as a matter of law cannot be deemed extreme and outrageous'" — was summary judgment, and the officers there had probable cause based on credible complainant information. It is distinguishable if probable cause collapses on the falsity allegations, as pleaded here.

**The "no physical contact with Northcross" point is not a defense.** IIED does not require physical contact. The distress pleaded for Plaintiff Northcross is specific: "Severe emotional distress, fear, and anxiety," "Physical manifestations of stress," "Trauma from witnessing the unlawful arrest and mistreatment of his brother," "Ongoing psychological harm." Compl. § IV.H. The fabrication narrative is the conduct, not the touching — and Plaintiff Northcross's own declaration, filed herewith upon signature, adds what he personally heard at the barracks: the other troopers talking about his brother's criminal history, laughing and making fun of him, after Trooper Sobrinho Silva had labeled him an "R0" to them. The severity pleaded for Plaintiff White is equally specific: "Severe anxiety, panic attacks, PTSD symptoms, night terrors," asthma complications, hair loss, skin breakouts, physical pain. Compl. § IV.G. Count IX states a claim against Trooper Sobrinho Silva — and it is stronger against her than against any other defendant, because she is the alleged author of the false report on which the entire course of conduct rests.

## XIII. COUNT X — EIGHTH AMENDMENT (CRUEL AND UNUSUAL PUNISHMENT): PLAINTIFFS PRESERVE THE CLAIM AND SEEK THE FOURTEENTH AMENDMENT REFRAME IN THE ALTERNATIVE

The memorandum (Doc. 59, p. 20) argues that "[s]ince none of the conduct White complains of occurred post-conviction, the Eighth Amendment does not apply," citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991), and *Gonzalez-Mercado v. Municipality of Guaynabo*, 206 F. Supp. 2d 257, 260–61 (D.P.R. 2002).

**Plaintiffs do not concede the label.** The memorandum's authorities hold the Eighth Amendment "prohibits the infliction of cruel and unusual punishments on those convicted of crimes," *Wilson*, 501 U.S. at 296–97, and that "[t]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law," *Ingraham v. Wright*, 430 U.S. 651, 671 n.40

(1977). *Martinez-Rivera v. Ramos*, 498 F.3d 3, 9 (1st Cir. 2007), held that "[b]ecause there had been no formal adjudication of guilt against [plaintiffs] at the time of the alleged constitutional deprivation, the Eighth Amendment is inapplicable and any claim brought on that theory was properly dismissed." Whether that line of authority defeats Count X as labeled is for the Court to decide. Plaintiff White was not convicted, and Plaintiffs preserve Count X as pleaded. Count X is not pleaded on conviction alone: it is pleaded on the full course of punishment the fabrication set in motion. In the alternative, Plaintiffs seek the Fourteenth Amendment reframe below.

**The substance survives under the Fourteenth Amendment.** "Under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535, 538–39 (1979). The test is whether there was express intent to punish, or whether the condition or restriction is "reasonably related to a legitimate governmental objective" versus "arbitrary or purposeless" — in which case a court "may permissibly infer that the purpose of the governmental action is punishment." *Id.* A pretrial detainee's excessive-force claim needs only objectively unreasonable force, judged from the perspective of a reasonable officer on the scene. *Kingsley*, 576 U.S. at 397. And the Fourth Amendment governs pretrial detention without probable cause after legal process begins. *Manuel v. City of Joliet*, 580 U.S. 357 (2017). Plaintiffs ask the Court for leave to amend Count X's label to the Fourteenth Amendment, under Federal Rule of Civil Procedure 15(a)(2) ("The court should freely give leave when justice so requires") — the reframe the Complaint's facts support: the post-arrest pretrial detention, the $1,000 bail, the months of GPS monitoring, curfews, and travel restrictions, and the year-long license suspension imposed without a lawful predicate. That punishment was foreseeable to the officer who fabricated its predicate, and it is still standing: the suspension and the record it created continue to injure Plaintiff White — including in the

insurance market, where Allstate declined him outright on that record (Doc. 32 opposition, Ex. G). Plaintiffs seek leave to amend to plead any further bail or conditions facts the record supports. Plaintiff White's position is that the $1,000 bail was excessive for a falsified traffic violation — bail imposed on a charge that rested on materially false information. In the alternative, Plaintiffs ask that Count X's facts be folded into Counts I, II, and IV, and that any dismissal of Count X as labeled be without prejudice.

---

## XIV. QUALIFIED IMMUNITY: PROBABLE-CAUSE-DEPENDENT, AND IT FAILS WITH PROBABLE CAUSE

Trooper Sobrinho Silva invokes qualified immunity (Doc. 59, pp. 2, 10–11, 19), but — unlike the memorandum's structure — her argument is entirely probable-cause-dependent: she "is entitled to qualified immunity… as both the citation she issued White and the arrest she made of White were based on probable cause." Doc. 59, p. 2. There is no standalone prong-two, clearly-established analysis in the memorandum. Qualified immunity is decidable at Rule 12(b)(6), but only on the plaintiff's facts. *Glik*, 655 F.3d at 79–81 (affirming denial of a Rule 12(b)(6) qualified-immunity motion). The two prongs are: (1) violation of a constitutional right; and (2) the right clearly established at the time, in a particularized sense. *Harlow*, 457 U.S. at 818; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (either prong first). The defendant must plead qualified immunity, *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); once raised, the plaintiff bears the burden on clearly-established law. *McGrath v. Tavares*, 757 F.3d 20, 29 (1st Cir. 2014).

**Prong one is pleaded, count by count, in Sections IV through XIII above.** The violation alleged is not a close call on the Complaint's facts: a stop and arrest without probable cause, built on speed figures the Complaint alleges were fabricated and that the defendant's own sworn

testimony contradicts; a prosecution initiated on a report the Dudley District Court found materially false; a license suspension imposed on the same false predicate; and a course of conduct — RMV, probation, parole — that continued after body-worn camera footage and judicial findings showed the predicate false.

**Prong two is clearly established.** It has "long been clearly established law that the Fourth Amendment prohibits a police officer from manufacturing probable cause by knowingly including false statements in a warrant affidavit." *Hernandez-Cuevas*, 723 F.3d at 96 — decided on a motion-to-dismiss / qualified-immunity posture, affirming denial of qualified immunity. "The right not to be framed by law enforcement agents was clearly established in 1967." *Limone*, 372 F.3d at 44–45. *Glik*, 655 F.3d at 79, 88 — arrest without probable cause violates clearly established Fourth Amendment rights, qualified immunity denied at Rule 12(b)(6). For the force points, *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 51, 55 (1st Cir. 2005), and *Mlodzinski*, 648 F.3d at 35–37 (gun display against a non-threatening person), supply the clearly-established law, subject to the factual distinctions noted in Section V, *supra*. Qualified immunity is objective — subjective malice is irrelevant to the defense, *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) — but intent **is** an element of the underlying claims (retaliation, *Franks* false statements, fabrication) and must be proved as part of prong one. *Id.* at 593–594. And qualified immunity cannot be resolved on disputed facts. *Mlodzinski*, 648 F.3d at 32; *Johnson v. Jones*, 515 U.S. 304, 313–314 (1995). The disputed facts here — whether there was a 94 mph observation at all, whether the citation recorded it, whether the stop location was as she claims — are the case.

**Arguable probable cause does not save her.** "For [officers] to establish qualified immunity, they need not show that they had actual probable cause, but rather merely that 'the presence of probable cause [was] at least arguable' at the time they arrested [plaintiff]." *Rivera*, 979 F.2d at

263. But "qualified immunity does not attach where the absence of probable cause is not 'arguable or subject to legitimate question.'" *Wilber*, 872 F.3d at 21. And arguable probable cause still fails where "there clearly was no probable cause at the time the arrest was made." *Topp*, 994 F.2d at 48. On the Complaint's facts — no speed recorded on the citation, a report contradicted by body-worn camera footage, and judicial findings that the trooper's testimony was not credible — the absence of probable cause was not "arguable." Qualified immunity does not defeat this motion.

## XV. THE BODY-WORN CAMERA AND THE TRANSCRIPT: WHAT THE COURT SHOULD — AND SHOULD NOT — DO WITH THEM

**The body-worn camera.** The memorandum asks the Court to consider Trooper Sobrinho Silva's body-worn camera video (Doc. 61, Exhibit 1) at the pleading stage. Doc. 59, pp. 2–3. Plaintiffs ask the Court to do three things. First, the complete video is already in the record — Doc. 61, Exhibit 1, already filed electronically. The Court should consider the complete video as submitted, not the two-to-three-second excerpts the memorandum cites. The memorandum cites timestamps (2:23–2:48; 00:40–00:42; 02:26–02:29; 09:33–11:00; 11:10–11:34; 34:08–35:00) as if each excerpt settled the fact it is cited for. An excerpt cannot settle what happened before or after it. Second, note what the video **cannot** show: speed is not visible on body-worn camera; the audio is silent for the first 30 seconds, Ex. N, Transcript Pg 18, ll. 13–15, so the video cannot show the horn and sirens Trooper Sobrinho Silva claims she used, or the initial stop; and there is no cruiser-mounted camera at all, Ex. N, Transcript Pg 18, ll. 18–19. Third, in the alternative, if the Court is inclined to weigh the video against the Complaint, convert the motion under Rule 12(d), with notice and a reasonable opportunity for Plaintiffs to present all pertinent material.

The video does not "incontrovertibly" resolve the disputed facts. The January 8, 2026 transcript records the **same video** being characterized differently by Trooper Sobrinho Silva and by defense counsel on the record, with the judge reserving judgment: Judge Hillman said he would make his own credibility determination from the video and declined to adopt another judge's assessment. Ex. N, Transcript Pg 42, l. 21 – Transcript Pg 43, l. 16. Where video is ambiguous or open to multiple interpretations, the Complaint governs at Rule 12(b)(6) and the dispute goes to summary judgment. *Scott*, 550 U.S. at 380, is a summary-judgment case on a full record, requiring a **"blatant"** contradiction. A two-second clip of a hand on a shoulder, or a still photograph, does not blatantly contradict the Complaint's account of the stop, the arrest, and the months of proceedings that followed.

**The transcript.** Plaintiffs cite the transcript of Trooper Sobrinho Silva's sworn testimony of January 8, 2026, in Dudley District Court, No. 2564CR000979 — a civil-infraction bench trial on the three remaining civil motor-vehicle infractions after the October 22, 2025 dismissal of the criminal reckless-operation charge for materially false information. The matter was taken under advisement; no decision appears in the transcript. Plaintiffs attach **only the cited pages** as Exhibit N — not the whole transcript — and cite it herein as 'Ex. N, Transcript Pg __,' for what it is: sworn testimony, usable to show what Trooper Sobrinho Silva has said under oath and where it conflicts with her report, her citation, and her own video. It is impeachment and credibility material, and support for the Complaint's allegations at the pleading stage. Plaintiffs do **not** cite the transcript as the source of the October 22, 2025 falsity finding — that finding is established by the dismissal order itself, Complaint Exhibit B, and is stated on the transcript record only through counsel's statements and the Commonwealth's confirmation. Ex. N, Transcript Pg 4, ll. 19–23; Ex. N, Transcript Pg 6, ll. 2–6. And Plaintiffs do not use Plaintiff

White's testimony as if it were Trooper Sobrinho Silva's: where this opposition relies on his testimony, it is labeled as his account.

Plaintiffs request Rule 12(d) treatment to the extent the Court considers the transcript pages, for the reasons in Section II, *supra*. The Complaint's allegations independently state the claims in this opposition; the transcript corroborates them and contradicts the memorandum. The motion cannot be granted on the memorandum's version of the facts while the defendant's own sworn testimony says otherwise.

## XVI. IF THE COURT FINDS ANY GAP, THE REMEDY IS LEAVE TO AMEND — NOT DISMISSAL

Plaintiffs ask the Court to deny the motion. In the alternative, they request leave to amend the Complaint under Federal Rule of Civil Procedure 15(a)(2): "The court should freely give leave when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962). A Rule 12(b)(6) dismissal is ordinarily without prejudice with leave to amend, unless amendment would be futile. The memorandum's own motion asks only to "dismiss all claims asserted against her in the Complaint." Doc. 58, p. 1. It does **not** ask for dismissal with prejudice, and it does not ask for costs. The memorandum's conclusion text is not on file — Doc. 59, p. 20 ends at the "V. CONCLUSION AND REQUESTED RELIEF" heading — so Plaintiffs do not attribute any further relief request to Trooper Sobrinho Silva. If the Court finds any gap in the Complaint as pleaded, Plaintiffs identify the amendments they seek:

**A signed First Amended Complaint under Rule 15(a)(1)(B)**, signed by both Plaintiffs, with Plaintiff Northcross signing the § 1746 verification, re-pleading all claims — the Rule 11 cure described in Section III.B, *supra*. The 21-day window runs to December 13, 2026.

**Count X reframe** to the Fourteenth Amendment (*Bell v. Wolfish*), Section XIII, *supra*.

**ADA *Parker* elements** — the disability, the major life activity, the service or program denied, the reasonable modification requested or denied, and the "by reason of" link — if the facts support them, Section VIII, *supra*.

**Retaliation causation facts** — what the social-media postings said, when they occurred, and Trooper Sobrinho Silva's knowledge of them — from Complaint Exhibit L and the transcript, if the facts support them, Section IX.B, *supra*.

**Force facts** — the seatbelt, the fidgeting as if about to shoot, and the booking contact — as body-worn-camera-supported context for Count II, Sections V, *supra*.

**Barracks conduct** — the "R0" remark and the officers' discussion of Plaintiff White's criminal history — as context for Counts VI and IX, Sections IX.A and XII, *supra*.

Plaintiffs will not invent any fact for the amendment. Each amendment will plead only facts Plaintiffs can verify. Any dismissal should be without prejudice, and no costs should be awarded.

---

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court:

**Deny** Defendant Yasmin Sobrinho Silva's Motion to Dismiss (Doc. 58) in full;

In the alternative, **grant Plaintiffs leave to amend** the Complaint under Federal Rule of Civil Procedure 15(a)(2), including by a signed First Amended Complaint under Rule 15(a)(1)(B);

In the further alternative, order that any dismissal be **without prejudice** and without costs; and

Grant such other and further relief as the Court deems just.

Plaintiffs are pro se. They ask the Court to read their Complaint as the law requires — liberally, in their favor, on the facts they pleaded under oath — and to hold the memorandum to the record: to the Complaint as written, to the citation as it was actually issued, to the body-worn

camera as it actually shows, and to Trooper Sobrinho Silva's own sworn testimony. On that record, the motion should be denied.

Respectfully submitted,

---

Onyx White, *pro se* 50 Causeway Street, Apt. 708 Boston, MA 02114 ogtlwhite3@gmail.com

857-247-9359 Date: ~~December~~ 7, 2026 11-24-26

---

Sincere Northcross, *pro se* Address: 857-995-3437 Telephone:

Northcross728@gmail Email: 11/24/26 Date:

---

## CERTIFICATE OF SERVICE

I, Onyx White, hereby certify that on December 7, 2026, I served a copy of the foregoing Plaintiffs' Opposition to Defendant Yasmin Sobrinho Silva's Motion to Dismiss (Doc. 58), and the exhibits listed below, on all counsel of record by means of electronic filing via the Electronic Case Filing (ECF) system, and on any party not registered for ECF by first-class U.S. Mail, postage prepaid.

---

Onyx White, *pro se*

---

## EXHIBIT LIST — EXHIBITS TO THIS OPPOSITION

**Already in the record (Complaint Exhibits A–M, Doc. 1):** Ex. A (body-worn camera footage); Ex. B (Dudley dismissal order, Oct. 22, 2025); Ex. C (police report and statement of facts); Ex.